# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BOARD OF TRUSTEES OF THE AFTRA RETIREMENT FUND, in its capacity as a fiduciary of the AFTRA Retirement Fund, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>JPMORGAN CHASE BANK, N.A.,<br><br>     Defendant. | Civil Action No. 09-00686 (SAS) (DF)<br><br>ECF Case<br><br>JURY TRIAL DEMANDED |

## AMENDED CLASS ACTION COMPLAINT

The Board of Trustees of the AFTRA Retirement Fund (the "Board" or "Plaintiff"), in its capacity as a fiduciary of AFTRA Retirement Fund (the "AFTRA Plan") files this Class Action Complaint against Defendant JPMorgan Chase Bank, N.A. ("JPMorgan" or "Defendant") and alleges as follows:[1]

## I.     SUMMARY OF THE ACTION

1.      Plaintiff brings this action on behalf of the Class (as that term is defined below), which consists of all plans under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that were participants in Defendant's securities lending program and that incurred losses, directly or through one or more of the collective investment vehicles managed by Defendant or its affiliates, relating to Defendant's investments in medium-term notes of Sigma Finance, Inc. Through this action, Plaintiff seeks to recover such losses on behalf of the AFTRA Plan and on behalf of all members of the Class ("Class Members" or the "ERISA Plans").

2.      Each Class Member, including the AFTRA Plan, was a party to a substantially similar securities lending agreement with JP Morgan (each a "Securities Lending Agreement"). Pursuant to these Securities Lending Agreements, Defendant loaned securities owned by Class Members to third-party borrowers in return for cash collateral. Defendant then invested, at its sole discretion, the cash collateral in an effort to earn an investment return on the cash collateral in excess of the rebate paid to the third-party borrowers. In return, Defendant received, as compensation, a percentage of

---

[1] Plaintiff's allegations are based upon information and belief, except as to those allegations concerning Plaintiff, which are based upon personal knowledge.

the revenues generated for each Class Member. Defendant referred to these activities as its "Securities Lending Program."

3.    At all times relevant hereto, Defendant was a "fiduciary" of the AFTRA Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that it exercised discretionary authority and/or control with respect to the management and/or disposition of the AFTRA Plan's assets.

4.    As a fiduciary, Defendant was required by § 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)( 1), to discharge its obligations with respect to Class Members (a) solely in the interest of Class Members, (b) for the exclusive purpose of providing benefits to Class Members, (c) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (d) in accordance with all applicable documents and instruments. *See* ERISA § 404(a), 29 U.S.C. §1104(a).

5.    These fiduciary duties are commonly referred to as the duties of loyalty, exclusive purpose and prudence. They are the highest known to the law.

6.    Further, because the funds invested for Class Members consisted of collateral that must be returned to borrowers upon repayment of the underlying securities loans, each of the Securities Lending Agreements required Defendant to, *inter alia*, (a) safeguard principal, (b) maintain adequate liquidity, and (c) discharge its duties with respect to the investment of the collateral with the care, skill, prudence, and diligence..

7.    Despite these objectives and duties, Defendant invested and lost a substantial portion of the cash collateral provided to Class Members in medium-term notes ("MTNs") issued by Sigma Finance, Inc. ("SFI"). SFI is a Delaware corporation organized for the sole purpose of issuing debt securities for its Cayman Islands parent company, Sigma Finance Corporation ("Sigma"). The debt securities – in this case MTNs – were secured only by a "floating lien" on the assets of Sigma, which was subject to subordination to the lien interests of Sigma's other creditors.

8.    Shortly after Defendant purchased a substantial amount of Sigma MTNs using the cash collateral held by Class Members, analysts following Sigma and other structured investment vehicles ("SIVs") like Sigma warned that the lack of liquidity in the credit market and sharp declines in the market value of assets backing many SIVs threatened their viability.

9.    At least by December 2007, analysts predicted that Sigma would not be able to repay the MTNs Defendant purchased with Class Members' collateral upon maturity. However, Defendant wholly ignored these reports and continued to hold these rapidly declining investments.

10.    The news continued to worsen for Sigma in January 2008 and the months that followed. Still, Defendant buried its head in the sand and refused to heed the warning signs.

11.    The analyst predictions proved true as Sigma's creditors seized over $25 billion of its approximately $27 billion of assets in late September and early October 2008, leaving approximately $1.9 billion as security for approximately $6.2 billion of

outstanding MTNs and other secured debt.  By October 6, 2008, Sigma was in receivership.

12.    Further, JP Morgan's involvement with Sigma MTNs was not limited to its investments on behalf of the AFTRA Plan.  Rather, while JP Morgan was investing the AFTRA Plan's money in Sigma MTNs, JP Morgan also earned substantial fees and interest through providing short term repurchase (repo) financing for Sigma. Accordingly: (a) JP Morgan's financial interest as Sigma's repo financier was in direct conflict with its fiduciary responsibility to the AFTRA Plan; and (b) JP Morgan was clearly in a position to know of Sigma's problems.  Further, money market funds managed by JP Morgan also held Sigma MTNs.  Rather than protect the assets of the AFTRA Plan and the Class, JP Morgan supported Sigma with repo financing, then pulled the plug on this financing after its own money market mutual funds received their final payments on their Sigma MTN holdings.

13.    Defendant's actions vis-à-vis Plaintiff and members of the Class constitutes a breach of Defendant's fiduciary duties owed to the Plan and breach of Defendant's obligations under ERISA and the Securities Lending Agreements.  As a direct result of Defendant's fiduciary breaches, the AFTRA Plan and the other Class Members suffered significant losses.

14.    ERISA §§ 409 and 502 authorize ERISA plan fiduciaries, such as the Board, to sue for losses suffered by their plans as a result of breaches of fiduciary duty, for the purpose of obtaining relief on behalf their plans.

15.    Accordingly, this is a proposed class action under Fed. R. Civ. P. 23 on behalf of all ERISA plans that were parties to Securities Lending Agreements with JP Morgan and suffered losses due to JP Morgan's breach of its fiduciary duties under ERISA during the Class Period.  Plaintiff brings this action on own behalf of the AFTRA Plan and on behalf of similarly situated ERISA plans throughout the country that were subject to, and affected by, JP Morgan's conduct in the same manner and with the same debilitating effect.   Plaintiff alleges that JP Morgan, having undertaken a fiduciary role with respect to the AFTRA Plan and members of the Class, breached its duties of prudence, loyalty, and exclusive purpose under ERISA §404(a) as described herein.

16.    Plaintiff seeks losses to these plans for which JP Morgan is liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from JP Morgan, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

## II.    PARTIES

17.    The Board is the administrator and a named fiduciary of the AFTRA Plan.  The AFTRA Plan was founded in 1954 as the result of negotiations between the American Federation of Television and Radio Artists ("AFTRA") and contributing employers in the broadcasting industry.  The AFTRA Plan's exclusive purpose is to provide retirement benefits to eligible members of AFTRA.  AFTRA is a national labor union representing over 70,000 performers, journalists and other artists working in the

entertainment and news media.    The AFTRA Plan's address is 261 Madison Avenue, New York, New York 10016.

18.    Defendant JPMorgan Chase Bank, N.A. is a national banking association organized and existing under the laws of the United States.  Defendant's principal place of business is located at 270 Park Avenue, New York, New York 10017-2070. Defendant is the securities lending agent for the AFTRA Plan and all Class Members.

### III.    JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

20.    Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the AFTRA Plan is administered in this district, Defendant resides or may be found in this district and/or the alleged breach occurred in this district.

### IV.    FACTS

#### A.    Defendant's Securities Lending Agreements

21.    Pursuant to a Securities Lending Agreement with the AFTRA Plan and pursuant to substantially similar Securities Lending Agreements with the other Class Members, Defendant loaned securities held by the AFTRA Plan and Class Members to third-party borrowers—typically, those seeking to short sell the securities.  According to the Securities Lending section of JPMorgan's website, the stated purpose for its Securities Lending Program is to "obtain an attractive return while minimizing risk."  *See* http://www.jpmorgan.com/tss/General/Securities_Lending/1114735415127 (accessed on January 19, 2009).

22.     Pursuant to the Securities Lending Agreements, in return for the loaned securities, the AFTRA Plan and Class Members received from the borrowers cash collateral in an amount exceeding the market value of the loaned securities.

23.     Defendant then commingled this cash collateral in one or more collective investment vehicles that they created and maintained and for which they served as the investment manager. For example, the AFTRA Plan's cash collateral received from JP Morgan's lending of its shares was invested in the Securities Lending Collateral Fund, which was also commonly referred to as the "CashCo Fund."

24.     Through these collective investment vehicles, Defendant invested the cash collateral received by the AFTRA Plan and other Class Members in the Securities Lending Program.

25.     The AFTRA Plan and other Class Members were to receive a pro rata share of revenues earned by the collective investment vehicles in which their cash collateral was invested, less the expenses and fees taken by Defendant and the rebate paid to the borrowers of the Class Members' securities.

26.     Defendant received, as compensation for its services, a percentage of the net revenues generated through the Securities Lending Program for each Class Member.

**B.     Objectives and Guidelines for Investment of Collateral**

27.     In addition to its general duties of prudence, care and loyalty under ERISA § 404(a), because Defendant invested cash collateral -- essentially borrowed money -- that had to be returned to the borrowers of the securities upon return of those securities, Defendant was contractually required to invest the cash collateral conservatively and

8

prudently, consistent with the principal objective of the Securities Lending Agreements of safeguarding principal. *See, e.g.,* AFTRA Securities Lending Agmt., § 5(e), attached hereto as Exhibit A.

28.     In particular, the Securities Lending Agreements required Defendant to follow certain guidelines and/or policies in the investment of the cash collateral (the "Investment Guidelines").

29.     The Investment Guidelines define the CashCo. Fund as a short term, fixed income fund. Fixed income funds are typically regarded by investors as safe -- generally, a way to generate a modest return with limited risk and the preservation of capital. Investors typically regard fixed income funds as being dependable because they limit the level of risk while preserving capital. Typical investments for a fixed income fund include shorter-term, higher-quality debt instruments that tend to have less risk, such as bonds, certificates of deposit and U.S. Treasury securities. As such, the Investment Guidelines for the CashCo Fund limited JP Morgan's investments to only instruments that were highly rated by rating agencies.

30.     Accordingly, consistent with Defendant's duties under ERISA and the Investment Guidelines, the key objectives for the management of the cash collateral were to: (a) safeguard principal; (b) maintain a diversified portfolio of investments and adequate liquidity; and (c) consistent with these objectives, to optimize the spread between the collateral earnings and the rebate paid to the borrowers of securities.

**C.**    **Defendant's Fiduciary Status**

31.    Defendant expressly acknowledged its obligation to manage the Securities Lending Program, including the investment of the cash collateral, as fiduciaries in accordance with the ERISA standard. *See* AFTRA Securities Lending Agmt., §§ 2(a), 3(d); AFTRA Plan Global Custody Agreement, § 7.1(a).

32.    Further, ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1) but also any other persons who act in fact as fiduciaries, *i.e.,* performed fiduciary functions.    ERISA § 3(21)(A)(i), 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ." During the relevant time period, Defendant performed fiduciary functions under this standard and thereby also acted as a fiduciary under ERISA.

33.    Defendant was a fiduciary with respect to its discretionary functions under the Securities Lending Agreements.

34.    As a fiduciary, Defendant was required by § 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)( 1), to discharge its obligations with respect to Class Members (a) solely in the interest of Class Members, (b) for the exclusive purpose of providing benefits to Class Members, (c) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with

like aims, and (d) in accordance with the documents and instruments governing its contract with Class Members. *See* ERISA § 404(a), 29 U.S.C. §1104(a).

### D.    Defendant's Investment of Cash Collateral

35.    Since as early as January 2007, Defendant invested billions of dollars of cash received as collateral for loans of Class Members' securities.

36.    Defendant invested the cash collateral through "collective investment vehicles" including, without limitation, the CashCo Fund.   A collective investment vehicle permits investors to combine their assets and invest the pooled funds.  Defendant acted as the investment manager for all such vehicles.

37.    Through these collective investment vehicles, Defendant used the cash collateral received by Class Members to purchase the MTNs of SFI.

38.    SFI, a Delaware corporation, is the wholly owned subsidiary of Sigma Finance Corporation ("Sigma"), an entity organized and existing under the laws of the Cayman Islands.  SFI was organized for the sole purpose of issuing and selling debt securities as a nominee for Sigma.  SFI is not permitted by its certificate of incorporation to engage in any other business.

39.    The MTNs issued by SFI are guaranteed by Sigma and secured by a "first priority floating lien" in the assets of Sigma, except with respect to assets used as collateral for repurchase agreements ("repo transactions")[2] or other borrowing

---

[2] In a repo transaction, the SIV sells a portion of its assets to a "repo counterparty," typically a bank with the highest possible short term rating.  At the same time, the SIV agrees to repurchase the assets at a specific point in the future (the repo term) and pays interest to the repo counterparty over the term of the transaction.  To protect itself from default by the SIV, the repo counterparty insists on a "haircut" being applied to assets.  This means that the SIV must post collateral valued in excess of the amount the SIV borrows from the repo counterparty.

arrangements (subject to the funds raised thereby being at least equal to 90% of the then current market value of such assets) in which case the lien will rank second in respect of such assets.

40.      Sigma is an SIV managed by the British firm Gordian Knot Limited.

41.      An SIV issues short term debt, typically in the form of MTNs and commercial paper, to finance the acquisition of long term high yielding assets, such as mortgage backed securities, earning revenues based on the difference in yield between the debt it issues and the investment assets its owns.

42.      During the summer of 2007, Sigma was the largest of approximately 30 SIVs in the world. As of July 2007, Sigma had outstanding debt of approximately $52 billion.

**E.**      **The Unmistakable – Yet Unheeded – Warnings Concerning Sigma**

43.      As early as August 2007, just a few months after Defendant invested millions of dollars of Class Members' cash collateral in the Sigma MTNs, analysts sounded alarm bells for the health of SIVs. According to Citi analysts, liquidity in the credit markets and sharp declines in the market value of assets backing many SIVs had already caused forced selling of assets among the world's major SIVs to support their revolving debt.

44.      On June 21, 2007, two hedge funds, created and managed by a subsidiary of the former investment bank Bear Stearns & Co. ("Bear Stearns"), whose investment strategy relied on financing its investment activities by borrowing against long term assets like mortgage-backed securities, faced a liquidity crisis as the hedge funds' lenders

were reluctant to lend money to an entity whose collateral was principally based on mortgage-backed securities. These hedge funds had to be bailed out by their parent, Bear Stearns, and in August 2007 were shut down.

45.    The collapse of the Bear Stearns hedge funds fueled a liquidity crisis among SIVs that held assets similar to these hedge funds. Between August and October 2007, more than a dozen SIVs failed, following downgrades by rating agencies over the quality of their assets.

46.    On October 26, 2007, Fortune Magazine published an article sharply critical of mutual funds that had invested in SIVs, referring to them as "shadowy debt funds." The article stated:

> The fact the SIVs stumbled so quickly shows that they weren't built with anywhere near enough capital or commitments of back-up funding. Fund management companies should have looked beyond the rating and basically asked themselves: Does a SIV really have the same creditworthiness as U.S. Treasuries, also rated AAA? And they should also have noted how skewed the SIVs were to short-term funding, since that is a common mistake in investing.

*See* Peter Eavis, *Risky Money Market Fund Bets May Be Illegal*, Fortune (October 26, 2007). Similarly, JP Morgan knew or should have known that the Sigma SIVs were an imprudent investment for the assets of the AFTRA Plan and the Class.

47.    In October 28, 2007, another observer noted:

> Some money-market funds got involved in SIVs by lending them money. Now, though, as it has become more difficult for the SIV wheel to keep spinning, some money-market fund managers have grown concerned that SIVs are less likely to repay the money they borrowed.

*See* Tim Paradis, *Money-Market Fund Investors Fret about Their SIV Risk*, Washington Post, p. F02 (October 28, 2007), *available at*: http://www.washingtonpost.com/wp-dyn/content/article/2007/10/27/AR2007102700123.html (accessed January 19, 2009).

48.    Of the many SIVs that failed, the bulk were subsidiaries of, or had been set up by, major banks.    As such, these banks—including Citigroup and HSBC—essentially absorbed their failures.

49.    Sigma, however, was unique in that it was a standalone entity and had no investment or commercial bank backing it.    Nevertheless, while many of the smaller SIVs were collapsing in the fall of 2007, Sigma barely managed to stay alive during this period because it had a large asset base that could be sold as its debt obligations matured, much of its outstanding debt was in the form of MTNs maturing in 2008, and it had eliminated market-value triggers from its governance that forced the other failing SIVs (who had not eliminated these provisions) to sell their assets and wind down in 2007 as the values of their underlying assets declined.    *See* Neil Unmack, Pioneers of Structured Investments Fight for Survival of Flagship Fund, *Bloomberg News* (Apr. 8, 2008).    Sigma removed these triggers in 2003 because its founders recognized that falling prices of the securities held by Sigma was a "contagion risk" that could infect and threaten the viability of Sigma.    However, the removal of these triggers simply prolonged Sigma's death.

50.    Faced with an inability to issue new MTNs, Sigma was forced to finance its activities using repo transactions which encumbered an overwhelming majority—approximately $25 billion—of its $27 billion in assets to the detriment of its MTN holders (who were subordinated to the security interests of the repurchase agreement

counterparties). Sigma's survival was contingent on these repo counterparties continuing to lend money to Sigma collateralized against Sigma's existing asset base. This was, however, a temporary survival strategy.

51.     As the *Financial Times* wrote on December 17, 2007, Sigma, despite weathering the first SIV liquidity storm, was certain to be caught up in a second liquidity storm when its MTNs came due:

> The funding problems for the structured investment vehicles (SIVs) that have been at the centre of this year's liquidity troubles are far from over in spite of a number of banks stepping in to support their vehicles. **January will bring the start of a second wave of liquidity problems for SIVs as the vast majority of medium-term funding starts to come due for repayment**, according to a report from Dresdner Kleinwort analysts to be published on Wednesday. SIVs rely on cheap, short-term debt to fund investments in longer-term, higher-yielding securities. **They have been hurt as funding has dried up and asset values have declined.** This cheap debt has come from both the very short-term commercial paper (CP) markets and from the slightly longer maturity medium-term note (MTN) markets. CP funding has long dried up and much of what was sold has matured . . . **According to the DrK analysts' calculations, two-thirds of all MTN funding for SIVs comes due for repayment by the end of next September. Almost $40bn is to be repaid from January to March alone. This second liquidity squeeze will affect some SIVs more than others. Sigma Finance, run by Gordian Knot, accounts for 22.5 percent of all outstanding MTNs issued by SIVs. It must repay about $22.5bn by the end of September and another $2.5bn in the final quarter.**

*See* Paul J. Davis, Second Wave of SIV Liquidity Problems Looms, FT.com (Dec. 17, 2007) (emphasis added).

52.     Thus, clearly, by as early as December 2007, analysts were predicting that Sigma would face a liquidity crisis by at least the end of September 2008.

53.    In a January 25, 2008 report, a Citi analyst echoed the sentiment of Sigma's impending failure, noting that Sigma had not secured the financing it would need to survive:

> [T]he largest unknown factor seems to be Gordian Knot, not only the largest but also the only non-bank sponsored SIV still looking to secure support. While initially in a better position due to its longer-term debt profile . . . 60% of the total MTNs will mature in 2008, one-third in the first quarter. Moody's has told us that Gordian Knot seems close to securing funding, but nothing has been confirmed to date. The worsening climate in markets does not help, we think.

*See* Birgit Specht, European Securitized Products Outlook 2008, Citi European Securitised Products Strategy & Analysis (Jan. 25, 2008).

54.    Thus, given these reports concerning numerous failures of SIVs and Sigma's inability to secure the financing it would need to survive beyond September 2008, Defendant had clear knowledge and understanding of the dire financial conditions facing Sigma at least by the end of January 2008 (and likely earlier) or should have, had it been managing the cash collateral in accordance with its ERISA mandated duty of care.

55.    This is especially true where, as Defendant touts:

> Our securities lending process involves a highly analytical, prudent approach toward achieving an attractive level of profitability. Through a combination of research, market information, individual expertise and solid negotiating skills, J.P. Morgan looks to capture the economic value of the securities lent, thus maintaining attractive spreads without having to resort to investing in lower credit quality issuers or taking excessive interest rate risk.

*See* http://www.jpmorgan.com/tss/General/Securities_Lending/1114735415127 (accessed on January 19, 2009.

56.    Thus, given the reported financial conditions facing Sigma and Defendant's self-proclaimed "highly analytical, prudent approach," Defendant should

16

have known that (i) the ERISA Plans' investments in the Securities Lending Program were imperiled and (ii) that it had ERISA-mandated duties to protect those assets, particularly where as here the initial investments were made in minimal risk fixed income investments.

57.    Had Defendant properly discharged its fiduciary duties, it would have incurred a fraction of the loss of the amortized price of the Sigma MTNs for all Class Members.

F.    **Negative Predictions for Sigma Continue**

58.    As forecasted in prior months, the circumstances continued to deteriorate for Sigma after January 2008.

59.    In February 2008, a Citi analyst wrote, "Sigma, the largest (non-bank managed) SIV appears to be the only one left yet to secure support. On February 27, 2008, Moody's put Sigma's CP/MTNs on review for downgrade." The report continued, "Moody's decision to finally place its senior debt ratings on Watch Negative has been based on its liquidity situation and current market valuations. The risk has been looming for weeks." *See* Birgit Specht, European Securitized Products Strategy, Citi European Securitized Products Strategy & Analysis, Feb. 29, 2008, at 5 and 6.

60.    Also in February 2008, the Financial Times reported, "Most other large SIVs are run by big banks, which have now stepped in to support their vehicles. The lack of a large bank behind Sigma leaves it vulnerable to collapse." *See* Paul J. Davis, Moody's to review Sigma rating, FT.com, Feb. 27, 2008.

61.   By at least March 19, 2008, as Bloomberg later reported, Sigma acknowledged that its ability to sell commercial paper had "diminished significantly."

62.   Days later, S&P issued a warning that Sigma's senior debt would be downgraded.  In a March 28, 2008 report, commenting on this development, a Citi analyst expressed further concern over Sigma's viability.  The analyst noted that the SIV was using asset sales to cover its maturing short term debt and increasingly resorting to "repo transactions" for financing purposes.  According to the analyst, "Sigma is the only remaining SIV not to have secured support . . . asset prices have continued to decline, and SIVs continue to sell assets to meet maturing liabilities. . .  .  The use of repo poses significant risk to other senior creditors . . . In the event of Sigma defaulting, the repo counterparty can seize these assets and sell them off at its discretion, only needing to cover the amount it is owned."  *See* Birgit Specht, European Securitized Products Outlook 2008, Citi European Securitised Products Strategy & Analysis, at 6 (Mar. 28, 2008).

63.   Despite this grim outlook for Sigma, Defendant did nothing to safeguard the AFTRA Plan's and the Class Members' investments.

64.   The news only got worse.  On April 4, 2008, both Moody's and S&P downgraded the MTNs issued by Sigma and held by the CashCo Fund.

65.   On April 8, 2008, Bloomberg News explained that the ratings agencies' downgrades were precipitated by the bleak prospect that Sigma could secure the funding it needed to remain viable:

> Gordian's Sigma Finance Corp. must refinance $20 billion of debt by
> September in a market where even the biggest banks are struggling to

borrow, according to Moody's Investor Service. Moody's cut the $40
billion fund's Aaa rating by five levels to A2 last week because of concern
about Sigma's ability to weather the credit crunch. Standard & Poor's
downgraded Sigma on Monday to AA- from AAA. The inability to
replace the debt may cause Sigma to dissolve.

[Sigma] ... has dodged the turmoil by finding financing alternatives after
demand for the industry's primary source of cash, commercial paper, dried
up. A failure would signal a credit market freeze that began in July [2007]
and led to the collapse of Bear Stearns isn't close to ending ....

*See* Neil Unmack, Pioneers of Structured Investments Fight for Survival of Flagship

Fund, Bloomberg News (Apr. 8, 2008). The report also noted that by April 2008, money

market funds had already reduced their investments in Sigma and rolled new money into

more conservative programs. *See id.*

66.    As a consequence of the downgrades, the CashCo Fund's unrealized

losses on SFI MTNs increased substantially from its unrealized losses as of January 2008.

67.    As Bloomberg reported, Sigma turned to $26 billion in repo financing to

temporarily survive and sold assets to repay maturing debt, shrinking the $40 billion from

a peak of $57 billion. The report cautioned, however, that while the repo arrangements

"may" provide financing through June, some of the transactions had not yet been

completed. *See* Neil Unmack, Pioneers of Structured Investments Fight for Survival of

Flagship Fund, Bloomberg News (Apr. 8, 2008).

68.    Through the summer of 2007, within the analyst community and in the

press, the cacophony of alarms continued about the financial troubles facing Sigma.

69.    In July 2008, the Citi analyst that had been following Sigma echoed his

warnings about Sigma's use of repo financing and asset sales to make up for shortfalls in

financing. He noted, "Sigma's repo funding looks to be the greatest threat to senior

creditors – and other investors in AAA ABS and bank floaters. If Sigma were to enter into enforcement/default on its debt, the repo counterparties would effectively rank ahead of senior noteholders.   Banks would most likely sell the assets immediately, with discounts potentially extinguishing the equity, and perhaps even more." *See* Birgit Specht, An Update on SIVs, European Fixed Income Strategy and Analysis, (Jul. 1 2008).   As with the prior negative news, Defendant ignored this information.   Only a couple months later, the Citi analyst's warnings materialized.

**G.    Analysts' Predictions Come True**

70.    As predicted as early as the fall of 2007, Sigma failed.

71.    On September 29, 2008, JP Morgan, one of Sigma's repo counterparties, terminated its repurchase agreement and served Sigma with a notice of default when Sigma could not provide sufficient collateral to JP Morgan in response to a margin call (prompted by a decline in value of the securities JP Morgan held as collateral).

72.    Following JP Morgan, HSBC Holdings PLC and Royal Bank of Scotland Group PLC also terminated their repurchase agreements.

73.    As a result, these lenders seized the assets they held under the repurchase agreements.   The defaults allowed Sigma's repo counterparties to sell the securities they held pursuant to the repo agreements.

74.    On September 30, 2008, Moody's and S&P downgraded Sigma on this news and warned that investors in roughly $6 billion of Sigma's remaining debt (which included the MTNs) may not get their money back.

75.    At the time of this default, of Sigma Finance's approximately $27 billion in face value of assets, approximately $25 billion of which had been seized as repo collateral which left approximately $1.9 billion in face value of unencumbered assets backing approximately $6.2 billion in outstanding senior secured liabilities (primarily MTNs).

76.    On October 1, 2008, Sigma announced that it had ceased trading and expected that a receiver would be appointed.

77.    By October 6, 2008, three receivers were appointed to wind up the affairs of Sigma.

78.    On December 2, 2008, the receivers held an auction sale of Sigma's debt securities and sold those securities for $306 million. The receivers estimated that Sigma's obligations to MTN holders was approximately $6.2 billion and that MTNs maturing after October 23, 2008 will not be satisfied from any such proceeds.

79.    Each of the Sigma MTNs held in the CashCo Fund as of September 30, 2008 matured after October 23, 2008 and will not participate in any of such proceeds.

80.    The Defendant has segregated the Sigma MTNs within the CashCo account. As of December 2008, these securities have lost approximately 97% of their value.

81.    Defendant has made no effort to remedy the losses for which it is liable for under the Securities Agreements and by virtue of its breaches of its ERISA mandated fiduciary duties.

**H.    JP Morgan Propped Up SFI Through Repo Transactions Long Enough For Sigma MTNs It Held In Its Money Market Mutual Funds to Mature Then Pulled The Plug on Sigma**

82.    JP Morgan's involvement with Sigma MTNs was not limited to its investments on behalf of the ERISA Plans under its Securities Lending Program. At the same time JP Morgan was investing the ERISA Plans' money in Sigma MTNs, JP Morgan also provided Sigma with short term repurchase (repo) financing which was necessary to Sigma's survival. Sigma's repo funding came with significant terms whereby lenders, such as JP Morgan, were able to demand approximately $2 in collateral for every $1 in financing they provided.[3]

83.    Despite the repeated warnings regarding Sigma MTN's and Sigma's survival throughout 2007, as set forth above, JP Morgan continued to invest the AFTRA Plan's assets in Sigma MTNs. Simultaneously, JP Morgan earned fees and interest through its repo financing for Sigma. Consequently, JP Morgan's financial interest as Sigma's repo financier was in direct conflict with its fiduciary responsibility to the AFTRA Plan.

84.    In October 2008, JP Morgan issued a notice of default for the credit it provided to Sigma and moved to seize the collateral provided in exchange for its repo funding. JP Morgan's move was followed by other lenders. The banks' seizure of Sigma's assets forced Sigma's collapse. Thus, at the same time that JP Morgan sought to safeguard its own financial interest by seizing Sigma's collateral – precipitating Sigma's collapse – JP Morgan continued to invest the AFTRA Plan's assets in Sigma.

---

[3] Published reports have disclosed that at some point prior to Sigma's collapse, Sigma had to pledge up to $25 billion worth of collateral in exchange for $17 billion in repo funding. *See* http://remington-work.blogspot.com/2008/10/sigma-collapse-ends-shadow-bank-project.html, accessed Dec. 22, 2008.

## V.   CLASS ALLEGATIONS

85.     On behalf of the AFTRA Plan, Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1)(A) and, alternatively, 23(b)(3) on behalf of a proposed Class consisting of the following:

> All plans governed by ERISA for which Defendant, pursuant to a securities lending agreement, invested cash collateral, either directly or through a collective investment vehicle, in one or more debt securities of Sigma Finance, Inc. and continued to hold those debt securities as of the close of business on September 30, 2008.   Excluded from the Class are (i) Defendant; (ii) all officers, directors, principals, and partners of Defendant and of Defendant's parents, subsidiaries, or affiliates, at all relevant times; (iii) members of the immediate family of any of the foregoing excluded parties; (iv) the legal representatives, heirs, successors, and assigns of any of the foregoing excluded parties; and (v) any entity in which any of the foregoing excluded parties has or had a controlling interest, other than ERISA plans offered by JP Morgan or any of its affiliates to its employees and which suffered losses as well due to the conduct alleged herein.

86.     The members of the Class are so numerous that joinder of all members is impracticable.

87.     The AFTRA Plan's claims are typical of the claims of all Class Members, as all Class Members are similarly affected by Defendant's uniform wrongful conduct and their claims are based on such conduct.

88.     The AFTRA Plan will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class, complex commercial and securities litigation.

89.     Class certification is warranted because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant.   This is because, among other reasons: (i) Defendant entered into

substantially similar Securities Lending Agreements with each member of the Class; (ii) Defendant owed the same ERISA-mandated fiduciary duties to each member of the Class; and (iii) Defendant invested the cash collateral of the Class members through comingled funds.

90.    Alternatively, certification is appropriate under Rule 23(b)(3) because common questions of law and fact exist as to all Class Members and predominate over any questions solely affecting individual Class Members and because a class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  There will be no difficulty in the management of this action as a class action.  Among the questions of law and fact common to the Class are:

(a)    whether Defendant owed a fiduciary duty to the AFTRA Plan and members of the Class;

(b)    whether Defendant violated ERISA by failing to act prudently and solely in the interests of the ERISA plans and their participants and beneficiaries;

(c)    when Defendant became aware or should have been aware of the negative reports and analysts warnings concerning Sigma;

(d)    whether Defendant breached the Securities Lending Agreements by investing in the Sigma MTNs and maintaining its investment in the Sigma MTNs;

(e)    whether the AFTRA Plan and members of the Class have sustained losses and, if so, what is the proper measure of losses.

## VI.    CAUSES OF ACTION

### COUNT I
### Failure to Prudently and Loyally Manage Plan Assets

91.    Plaintiff restates and incorporates the allegations contained in each paragraph above as though fully set forth herein.

92.    At all relevant times, as alleged above, Defendant was a "fiduciary," within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Defendant exercised discretionary authority with respect to the management of the ERISA Plans and/or the management or disposition of the ERISA Plans' assets.

93.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that assets within the plan are prudently invested.   Under the Securities Lending Agreements, Defendant clearly exercised discretionary authority over the investment of the ERISA Plans' assets, as acknowledged, for instance, in §§ 2(a) and 3(d) of its Securities Lending Agreement with the AFTRA Plan.

94.    Further, a fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).   Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, to do so.

95.    Defendant was not only obligated to ensure that all investments of the ERISA Plans' collateral were initially consistent with the conservative investment guidelines established for the portfolio, including the diversification requirements, but it was also required to continuously monitor all such investments to ensure that such investments remained prudent throughout the period of the investment.

96.    Thus, if the investment became imprudent due to its excessive risk and/or the inadequate level of diversification within the portfolio, Defendant was obligated to take action to protect the ERISA Plans' assets.

97.    Defendant breached its duties to prudently and loyally manage the assets as required by ERISA.  As described herein, Defendant knew or should have known that, as described herein, the substantial investment in Sigma MTNs was not a proper investment of the ERISA Plans' assets; notwithstanding this, Defendant failed to adequately protect the ERISA Plans from the inevitable losses that they knew or should have known would ensue, due to Defendant's imprudent management of the ERISA Plans' assets.

98.    Specifically, Defendant breached its fiduciary duties by, *inter alia*: (a) imprudently investing the collateral received by the AFTRA Plan and other Class Members in the Sigma MTNs which were inappropriate and unsuitable investments for the investment of the cash collateral; (b) imprudently failing to properly monitor the investments in the Sigma MTNs which, if prudently done, would have revealed excessive risks of Sigma's inability to pay the MTNs as they matured; and (c) imprudently maintaining the investments in the Sigma MTNs after becoming aware of analysts

warnings concerning Sigma, its dire financial condition, and its likely failure before the MTNs matured.

99.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the ERISA Plans sustained substantial losses.

100.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

101.    Because ERISA specifically authorizes plan fiduciaries to sue for relief to a plan from breaches of fiduciary duty such as those alleged herein, this action is brought on behalf of the AFTRA Plan and similarly situated ERISA plans, to remedy Defendant's breaches of fiduciary duties under § 404(a) of ERISA.

102.    Accordingly, pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendant is obligated to restore losses to the ERISA Plans.

## COUNT II
### Breach of Duty to Avoid Conflicts of Interest

103.    Plaintiff restates and incorporates the allegations contained in each paragraph above as though fully set forth herein.

27

104.    At all relevant times, as alleged above, Defendant was a "fiduciary," within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, it was bound by the duties of loyalty, exclusive purpose and prudence.

105.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

106.    Defendant breached its duty to avoid conflicts of interest by, inter alia: (a) earning fees and interest through JP Morgan's repo financing for Sigma, while maintaining its investment of the assets of the ERISA Plans in Sigma MTNs; (b) failing to timely engage independent fiduciaries who could make independent judgments concerning the investment of the ERISA Plans' assets in Sigma MTNs; and (c) by otherwise placing its own interests above the interests of the ERISA Plans in disregard of the risk of principal losses to the AFTRA Plan and other Class Members.

107.    Defendant was obligated to notify the AFTRA Plan and the ERISA Plans of any conflict of interest, including the extent of JP Morgan's self-interest in propping up Sigma through repo financing, seizing Sigma's collateral so as to safeguard it own financial interest, then pulling the plug on Sigma once that collateral declined in value and Sigma could not meet a margin call. Notwithstanding its clear duty, Defendant failed to do so.

108.    Defendant's breach of its fiduciary duties was the direct cause of losses to the AFTRA Plan and all Class Members.

109.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendant is obligated to restore the losses to the ERISA Plans caused by their breaches of fiduciary duties alleged in this Count.

## VII.    JURY DEMAND

110.    Plaintiff demands a trial by jury as to all issues so triable.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A Declaration that Defendant has breached its ERISA fiduciary duties to the ERISA Plans;

B.    An Order compelling the Defendant to make good to the ERISA Plans all losses to the Plans resulting from Defendant's breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits Defendant made through use of the Plans' assets, and to restore to the Plans all profits which the Plans would have made if the Defendant had fulfilled its fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.    Actual damages in the amount of any losses the Plans suffered;

F.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.    An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.    An Order for equitable restitution and other appropriate equitable monetary relief against Defendant.

Dated: April 22, 2009.

Respectfully submitted,

**DEALY & SILBERSTEIN, LLP**

Milo Silberstein (MS 4637)
225 Broadway, Suite 1405
New York, NY 10007
Telephone: (212) 385-0066
Facsimile:  (212) 385-2117

**BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP**
Joseph H. Meltzer
Darren J. Check
Sharan Nirmul
Joseph Weeden
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Facsimile: (610) 667-7056

**NIX PATTERSON & ROACH, LLP**
Bradley E. Beckworth
Brad E. Seidel
205 Linda Drive
Daingerfield, Texas 75638
Telephone: (903) 645-7333
Facsimile: (903) 645-4415

*Attorneys for Plaintiff and the Proposed
Class*

30

**EXHIBIT A**

354285.v2

SECURITIES LENDING AGREEMENT ("Lending Agreement"), dated as of December 1, 2005, between AFTRA Retirement Fund ("Lender"), having its principal place of business at 261 Madison Avenue, New York, NY 10016 and JPMorgan Chase Bank, National Association ("Bank"), having a place of business at 270 Park Avenue, New York, New York 10017-2070.

It is hereby agreed as follows:

Section 1 - Definitions

Unless the context clearly requires otherwise, the following words shall have the meanings set forth below when used herein:

a) "Accounts" shall mean the securities account (and all sub-accounts thereof) established and maintained by Bank on behalf of Lender pursuant to a separate agreement (the "Global Custody Agreement"), dated as of December 1, 2005, between Bank and Lender, which Agreement provides, *inter alia*, for the safekeeping of Securities received by Bank from time to time on behalf of Lender.

b) "Affiliate" shall mean an entity controlling, controlled by, or under common control with, Bank.

c) "Agreement" shall have the meaning assigned in the definition of Account.

d) "Authorized Investment" shall mean any type of instrument, security, participation or other property in which Cash Collateral may be invested or reinvested, as described in Section 5(e) hereof and Appendix 1 hereto (and as such Appendix may be amended from time to time by written agreement of the parties).

e) "Authorized Person" shall mean, except to the extent that Bank is advised to the contrary by Proper Instruction, any person who is authorized to give instructions to Bank pursuant to the Agreement and any mandates given to Bank in connection with such Agreement. An Authorized Person shall continue to be so until such time as Bank receives Proper Instructions that any such person is no longer an Authorized Person.

f) "Borrower" shall mean an entity listed on Appendix 2 hereto other than any entity which Bank shall have been instructed to delete from such list pursuant to Written Instructions and as such Appendix may be amended in accordance with Section 4(b) hereof.

g) "Business Day" shall have the meaning assigned in the applicable MSLA, including any applicable Addendum or Exhibit thereto and shall, include, as applicable, a New York Business Day and a Foreign Business Day.

h) "Cash Collateral" shall mean fed funds and such U.S. and non-U.S. currencies as may be pledged by a Borrower in connection with a particular Loan; provided that any non-U.S. currency shall be denominated in the same currency as that of the Securities being lent in respect of such Collateral.

i) "Collateral" shall mean the types of collateral acceptable to Lender as set forth in Appendix 3 hereto, together with Cash Collateral.

j) "Collateral Account" shall mean, as the case may be, a segregated account maintained by Bank with itself, with any Depository or with any Triparty Institution and designated as a Collateral Account for the purpose of holding any one or more of Collateral, Authorized Investments, and Proceeds on behalf of Bank's lending customers generally in connection with Loans hereunder.

k) "Collateral Amount" shall have the meaning assigned in Section 5(c) hereof.

l) "Collateral Requirement" shall have the meaning assigned in Section 5(c) hereof.

m) "Contract Year" shall mean each 12 month period between December 1st and November 30th.

n) "Depository" shall mean: (i) The Depository Trust Company, and any other securities depository or clearing agency (and each of their respective successors and nominees) registered with the U.S. Securities and Exchange Commission or registered with or regulated by the applicable foreign equivalent thereof or otherwise able to act as a securities depository or clearing agency, (ii) any transnational depository, (iii) the Federal Reserve book-entry system for the receiving and delivering of U.S. Government Securities, and (iv) any other national system for the central handling of that country's government securities.

o) "Distributions" shall have the meaning assigned in Section 3(b)(v) hereof.

p) "Dollars" shall have the meaning assigned in Section 5(c) hereof.

q) "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended (and all rules and regulations promulgated pursuant thereto by the Department of Labor).

r) "Event of Default" shall have the meaning assigned in Section 5(f)(i) hereof.

s) "Letter of Credit", to the extent acceptable to Lender as Collateral in accordance with Appendix 3 hereto, shall have the meaning assigned thereto in the applicable MSLA and be issued by a bank listed on Appendix 4 hereto (as such list may be amended by Bank from time to time on seven days advance notice to Lender to add one or more banks), other than a bank deleted from such list pursuant to Written Instruction or by Bank.

t) "Loan" shall mean a loan of Securities hereunder and under the applicable MSLA.

u) "Loan Fee" shall mean the amount payable by a Borrower to Bank pursuant to the applicable MSLA in connection with Loans collateralized other than by Cash Collateral (to the extent permitted by Appendix 3).

v) "Losses" shall have the meaning assigned in Section 7(a)(i) hereof.

w) "Market Value" shall have the meaning assigned in Section 7(c)(iii) hereof.

2

x) "MSLA" shall mean a master securities lending agreement or securities borrowing agreement between Bank and a Borrower, pursuant to which Bank lends securities on behalf of its customers (including Lender) from time to time. A copy of Bank's standard forms of MSLA, including (as applicable) the international addendum thereto, are annexed (i) as Appendix 5A in the case of Borrowers located in the United States, and (ii) as Appendix 5B in the case of affiliated borrowers of Bank that are covered by PTE 99-34 (or another prohibited transaction exemption) and are Borrowers located outside the United States. (The location of each Borrower is indicated in Appendix 2.)

y) "Non-U.S. Securities" shall mean Securities other than "U.S. Securities" as defined below, and shall include Global Depositary Receipts (i.e., a certificate issued by a bank in one country (other than the U.S.) representing Bank's control or possession of, or its contractual right to receive, a specific number of shares of a stock traded in another country, but excluding American Depositary Receipts).

z) "Oral Instructions" shall have the meaning assigned in Section 10 hereof.

aa) "Proceeds" shall mean interest, dividends and other payments and Distributions received by Bank in connection with Authorized Investments.

bb) "Proper Instructions" shall mean Oral Instructions and Written Instructions.

cc) "PTE-99-34" shall mean Department of Labor Prohibited Transaction Exemption 1999-34, as granted to Bank on August 25, 1999.

dd) "PTE-02-30" shall mean Department of Labor Prohibited Transaction Exemption 2002-30, as granted to EquiLend Holdings LLC on June 3, 2002.

ee) "Rebate" shall mean the amount payable by Bank on behalf of Lender to a Borrower in connection with Loans collateralized by Cash Collateral, which shall be a percentage of the Cash Collateral as agreed by the Borrower and Bank.

ff) "Return Date" shall have the meaning assigned in Section 7(c)(i) hereof.

gg) "Securities" shall mean government securities (including U.S. Government Securities), equity securities, bonds, debentures, other corporate debt securities, notes, mortgages or other obligations, and any certificates, warrants or other instruments representing rights to receive, purchase, or subscribe for the same, or of evidencing or representing any other rights or interests therein and held pursuant to the Agreement.

hh) "Term Loan" shall have the meaning assigned in Section 5(h) hereof.

ii) "Triparty Institution" shall mean a financial institution with which Bank shall have previously entered a triparty agreement among itself, such Triparty Institution and a particular Borrower providing, among other things, for the holding of Collateral in a Collateral Account at such Triparty Institution in Bank's name on behalf of Bank's securities lending customers and for the substitution of Collateral; provided, however, that any substituted Collateral shall meet the then standards for acceptable Collateral set by Bank and which otherwise satisfies the definition of Collateral herein.

jj)  "U.S. Government Securities" shall mean book-entry securities issued by the U.S. Treasury (as defined in Subpart O of Treasury Department Circular No. 300 and any successor provisions) and any other securities issued or fully guaranteed by the United States government or any agency, instrumentality or establishment of the U.S. government, including, without limitation, securities commonly known as "Ginnie Maes," "Sally Maes," "Fannie Maes" and "Freddie Macs".

kk)  "U.S. Securities" shall mean Securities issued by an issuer that is organized under the laws of the United States or any State thereof or that are otherwise traded in the United States, and shall include, without limitation, American Depositary Receipts (i.e., a certificate issued by a depositary bank in the United States representing control or possession of, or its contractual right to receive, a certain amount of shares of a foreign company on a non-U.S. exchange and which certificates are traded in the U.S.) and Yankee Bonds.

ll)  "Written Instructions" shall have the meaning assigned in Section 10 hereof.

## Section 2 - Appointment, Authority

(a) Appointment.  Lender hereby appoints Bank as its agent to lend Securities in the Accounts on Lender's behalf on a fully disclosed basis to Borrowers from time to time in accordance with the terms hereof and on such terms and conditions (not inconsistent with ERISA, the Global Custody Agreement (when the same are not inconsistent herewith) or the provisions hereof) and at such times as Bank shall determine and Bank may exercise all rights and powers provided under any MSLA as may be incidental thereto, and Bank hereby accepts appointment as such agent and agrees to so act.

(b) Authority; Conflicts of Interest.  Lender hereby authorizes and empowers Bank to execute in Lender's name and on its behalf and at its risk all agreements and documents as may be necessary to carry out any of the powers herein granted to Bank.  Lender grants Bank the authority set forth herein notwithstanding its awareness that Bank: (1) in its individual capacity or acting in a fiduciary capacity for other accounts, may have transactions with the same institutions to which Bank may be lending Securities hereunder, which transactions may give rise to actual or potential conflict of interest situations; and (2) may use EquiLend, a securities lending platform in which Bank has an equity interest (and therefore a financial interest in its success), to transact certain Loans with Borrowers that are EquiLend participants, it being understood that EquiLend will neither act as principal in, nor guarantee, any such Loan.  (A description of EquiLend, soliciting your consent to Bank's participation in EquiLend on your behalf, is annexed as Exhibit 1 hereto.)  Bank shall not be bound to: (i) account to Lender, to the maximum extent permitted under ERISA, and the regulations thereunder, for any sum received or profit made by Bank for its own account or the account of any other person or (ii) disclose or refuse to disclose any information or take any other action if the same would or might in Bank's judgment, made in good faith upon advice of counsel (which advice may be oral), constitute a breach of any law or regulation or be otherwise actionable with respect to Bank; provided that, in circumstances mentioned in (ii) above, Bank shall promptly inform Lender of the relevant facts (except where doing so would, or might in Bank's judgment, made in good faith upon advice of counsel (which advice may be oral), constitute a breach of any law or regulation or be otherwise actionable as aforesaid).

## Section 3 - Representations and Warranties

(a) Representations of each party.  Each party hereto represents and warrants to the other that: (i) it has the power to execute and deliver this Lending Agreement, to enter into the transactions contemplated hereby, and to perform its obligations hereunder; (ii) it has taken all necessary action to

authorize such execution, delivery, and performance; (iii) this Lending Agreement constitutes a legal, valid, and binding obligation enforceable against it; (iv) the execution, delivery, and performance by it of this Lending Agreement shall at all times comply with all applicable laws and regulations; and (v) the person executing this Lending Agreement has been duly and properly authorized to do so.

(b) Representations of Lender.  Lender represents and warrants to Bank that: (i) this Lending Agreement is, and each Loan effected in compliance with the provisions of this Lending Agreement shall be, legally and validly entered into, and does not and shall not violate any statute, regulation, rule, order or judgment binding on Lender, or any provision of Lender's charter or by-laws, or any agreement binding on Lender or affecting its property; (ii) all Authorized Persons acting on behalf of Lender have been duly and properly authorized to do so; (iii) it is lending Securities as principal and, subject to the last sentence of this Section 3(b), shall not transfer, assign or encumber its interest in, or rights with respect to, any Securities available for Loan hereunder (it being understood that the foregoing shall not derogate from Lender's right to sell any Security); (iv) it is the beneficial owner of all Securities or otherwise has the right to lend Securities; (v) it is entitled to receive all interest, dividends and other distributions (including, but not limited to, payments made by the depositary in connection with American Depositary Receipts and Global Depositary Receipts ) (collectively, "Distributions") actually paid by the issuer with respect thereto.  Lender shall promptly identify to Bank by notice, which notice may be oral, any Securities that are no longer subject to the representations contained in this Section 3 (b).

(c) Representations of Lender in respect of the MSLAs.  Lender further represents and warrants to Bank that the representations and warranties to be given by Bank on Lender's behalf as set out in the MSLAs are true and will continue to be true at all times until termination of Bank's authority to act as Lender's agent as provided in this Lending Agreement.

(d) Representation of Bank to Lender.  Bank represents and warrants to Lender that: (i) Bank's securities lending program has been designed to comply in all material respects with the 1997 policy statement by the Task Force on Supervision of the Federal Financial Institutions Examination Council on safe and sound securities lending practices; and (ii) it is a fiduciary with respect to its discretionary functions hereunder.

Section 4 - Borrowers

(a) MSLA.  Lender hereby acknowledges receipt of the forms of MSLA and authorizes Bank to lend Securities in the Account to Borrowers thereunder pursuant to an agreement substantially in the form thereof, it being understood and agreed, however, that Bank may modify the MSLA without Lender's consent to comply with law or regulation.  Bank shall notify Lender of any such modifications, which notice shall be in advance where reasonably practicable.

(b) Borrowers.  Securities may be lent to any Borrower listed in Appendix 2, as such Appendix may be updated from time to time to add new Borrowers and to delete entities that have ceased to be potential Borrowers. Bank shall provide Lender with seven days' advance notice of each addition of a Borrower to such list.  If Lender notifies Bank in writing within seven Business Days from the date of any such notice that it objects to a potential Borrower, no Loans of Securities shall be made to such potential Borrower.  If Lender does not so object within such seven Business Day period, each potential Borrower notified to Lender by Bank shall be deemed acceptable to Lender.

Section 5 - Loans

(a) <u>Securities to be lent. Lending opportunities. Loan initiation.</u> All Securities of Lender held by Bank that are issued, settled or traded in the markets that have been approved by Bank from time to time for purposes of Bank's discretionary securities lending program shall be subject to the terms hereof. Bank shall seek to assure that Lender receives a fair allocation of lending opportunities vis-à-vis other lenders, taking into account the demand for and availability of Securities, types of Collateral, eligibility of Borrowers, limitations on investments of Cash Collateral, tax treatment, and similar commercial factors. From time to time, Bank may lend to Borrowers Securities held in the Account (except Securities that Lender has notified to Bank are unavailable or Securities that are no longer subject to the representations set forth in Section 3) and shall deliver such Securities against receipt of Collateral in accordance with the applicable MSLA. Bank shall have the right to decline to make any Loans to any Borrower and to discontinue lending to any Borrower in its sole discretion and without notice to Lender.

(b) <u>Receipt of Collateral. Collateral substitution.</u> For each Loan, Bank shall receive and hold Letters of Credit received as Collateral and Bank or a Triparty Institution shall receive and hold all other Collateral required by the applicable MSLA in a Collateral Account, and Bank is hereby authorized and directed, without obtaining any further approval from Lender, to invest and reinvest all or substantially all Cash Collateral in Authorized Investments. A given Loan may be collateralized by more than one type of Collateral. Bank shall credit, or where applicable shall have a Triparty Institution credit, all Collateral, Authorized Investments and Proceeds to a Collateral Account and Bank shall mark its books and records to identify Lender's interest therein, it being understood, however, that all monies credited to a Collateral Account may for purposes of investment be commingled with cash collateral held for other lenders of securities on whose behalf Bank may act but shall not be commingled with any proprietary assets of Bank used for Bank's own account. Bank may, in its sole discretion consistent with standards of commercial reasonableness, liquidate any Authorized Investment and credit the net proceeds to a Collateral Account. Bank shall accept substitutions of Collateral in accordance with the applicable MSLA and this Lending Agreement, and shall credit, or where applicable shall have a Triparty Institution credit, all such substitutions to a Collateral Account.

(c) <u>Mark to market procedures.</u> (i) Bank shall require initial Collateral for a Loan in an amount determined by applying the then applicable "Collateral Requirement" (as defined below) to the Market Value of the Security that is the subject of the Loan together with, in the case of fixed income Securities, any accrued but unpaid interest thereon. The "Collateral Requirement" with respect to a given Security shall be an amount equal to the then applicable percentage (currently 102% where Securities and the Collateral therefor are denominated in the same currency, and 105% for all other securities) of the Market Value of the Security which is the subject of a Loan as determined as of the close of trading on the preceding Business Day and such Collateral shall be marked as provided below.

(ii)(A) With respect to each Loan of Securities denominated in U.S. dollars ("Dollars"), or where the Securities on Loan and the Collateral therefor are denominated in the same currency if, and only if, the Market Value of the Collateral held by Bank on behalf of Lender for such Loan on any Business Day is less than the Market Value of the Securities which are the subject of such Loan (together with accrued but unpaid interest in the case of fixed income Securities), Bank shall demand on behalf of Lender that the Borrower, deliver additional Collateral in accordance with the applicable MSLA. Such additional Collateral demanded, together with the Collateral then held by Bank on behalf of Lender for such Loan, shall be not less than the applicable Collateral Requirement. (B) With respect to all other Loans of Securities (i.e., where the Security on Loan and the Collateral are in different currencies), if, and only if, the Market Value of the Collateral held in the aggregate for all Loans of a given Security to a given Borrower from all lenders (including Loans from Lender) falls below the aggregate amount ("Collateral Amount") determined by applying the applicable Collateral Requirement to all Loans of such Security (together with accrued but unpaid interest in the case of fixed income

354285v2

Securities), then Bank shall demand on behalf of Lender that Borrower deliver additional Collateral in accordance with the applicable MSLA so as to meet the Collateral Amount (it being understood that, for purposes of this clause (B), if a given lender to such Borrower were to be undercollateralized, consistent with Bank's right under the MSLA with such Borrower, Bank shall then reallocate sufficient Collateral from other lenders to such Borrower where loans to Borrower, as described in this clause (B), are in excess of the required collateralization level, to such lender whose loans to such Borrower are below the required collateralization level so that all lenders to such Borrower are not less than fully collateralized). In respect of these Sections 5(c)(ii)(A) and (B), additional Collateral shall not be demanded to the extent that a Collateral shortfall is on account of a diminution in the Market Value of Authorized Investments.

(iii) Where market convention does not permit marking to at least the amounts indicated above, the foregoing procedures shall to that extent not apply and marking shall be in accordance with such convention (and applicable law and regulation, including, for the avoidance of doubt, ERISA). As of the date hereof, the only conventions requiring such a deviation are that: (x) with respect to Securities such as U.S. Treasury strips and bills, where the market functions so as to not allow for the sale of such Securities at greater than par, the Collateral Requirement shall equal the lesser of 100% of the par value of the Security or 102% of its Market Value; and (y) the Collateral Requirement for Loans of Japanese Government Securities made against Yen-denominated Collateral is 100%. Bank shall advise Lender of any other such deviations. The Market Value of certain Securities (including, without limitation, U.S. Government Securities), whether on Loan or received as Collateral, may be determined on a same day basis by reference to recognized pricing services.

(d) Changes in procedures applicable to Collateral. The Collateral procedures set forth in Sections 5(b)-(c) above reflect Bank's current practice and may be changed by Bank from time to time based on general market conditions (including volatility of Securities on Loan and of securities Collateral), the Market Value of Securities on Loan to a given Borrower, and in accordance with general market practice and regulatory requirements. Bank shall notify Lender in advance of material revisions to the foregoing procedures.

(e) Investment of Cash Collateral. (i) Bank is hereby authorized to invest and reinvest Cash Collateral in accordance with the investment guidelines annexed hereto as Appendix 1. (ii) Authorized Investments are made for the account of, and at the sole risk of, Lender. In that connection, Lender shall pay to Bank on demand in cash an amount equal to any deficiency in the amount of Collateral available for return to a Borrower pursuant to the applicable MSLA. Bank is authorized to select brokers and dealers for the execution of trades in connection with the investment and reinvestment of Cash Collateral, such selection to be based on principles of best execution and arms-length negotiated prices.

(f) Distributions and Voting Rights.

(i) Bank shall credit the Account on payable date with the amount of all cash Distributions (but for purposes of this Section 5(f) and of Section 7(b) hereof, the term "cash Distributions" shall not include any principal payment, whether paid upon the maturity of any debt Security or prior to its maturity) with respect to Securities on Loan over their record date that Lender would have received under the Agreement had such Securities not been on Loan over record date; provided, that with respect to Non-U.S. Securities, Bank's obligation to credit the Account shall extend only to record dates (and Distributions made during the period of the relevant Loan) up to and including the date of any "Event of Default" (as defined in the applicable MSLA). To the extent that cash Distributions are not delivered to Bank by Borrower and Bank has so credited the Account with such Distributions, Bank shall be subrogated to Lender's rights against Borrower as provided in Section 7(d); provided

7

that, such subrogation right shall not be exercised during the term of the associated Loan until such time as the Loan has been subject to an Event of Default such that Bank has performed its indemnity obligations in respect thereof pursuant to Section 7 or until such time as the Borrower has performed all its other obligations in respect of such Loan and such Loan has terminated. In connection with the foregoing, Lender shall promptly return any amount so credited upon oral or written notification from Bank that (a) such amount has not been paid by the issuer of the Securities or the paying agent therefor (as applicable) in the ordinary course of business or (b) such amount was incorrectly credited. If Lender does not promptly return any amount upon such notification, Bank shall be entitled, upon oral or written notification to Lender, to reverse such credit by debiting the Account for the amount previously credited.

(ii) (A) Any non-cash Distribution which is in the nature of a stock split or a stock dividend shall be added to the existing Loan to which such dividend relates as of the date such non-cash Distribution is payable and shall be subject to the provisions hereof and the applicable MSLA, including with respect to required collateralization. (B) Any non-cash Distribution which is in the nature of warrants or rights to purchase shares made with respect to any Securities on Loan shall be deemed to be a new Loan made by Lender to Borrower (and shall be considered to constitute Securities on Loan) as of the date such non-cash Distribution is payable and shall be subject to the provisions hereof, including with respect to required collateralization; provided that Lender may, by giving Bank ten (10) Business Days' notice prior to the date of such non-cash Distribution (or such different amount of time as Bank may from time to time require on advice to Lender), direct Bank to request that the Borrower deliver such non-cash Distribution to Bank pursuant to the applicable MSLA, in which case Bank shall credit such non-cash Distribution to the Account. (C) If, despite (A) and (B) Lender requests that Bank instruct the Borrower to deliver a non-cash Distribution on its payable date, and Borrower fails so to deliver the non-cash Distribution, the indemnity provisions and corresponding subrogation rights set forth in Section 7 shall apply; provided that, such subrogation right shall not be exercised during the term of the associated Loan until such time as the Loan has been subject to an Event of Default such that Bank has performed its indemnity obligations in respect thereof pursuant to Section 7 or until such time as the Borrower has performed all its other obligations in respect of such Loan and such Loan has terminated.

(iii) During the term of any Loan, Bank shall permit the Securities on Loan to be transferred into the name of and be voted by the Borrower or others. Lender shall not be entitled to participate in any dividend reinvestment program with respect to Securities that are eligible for Loan (whether or not actually on Loan) as of the applicable record date for such Securities; it being understood that where Bank is advised sufficiently prior to the dividend reinvestment program record date for a particular Security that Lender wishes to participate in such program then such Security shall not be considered eligible to lend until further notice from Lender and it being further understood that the ability to make such Security again eligible for lending must be consistent with the terms of the particular dividend reinvestment program as determined by Lender in good faith as communicated to Bank (and Bank shall have no liability for Lender's determination). Lender shall not be able to vote proxies with respect to Securities that are on Loan as of the applicable record date for such Securities. In those markets where it is not practical or permissible to do so, Lender shall not be entitled to vote proxies with respect to Securities that are eligible for Loan (but not actually on Loan) as of the applicable record date for such Securities. The only market subject to the preceding sentence as of the date hereof is Denmark and Bank shall advise Lender of any additional such markets or of the deletion of Denmark.

(g) Advances, overdrafts and indebtedness. Security Interest. Bank may, in its sole discretion, advance funds on behalf of Lender in order to pay to Borrowers any Rebates or to return to Borrowers Cash Collateral to which they are entitled pursuant to the applicable MSLA. Lender shall repay Bank on demand the amount of any advance or any other amount owed by Lender hereunder. Additionally,

Lender shall reimburse Bank for its cost of funds with respect to any such advance and, if permitted by applicable law, pay Bank interest on such advance, provided that the aggregate amount so reimbursed and paid shall not exceed the rate customarily charged by Bank for such loans at the time such loan is made and is otherwise on such terms as Bank customarily makes such loans available. In order to secure repayment of any advance or other indebtedness of Lender to Bank arising hereunder, Bank shall have , and be granted at the time of the making of any such advance, a lien and security interest in and to all assets now or hereafter held in the Account and any Collateral Account (to which Lender is entitled hereunder) and any other property at any time held by it for the benefit of Lender or in which Lender may have an interest which is then in Bank's possession or control or in the possession or control of any third party acting on Bank's behalf, which lien shall terminate on satisfaction of the advance.  In this regard, Bank shall be entitled to all the rights and remedies of a pledgee under common law and a secured party under the New York Uniform Commercial Code and/or any other applicable laws and/or regulations as then in effect.

(h)  Termination of a Loan.  (i) Loans shall generally be terminable on demand.  With the prior approval of Lender, however, Loans may be made on the basis of a reasonably anticipated termination date ("Term Loan") and without providing for the right of substitution of equivalent securities. Termination of a Term Loan prior to its anticipated termination date by either Lender or Borrower may result in the terminating party having to pay the non-terminating party damages based on the cost of obtaining a replacement loan.  (ii) Bank shall terminate any Loan of Securities to a Borrower as soon as practicable after: (A) receipt by Bank of a notice of termination of the respective MSLA; (B) receipt by Bank of Written Instructions directing it to terminate a Loan; (C) receipt by Bank of Written Instructions instructing it to delete from Appendix 2 the Borrower to which such Loan was made; (D) receipt by Bank of Written Instructions advising that the Security subject to a Loan is no longer subject to the representations contained in Section 3 hereof; (E) receipt by Bank of notice advising that an Event of Default has occurred or Bank has knowledge of an Event of Default and such Event of Default is continuing beyond any applicable grace period; (F) Bank elects, in its sole discretion, elects to terminate a Loan other than a Term Loan; or (G) termination hereof.  (iii)  Lender acknowledges that: (1) termination of this Agreement may result in the termination of certain Authorized Investments prior to their maturity which, in turn, may result in losses being realized in such Authorized Investments; and (2) any such losses shall be for the account and sole risk of Lender.

(i)  Sale of a Security on Loan.  Lender shall advise Bank of the sale of Securities on Loan no later than the sale date.  Bank shall not be liable for any failures occurring on a settlement date for sale of Securities if timely notice is not given by Lender as provided in the preceding sentence, and shall not be liable in any event (except as provided in Section 7) for failure of a Borrower to return Securities on Loan in a timely fashion.

(j)  Recordkeeping and Reports.  Bank shall establish and maintain such records as are reasonably necessary to account for Loans that are made and the income derived therefrom.  Bank shall provide Lender with a monthly statement describing the Loans made during the preceding month, the investments made with Cash Collateral, and the income derived from Loans, during the period covered by such statement.  (For purposes of the foregoing, Securities constituting Authorized Investments shall be valued based on their amortised cost.)  A party shall comply with reasonable requests of the other party for information necessary to the requester's performance of its duties hereunder.

## Section 6 - Default by Borrower

(i)  Bank may assume (unless it has actual knowledge to the contrary) that any representations made by a Borrower in connection with any Loan are true, that no event which is or may become an Event of Default has occurred and that a Borrower has complied with its obligations under the

applicable MSLA. Subject to Sections 5(f)(i)-(ii) and 7(b)-(c) hereof, Bank shall have no responsibility for any breach of any obligation by any Borrower under or in connection with any MSLA or Loan. Bank shall have no responsibility for the accuracy or completeness of any information supplied by any Borrower. In connection with the foregoing and limited thereto, Bank shall not be liable as a result of taking or omitting to take any action, provided that Bank shall have carried out its responsibilities hereunder in good faith. (ii) If any Borrower with respect to any Loan effected pursuant hereto and pursuant to the applicable MSLA fails to return any Securities on Loan when due thereunder for reasons other than relating to the solvency of the Borrower, Bank shall take whatever action it deems appropriate in accordance with general market practice and Bank's reasonable judgment, including, but not necessarily limited to, claiming compensation from such Borrower on behalf of Lender in the event a trade executed by Lender or its investment managers and other agents fails on account of such Borrower's failure timely to have returned Securities on Loan or, where Bank deems it necessary, such other action as may be permitted by law or the applicable MSLA and, in the case of Loans collateralized by Cash Collateral, reducing the applicable Rebate to zero, until such time as the affected Security is returned. Where Securities on Loan have not been returned within 10 Business Days of the demand therefor by Bank (or of the maturity date, if a Term Loan), Bank shall so advise Lender and Lender may then require that Bank perform its indemnity obligations in respect of such Securities as provided in Section 7(c) hereof and Bank shall then promptly do so. (iii) If any Borrower with respect to any Loan effected pursuant hereto and pursuant to the applicable MSLA fails to return any Securities on Loan when due thereunder for reasons relating to the solvency of the Borrower, Bank shall then, in addition to taking whatever action may be required by Section 7(c) hereof, take such further and other action as its deems appropriate in accordance with Bank's reasonable judgment under the applicable MSLA.

### Section 7 - Liabilities, Indemnification

(a) Liabilities. (i) Except as provided in Sections 5(f)(i)-(ii) and 7(b)-(c) hereof, Bank shall not be liable for any costs, expenses, damages, losses, liabilities or claims (including attorneys' and accountants' fees) (collectively "Losses") incurred by Lender, except those Losses arising out of the negligence, bad faith, fraud or other willful misconduct of Bank. Bank shall have no obligation hereunder for Losses which are sustained or incurred by Lender by reason of any action or inaction by any pricing service, any Depository or a Triparty Institution or their respective assigns, successors or nominees. In no event shall Bank be liable for indirect or consequential Losses (including, but not limited to, lost profits and loss of business), arising hereunder or in connection herewith, even if previously informed of the possibility of such damages and regardless of the form of action.

(ii) Except for any costs or expenses incurred by Bank in performing its obligations pursuant to Sections 5(f)(i)-(ii) and 7(b)-(c) hereof and ordinary operating expenses incurred by Bank in providing services hereunder, Lender shall indemnify Bank and hold it harmless from and against any and all Losses which Bank may sustain or incur or which may be asserted against Bank by reason of or as a result of any action reasonably taken or omitted by Bank in connection with operating hereunder or enforcing Lender's rights under the applicable MSLA, other than those Losses arising out of the negligence, bad faith or willful misconduct of Bank. Lender shall indemnify Bank against, and hold it them harmless from, any Losses that may be imposed on, incurred by, or asserted against Bank as a result of any action or omission taken in good faith accordance with any Proper Instructions or other directions upon which Bank is authorized to rely under the terms of this Agreement. The foregoing indemnities shall be a continuing obligation of Lender, its successors and assigns, notwithstanding the termination of any Loans hereunder or of this Lending Agreement. Bank may charge any amounts to which it is entitled hereunder against the Account, and Lender shall be entitled to an accounting of all amounts so charged. Actions taken or omitted in reliance upon Proper Instructions, or upon any information, order, indenture, stock certificate, power of attorney, assignment, affidavit or other

instrument reasonably believed by Bank, in good faith, to be genuine or bearing the signature of a person or persons reasonably believed, in good faith, to be authorized to sign, countersign or execute the same, shall be conclusively presumed to have been taken or omitted in good faith.

(iii) Bank, at its sole expense (except where Lender has authorized such expenditure in advance and in writing) shall be entitled to rely on, and may act upon, the advice of reputable professional advisers in relation to matters of law, regulation or market practice (which may be professional advisers of Lender) and that relate to the provision of securities lending services, and shall not be liable to Lender for any action taken or omitted pursuant to such advice.

(iv) Bank shall have no liability for Losses that Lender may suffer or incur, caused by an act of God, fire, flood, civil disturbance, war, terrorism, act of any governmental authority or other act or threat of any authority (*de jure* or *de facto*), legal constraint, malfunction of equipment or software (except to the extent such malfunction is primarily attributable to Bank's negligence in maintaining the equipment or software), failure of or the effect of rules or operations of any external funds transfer system, inability to obtain or interruption of external communications facilities, inability to access collateral held at a Tri-Party Institution or Depository or any cause beyond the reasonable control of Bank.

(b) <u>Indemnification of Lender in respect of Distributions</u>. If the Borrower in respect of any Loan effected pursuant hereto and pursuant to the applicable MSLA fails to deliver any non-cash Distributions with respect to Securities on Loan as and when requested to do so by Bank as provided in Section 5(f)(ii)(C) hereof, Bank shall with respect to: (x) U.S. Securities at its option, credit such non-cash Distribution or, if commercially impracticable to do so, then credit an amount equivalent thereto to the Account on the date it is due, and (y) Non-U.S. Securities, for any non-cash Distributions made during the period of the relevant Loan (up to and including the date of any Event of Default) or for any non-cash Distributions for which the record date occurs on or before the date of any Event of Default, Bank shall, at its option, either (i) purchase for the Account replacement securities (of an equal amount of the same issue, class, type or series as the Distribution) on the principal market in which such securities are traded or, if commercially impracticable to do so, then (ii) credit the Account with the Market Value in Dollars of such Distributions on the due date as determined by Bank in good faith (and Lender acknowledges that the time required to purchase replacement Non-U.S. Securities may be materially longer than the time required to purchase replacement U.S. Securities). The foregoing shall, subject to Sections 7(c)(iii) and 7(d) hereof, be at Bank's expense.

(c) <u>Indemnification of Lender in respect of Securities</u>.

(i) <u>U.S. Securities</u>. If the Borrower in respect of any Loan of U.S. Securities effected pursuant hereto and pursuant to the applicable MSLA fails to return any Securities on Loan to Bank for the Account when due thereunder, which is the date an Event of Default shall have occurred under the applicable MSLA (the "Return Date"), then Bank shall, at its expense, but subject to Sections 7(c)(iii) and 7(d) hereof, deposit replacement Securities of the same issue, type, class and series to the Account, as soon as practicable. If Bank is unable promptly to obtain replacement Securities, Bank shall, at its expense, but subject to Sections 7(c)(iii), 7(d) and 11 hereof, credit the Account in Dollars with the Market Value of such Securities on Loan on the credit date.

(ii) <u>Non-U.S. Securities</u>. If the Borrower in respect of any Loan of Non-U.S. Securities effected pursuant hereto and pursuant to the applicable MSLA fails to return any such Securities on Loan to Bank for the Account on the Return Date, Bank shall, at its expense, but subject to Sections 7(c)(iii), 7(d) and 11 hereof and to Bank not being responsible to compensate Lender for any increase in the Market Value of such Non-U.S. Securities after the Return

Date, as soon as practicable, at is option either (x) deposit replacement Securities of the same issue, type, class and series to the Account as the Securities on Loan up to the Market Value of such Securities determined as of the Return Date or, if in Bank's good faith judgment it is not practical to do so, (y) credit the Account, in Dollars, with the Market Value of the Securities on Loan determined as of the Return Date.

(iii) Market Value; Loss in Value of Cash Collateral Investments and Letters of Credit. In connection with Sections 7(b) and 7(c)(i)-(ii) above, "Market Value" shall: (y) be determined by Bank in accordance with the applicable MSLA, including the computation of Dollar equivalents where Securities on Loan and/or Collateral (and Proceeds) are denominated in a currency other than Dollars; and (z) in the case of fixed income Securities, include any accrued but unpaid interest thereon. If the Market Value of Authorized Investments on a credit date or a Return Date is less than that which is required to purchase replacement securities (and non-cash Distributions) or to credit the Account with the Market Value in Dollars of the Securities on Loan (and non-cash Distributions) as a result of a decrease in the Market Value of such Authorized Investments, Bank shall not be responsible for that decrease and shall deposit replacement securities or credit the Account, with the Market Value of such Securities on Loan only to an amount net of the decrease in Market Value of Authorized Investments. With respect to and to the extent that a Loan is made against Letter of Credit Collateral, in the event of a default by both the issuer of the Letter of Credit and the Borrower, Bank shall not be responsible for any resulting decrease in the Market Value of such Letter of Credit Collateral or have any obligation to either contribute to or otherwise provide for any resulting Collateral deficiency.

(d) Subrogation. If Bank makes a payment or a purchase pursuant to Sections 5(f), 7(b) or 7(c) Bank shall, to the extent of such payment or purchase, be subrogated to, and Lender shall assign and be deemed to have assigned to Bank, all of its rights in, to and against the Borrower (and any guarantor thereof) in respect of such Loan, any Collateral pledged by the Borrower in respect of such Loan (including any Letters of Credit and the issuers thereof), and all proceeds of such Collateral. In the event that Lender receives or is credited with any payment, benefit or value from or on behalf of the Borrower in respect of rights to which Bank is subrogated as provided herein, Lender shall promptly remit or pay to Bank the same (or its Dollar equivalent).

## Section 8 - Bank Compensation

(i) In connection with each Loan hereunder, Lender hereby authorizes Bank to retain a fee equal to: (A) 20% of earnings (less any Rebate paid by Bank to a Borrower) derived from Authorized Investments in connection with Loans of U.S. Securities collateralized by cash; (B) 20% of earnings (less any Rebate paid by Bank to a Borrower) derived from Authorized Investments in connection with Loans of Non-U.S. Securities collateralized by cash; (C) 20% of any Loan Fee paid or payable by the Borrower in connection with Loans of U.S. Securities not collateralized by cash; and (D) 20% of any Loan Fee paid or payable by the Borrower in connection with Loans of Non-U.S. Securities not collateralized by cash. (ii) Bank may retain its share of earnings and Loan Fees under Section 8(i) hereof and shall credit Lender monthly with Lender's share of earnings and Loan Fees under Section 8(i). Bank may charge any amounts owed by Lender hereunder against the Account and/or a Collateral Account and, with the prior written approval of Lender, Bank may incur expenses for which it may then charge Lender it being understood, however, that such expenses shall in no event extend to Bank's normal costs, expenses and overhead related to the provision of securities lending services. (iii) If the earnings hereunder actually paid to Lender during a Contract Year are less than $250,000, Bank will refund to Lender from the earnings Bank has retained pursuant to this Section 8 during such Contract Year an amount that would be necessary to make the amount paid to the Lender equal to the lesser of 100% of earnings hereunder during such period or $250,000; provided, however, that in the event of (A) a substantial change in the asset mix or countries of investment of

12

354285:v2

Securities both held in the Account and made eligible for Loan; or (B) an introduction of new tax laws, any modifications to existing tax laws, regulations promulgated pursuant to such tax laws, or interpretations of existing tax laws that negatively affect potential revenue hereunder, the foregoing minimum revenue amount shall be subject to change as mutually agreed upon by the parties. In any case, the minimum revenue amount set forth in this Section is subject to renegotiation after November 30, 2006.

### Section 9 - Taxes

(a) Tax Filings. Lender shall be responsible for all filings, tax returns and reports on any Loans undertaken by Bank on Lender's behalf which are to be made to any authority whether governmental or otherwise and for the payment of all unpaid calls, taxes (including, without limitation, any value added tax), imposts, levies or duties due on any principal or interest, or any other liability or payment arising out of or in connection with any Securities or any Collateral, and insofar as Bank is under any obligation (whether of a governmental nature or otherwise) to pay the same on Lender's behalf, Bank may do so out of any monies or assets held by it pursuant to the terms of the Agreement or hereunder.

(b) Tax Treatment. Lender acknowledges that (i) the tax treatment of the payments made by a Borrower to Lender in lieu of Distributions (including, by way of illustration and not of limitation, with respect to any dividends received deduction and amounts paid by the depositary on American Depositary Receipts and Global Depositary Receipts) may differ from the tax treatment of the Distribution to which such payments relate; and (ii) it has made its own determination as to the tax treatment of any Loan made pursuant hereto, of any in lieu of payments made by a Borrower and of any remuneration and any other amounts that may be received by it hereunder.

### Section 10 - Instructions

(a)(i) Written Instructions. "Written Instructions" shall mean written communications actually received by Bank from an Authorized Person or from a person reasonably believed by Bank to be an Authorized Person by letter, memorandum, telegram, cable, telex, telecopy facsimile, computer, video (CRT) terminal or other on-line system, or any other method reasonably acceptable to Bank and whereby Bank is able to verify with a reasonable degree of certainty the identity of the sender of such communications or which communications are transmitted with proper testing or authentication pursuant to terms and conditions which Bank may specify. (ii) Oral Instructions. "Oral Instructions" shall mean oral communications actually received by Bank from an Authorized Person or from a person reasonably believed by Bank to be an Authorized Person. Oral Instructions shall promptly thereafter be confirmed in writing by an Authorized Person (which confirmation may bear the facsimile signature of such Person), but Lender shall hold Bank harmless for the failure of an Authorized Person to send such confirmation in writing, the failure of such confirmation to conform to the Oral Instructions received, or Bank's failure to produce such confirmation at any subsequent time. Lender shall be responsible for safeguarding any testkeys, identification codes or other security devices which Bank may make available to Lender or its Authorized Persons.

(b) Continuing effect of Proper Instructions. Unless otherwise expressly provided, all Proper Instructions shall continue in full force and effect until canceled or superseded.

### Section 11 - Pricing Services

Bank may use any pricing service referred to in an applicable MSLA and any other recognized pricing service (including itself and any of its Affiliates, provided that such use does not violate ERISA and conforms to the terms of any applicable prohibited transaction exemptions) in order to perform

13

354285:v2

its valuation responsibilities with respect to Securities, Collateral and Authorized Investments, and Lender shall hold Bank harmless from and against any loss or damage suffered or incurred as a result of errors or omissions of any such pricing service.

## Section 12 - Termination

This Lending Agreement may be terminated at any time by (a) Lender upon delivery to Bank of notice specifying the date of such termination, which shall be not less than 15 days after the date of receipt of such notice; and (b) Bank upon delivery to Lender of notice specifying the date of such termination, which shall be not less than 30 days after the date of receipt of such notice. Notwithstanding any such notice, this Lending Agreement shall continue in full force and effect with respect to all Loans outstanding on the termination date, which Loans shall, however, be terminated as soon as reasonably practicable.

## Section 13 - Miscellaneous

(a) Legal proceedings. Bank may refrain from bringing any legal action or proceeding arising out of or in connection with any Loan until it shall have received such security as it may reasonably require for all costs, expenses (including legal fees) and liabilities which it shall or may reasonably be expected to expend or incur in relation thereto.

(b) Integration. Lending Agreement to Govern. Assignment. This Lending Agreement and the Global Custody Agreement contain the complete agreement of the parties with respect to the subject matter hereof and supersede and replace any previously made proposals, representations, warranties or agreements with respect thereto by the parties. In the event of any conflict between this Lending Agreement and the Global Custody Agreement, this Lending Agreement shall govern. This Lending Agreement shall be binding on each of the parties' successors and assigns, but neither party shall assign its rights and obligations under this Lending Agreement without the prior written consent of the other, which consent shall not be unreasonably withheld.

(c) Notices. Unless expressly provided herein to the contrary, notices hereunder shall be in writing, and delivered by telecopier, overnight express mail, first-class postage prepaid, delivered personally or by receipted courier service. All such notices which are mailed shall be deemed delivered upon receipt. Notices shall be addressed as follows (or to such other address as a party may from time to time designate on notice duly given in accordance with this Section): notices to Bank shall be addressed to it at 4 New York Plaza, New York, New York, 10004, Attention: Global Securities Lending; notices to Lender shall be given to Bank shall be addressed to it at its offices at AFTRA Retirement and Health Funds, Attn: Dina Goldman, Executive Director, 261 Madison Avenue, New York, NY 10016.

(d) Amendments. Waiver. This Lending Agreement may be modified only by a written amendment signed by both parties, and no waiver of any provision hereof shall be effective unless expressed in a writing signed by the party to be charged.

(e) Governing Law. Consent to Jurisdiction. Waiver of Jury Trial. Waiver of Immunity. THIS LENDING AGREEMENT TO THE EXTENT NOT PREEMPTED BY ERISA OR OTHER FEDERAL LAW SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, without regard to the conflict of laws principles thereof, except that the foregoing shall not reduce any statutory right to choose New York law or forum. Bank and Lender each hereby consents to the jurisdiction of a state or federal court situated in New York City, New York in connection with any dispute arising hereunder and Lender hereby waives any claim of *forum non conveniens* to the extent that it may lawfully do so. Bank and Lender hereby voluntarily,

14

irrevocably, and unconditionally waive any right to have a jury participate in resolving any dispute, whether arising in contract, tort, or otherwise, between them arising in connection with, related to, or incidental to the relationship established between the Bank and Lender in connection with this Agreement, or any other agreement or document executed or delivered in connection herewith or the transactions related hereto. To the extent that in any jurisdiction Lender may now or hereafter be entitled to claim, for itself or its assets, immunity from suit, execution, attachment (before or after judgment) or other legal process, Lender irrevocably shall not claim, and hereby waives, such immunity.

(f) Counterparts, Headings. This Lending Agreement may be executed in several counterparts, each one of which shall constitute an original, and all collectively shall constitute but one instrument. The headings of the Sections hereof are included for convenience of reference only and do not form part of this Lending Agreement.

(g) Severability. Any provisions hereof which may be determined by competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(h) PTE 99-34. (i) Lender acknowledges that (A) certain segments of "Global Capital Markets", "IS" and "SL" (each as defined herein) are, or may be deemed to be, the same legal entity; and (B) it has received a copy of PTE 99-34. (ii) Bank hereby represents to Lender that each and every Loan made to Global Capital Markets on behalf of Lender shall be at market rates and shall, in no event, be less favorable to Lender than a Loan of such Securities, made at the same time and under the same circumstances, to an unaffiliated borrower and shall be effectively at arm's length. For purposes hereof, "Global Capital Markets" shall mean affiliates of JPMorgan Chase & Co. ("JPM") which are engaged in the capital markets line of business, "IS" shall mean JPM's Investor Services line of business, as operated through Bank and its Affiliates, and "SL" shall mean the Bank's Securities Lending division or any other similar division of Bank or U.S. Affiliates of JPM. (iii) In addition to subsection (ii) of this Section 13(h), Bank hereby acknowledges its responsibility to perform all the other obligations imposed on it by PTE 99-34. In the event of any inconsistency between the terms of this Lending Agreement and PTE 99-34, the terms of PTE 99-34 shall govern in respect of those Borrowers subject to PTE 99-34.

(i) Confidentiality. The parties hereto agree that each shall treat confidentially the terms and conditions of this Lending Agreement and all information provided by each party to the other pursuant to this Lending Agreement regarding its business and operations, including without limitation any information relating to Lender's securities transactions, asset values, or securities holdings. Except as set forth below, all confidential information provided by one party hereto shall be used by the other party hereto solely for the purpose of rendering services pursuant to this Lending Agreement and, except as may be reasonably required in carrying out this Lending Agreement, shall not be disclosed to any third party without the prior consent, instruction or authorization of the party providing the information. For purposes of clarity, the foregoing shall not be applicable to any information: (a) relating to the identity of Lender and, subsequent to the completion of any Loan transaction effected by Lender, the particular information relating to that loan transaction that is (i) disclosed to the Borrower in connection with any Loan made pursuant to this Lending Agreement and (ii) necessary to permit the Borrower to comply with applicable legal and/or regulatory requirements or the Borrower's internal credit and capital requirements (including, without limitation, the Agent Lender Disclosure Project), (b) publicly available when provided or thereafter becomes publicly available other than through a breach of this Lending Agreement, (c) independently derived by any party hereto without the use of any information provided by the other party hereto in connection with this Agreement, (d)

15

disclosed in connection with the exercise of any remedies under this Lending Agreement or an MSLA or in connection with any suit, action or proceeding relating to this Lending Agreement or any MSLA, or (e) requested or required in any legal or regulatory proceeding, investigation, audit, examination, subpoena, civil investigative demand or other similar process, or required by operation of law or regulation. Subsequent to the completion of any Loan, Lender acknowledges and agrees that the Borrower may disclose Lender's identity in connection with such Loan that is disclosed to the borrower in connection with such Loan to the Borrower's auditor and legal counsel and to third parties, in each case, only to the extent necessary to permit the borrower to comply with applicable legal and/or regulatory requirements. The provisions of this Section 13(i) shall survive any termination of this Agreement for a period of one year.

(j)    No Personal Liability.  (A) The execution of this Lending Agreement shall impose no personal liability on the members of Lender's Board of Trustees ("Trustees") (or Trustees' employees, agents, or representatives). In the event of any breach, non-performance or other default by Lender under this Lending Agreement, Bank agrees not to seek any personal judgment against Trustees (or Trustees' employees, agents or representatives), or their heirs executors or administrators, but shall look solely to the assets of Lender itself (i.e., the AFTRA Retirement Fund trust) for (i) the satisfaction of any claim that Bank may have hereunder; or (ii) the collection of any judgment recovered against Lender itself based upon a breach by Lender of any of the terms, conditions or covenants under this Lending Agreement.  (B)  No property or assets of Trustees (or Trustees' employees, agents or representatives) shall be subject in any manner whatsoever to any levy, judgment, execution or other enforcement proceeding for the satisfaction of Bank's remedies arising from or related to either this Lending Agreement or the relationship between Bank and Lender.  (C)  Bank hereby acknowledges that the Individual(s) executing this Lending Agreement on behalf of Lender do so solely in their representative capacities as trustees and fiduciaries of Lender, and not in their personal or individual capacities.

IN WITNESS WHEREOF, the parties have executed this Lending Agreement as of the date first above-written.

AFTRA RETIREMENT FUND

By: _____
Name: Dean Ferris
Title:  Chairperson

By: _____
Name: Shelby Scott
Title:  Co-Chairperson

JPMORGAN CHASE BANK,
NATIONAL ASSOCIATION

By: _____
Name: GENE GEMELLI
Title:  VICE PRESIDENT

354265;v2                                    16

disclosed in connection with the exercise of any remedies under this Lending Agreement or an MSLA or in connection with any suit, action or proceeding relating to this Lending Agreement or any MSLA, or (e) requested or required in any legal or regulatory proceeding, investigation, audit, examination, subpoena, civil investigative demand or other similar process, or required by operation of law or regulation. Subsequent to the completion of any Loan, Lender acknowledges and agrees that the Borrower may disclose Lender's identity in connection with such Loan that is disclosed to the borrower in connection with such Loan to the Borrower's auditor and legal counsel and to third parties, in each case, only to the extent necessary to permit the borrower to comply with applicable legal and/or regulatory requirements. The provisions of this Section 13(f) shall survive any termination of this Agreement for a period of one year.

(j)    No Personal Liability.  (A) The execution of this Lending Agreement shall impose no personal liability on the members of Lender's Board of Trustees ("Trustees") (or Trustees' employees, agents, or representatives). In the event of any breach, non-performance or other default by Lender under this Lending Agreement, Bank agrees not to seek any personal judgment against Trustees (or Trustees' employees, agents or representatives), or their heirs executors or administrators, but shall look solely to the assets of Lender itself (i.e., the AFTRA Retirement Fund trust) for (i) the satisfaction of any claim that Bank may have hereunder; or (ii) the collection of any judgment recovered against Lender itself based upon a breach by Lender of any of the terms, conditions or covenants under this Lending Agreement.  (B)  No property or assets of Trustees (or Trustees' employees, agents or representatives) shall be subject in any manner whatsoever to any levy, judgment, execution or other enforcement proceeding for the satisfaction of Bank's remedies arising from or related to either this Lending Agreement or the relationship between Bank and Lender.  (C)  Bank hereby acknowledges that the individual(s) executing this Lending Agreement on behalf of Lender do so solely in their representative capacities as trustees and fiduciaries of Lender, and not in their personal or individual capacities.

IN WITNESS WHEREOF, the parties have executed this Lending Agreement as of the date first above-written.

AFTRA RETIREMENT FUND

By: _____
Name: Dean Ferris
Title: Chairperson.

By: _____
Name: Shelby Scott
Title: Co-Chairperson

JPMORGAN CHASE BANK,
NATIONAL ASSOCIATION

By: _____
Name:
Title:   GENE GEMELLI
         VICE PRESIDENT

354285:v2

354285v2

## EXHIBIT 1

## EQUILEND DESCRIPTION AND CONSENT TO BANK'S PARTICIPATION ON LENDER'S BEHALF

In May 2001, Bank and a group of leading financial services firms joined to establish EquiLend Holdings LLC ("EquiLend"). EquiLend has developed a system that is designed to facilitate securities lending. The EquiLend platform is an open, global, standards-based system that allows borrowers and lenders of securities to transact with each other through a secure "hub." EquiLend is designed to eliminate the need for participants to maintain point-to-point connections between counterparties. While EquiLend operates an electronic platform ("Platform") for the negotiation of securities lending and borrowing transactions, it neither acts as a principal in any securities lending transaction nor guarantees any transaction executed through the Platform. As required by PTE 02-30, please be advised that Bank intends to use the Platform to transact securities loans on Lender's behalf with other EquiLend participants that are approved Borrowers. (A copy of PTE 02-30 has been furnished to Lender.)

The Platform is itself based on EquiLend's Securities Lending Markup Language™ (SLML™), an open-standards protocol created for the securities lending industry. The Platform (and SLML) are meant to enhance efficiency by replacing manually intensive processes, such as the use of faxes, phone calls, and back-office data handling with a more seamless, standards-based electronic system. By reducing the need for manual intervention, it is anticipated that the Platform will lower the risk of errors and failed transactions. Moreover, by aggregating transaction data in a central electronic location, EquiLend should be able to develop statistically significant benchmarks. EquiLend may also offer to (a) sell or license current and historical data relating to transactions using the Platform and (b) license to users tools that will permit use of the data provided to evaluate securities lending activities. These lending-related products may be offered directly to end users or to securities lending agents for the benefit of their clients. In an October 16, 2002 press release, EquiLend announced that it had facilitated more than $120 billion in lending transactions during the first three months of Platform operation and that the Platform then offered its participants daily access to more than $1 trillion in assets for borrowing.

Given that Bank and a number of other lending agent banks are equity owners of EquiLend, and therefore have a financial interest in its successful operation, EquiLend obtained PTE 02-30 from the U.S. Department of Labor to enable Bank (and other lending agents with an equity interest in EquiLend) to use the Platform to lend assets of ERISA plans (each a "Plan"). (A list of the other firms with an equity interest in EquiLend are set out at the end of this Exhibit.) Among other things, PTE 02-30 permits participation in the Platform by an equity owner of EquiLend in its capacity as a securities lending agent for a Plan, provided that certain conditions are met. (An equity owner acting in the capacity of a securities lending agent is frequently referred to herein and in PTE 02-30 as an "Owner Lending Agent".)

One of the conditions established by PTE 02-30 is that none of the fees imposed by EquiLend for securities lending transactions conducted through the use of the Platform at the direction of an Owner Lending Agent will be charged to the Plan. Consistent with that condition, no Plan will be charged any additional fee for loans made over the Platform; rather the relevant fees charged by EquiLend will be paid by Bank. Such fees are typically expected to include an initiation fee and an annual fee, payable by both lenders and borrowers, that will be structured on a tiered basis. (As an equity owner, however, Bank will not be required to pay the initiation fee. Pursuant to the fee structure, a participant at a given annual fee level will be entitled to a certain number of transactions, with excess transactions being subject to an additional charge. Participants paying the

highest annual fee level will be entitled to an unlimited number of transactions; Bank expects to fall into the highest fee category.)

In addition, PTE 02-30 requires Bank, as an Owner Lending Agent, to: (a) provide prior written notice to a plan, which this Exhibit constitutes, of its intention to participate in EquiLend in connection with the lending of plan assets; and (b) obtain the prior written authorization of a plan fiduciary, that is independent of the Owner Lending Agent (the "Independent Fiduciary"), of the arrangement pursuant to which the Owner Lending Agent (in this case, Bank) will participate in the Platform on behalf of the Plan. By signing in the space provided below, Lender will have given such consent.

Consistent with the requirements of PTE 02-30, please note that at any time after Bank commences using the Platform, the Independent Fiduciary may, without penalty to the Plan, terminate use of the Platform for lending Lender's Securities by providing Bank with five business days' advance written notice of termination (or such lesser time as may be negotiated for such notice of termination by Lender and Bank). (Bank shall also provide an annual statement confirming that these arrangements may be terminated in accordance with such notice procedures.)

In connection with the foregoing, Bank has provided the Independent Fiduciary with such reasonably available information as it reasonably believes is necessary for the Independent Fiduciary to determine whether Bank's proposed use of the Platform on the Plan's behalf should be authorized. In addition, Bank shall provide any other reasonably available information that the Independent Fiduciary may reasonably request to make such determination.

*********************

The other equity owners of EquiLend are: Barclays California Corporation; Bear, Stearns Securities Corp.; Credit Suisse First Boston Next Fund, Inc (a wholly-owned subsidiary of Credit Suisse); LBI Group (a wholly-owned subsidiary of Lehman Brothers, Inc.); Merrill Lynch, Pierce, Fenner & Smith; Inc.; SSB Investments, Inc. (a wholly-owned subsidiary of State Street Corporation); Strategic Investments I, Inc. (a wholly-owned subsidiary of Morgan Stanley & Co.); The Goldman Sachs Group, Inc.; Northern Trust Corporation; and UBS (USA), Inc. Each equity owner has an equal interest.

ACCEPTED AND AGREED BY:
INDEPENDENT PLAN FIDUCIARY OF
AFTRA RETIREMENT FUND

By: _____         By: _____
Name: Dean Ferris                   Name: Shelby Scott
Title: Chairperson                  Title: Co-Chairperson

354285:v2                           2

highest annual fee level will be entitled to an unlimited number of transactions; Bank expects to fall into the highest fee category.)

In addition, PTE 02-30 requires Bank, as an Owner Lending Agent, to: (a) provide prior written notice to a plan, which this Exhibit constitutes, of its intention to participate in EquiLend in connection with the lending of plan assets; and (b) obtain the prior written authorization of a plan fiduciary, that is independent of the Owner Lending Agent (the "Independent Fiduciary"), of the arrangement pursuant to which the Owner Lending Agent (in this case, Bank) will participate in the Platform on behalf of the Plan. By signing in the space provided below, Lender will have given such consent.

Consistent with the requirements of PTE 02-30, please note that at any time after Bank commences using the Platform, the Independent Fiduciary may, without penalty to the Plan, terminate use of the Platform for lending Lender's Securities by providing Bank with five business days' advance written notice of termination (or such lesser time as may be negotiated for such notice of termination by Lender and Bank). (Bank shall also provide an annual statement confirming that these arrangements may be terminated in accordance with such notice procedures.)

In connection with the foregoing, Bank has provided the Independent Fiduciary with such reasonably available information as it reasonably believes is necessary for the Independent Fiduciary to determine whether Bank's proposed use of the Platform on the Plan's behalf should be authorized. In addition, Bank shall provide any other reasonably available information that the Independent Fiduciary may reasonably request to make such determination.

**************************

The other equity owners of EquiLend are: Barclays California Corporation; Bear, Stearns Securities Corp.; Credit Suisse First Boston Next Fund, Inc (a wholly-owned subsidiary of Credit Suisse); LBI Group (a wholly-owned subsidiary of Lehman Brothers, Inc.); Merrill Lynch, Pierce, Fenner & Smith, Inc.; SSB Investments, Inc. (a wholly-owned subsidiary of State Street Corporation); Strategic Investments I, Inc. (a wholly-owned subsidiary of Morgan Stanley & Co.); The Goldman Sachs Group, Inc.; Northern Trust Corporation; and UBS (USA), Inc. Each equity owner has an equal interest.

ACCEPTED AND AGREED BY:
INDEPENDENT PLAN FIDUCIARY OF
AFTRA RETIREMENT FUND

By: _____          By: _____
Name: Dean Ferris                    Name: Shelby Scott
Title: Chairperson                   Title: Co-Chairperson

354285;v2                            2

**Appendix 1**

**SECURITIES LENDING**
**JPMORGAN CHASE BANK, N.A. CASH COLLATERAL FUND**
**INVESTMENT GUIDELINES**

**AFTRA Retirement Plan**

**A.    FUND OBJECTIVE**

This short term, fixed income fund (the "Fund") is designed to obtain an attractive yield on securities lending cash collateral by investing in eligible securities that satisfy these guidelines, as applied at the time of purchase.

**B.    PERMISSIBLE INVESTMENTS**

**1.    Instruments:**

The Fund is permitted to purchase fixed-income instruments and other securities with debt-like characteristics, including (subject to the Prohibited Investments set forth in paragraph C):

Asset Backed Securities
Bank Notes
Banker's Acceptances
Certificates of Deposit
Commercial Paper,
   including unregistered
   (so-called 4(2))
   Commercial Paper
Corporate Bonds
Corporate Notes
Floating Rate Notes
Floating Rate
   Certificates of Deposit
GICs and synthetic GICs

Master Notes
Medium Term Notes
Promissory Notes
Repurchase Agreements
Time Deposits
U.S. Government Securities
   including Obligations of
   the U.S. Treasury and
   Obligations of U.S.
   Government Agencies or
   Instrumentalities

**2.    Commingled Vehicles:**

In addition, for purposes of these guidelines, shares of a money market mutual fund (a "money market fund") registered with the Securities and Exchange Commission as an investment company under the Investment Company Act of 1940, as amended (the "1940 Act"): (i) shall be an Eligible Security; (ii) shall be deemed to have a Final Maturity of one day for purposes of the Maturity Guidelines in paragraph F; and (iii) are not subject to the Concentration Guidelines in paragraph E or the Quality Guidelines in paragraph H.

3.   **Currency:**

U.S. dollar denominated securities only.

4.   **Limitation on foreign issuers:**

None, provided that they otherwise meet the criteria set forth in these guidelines.

### C.   PROHIBITED INVESTMENTS

1.   Any securities issued by J.P. Morgan Chase & Co. or its affiliates.

2.   Equity securities other than equity securities such as owner trust certificates, that have predominantly debt characteristics, are not prohibited.

3.   Floating rate securities with an interest rate cap or collar, with the exception of those capped to comply with state usury laws.

4.   Floating rate securities the interest rate on which does not reset as a result of changes in one or more reference interest rates. Examples of prohibited floating rate securities are those whose interest rate reset is based on an index of commodities or equity securities.

5.   Futures contracts and options on futures contracts.

6.   Interest rate swap transactions where the Fund is a counterparty to the interest rate swap agreement.

7.   Mortgage pass-through certificates, collateralized mortgage obligations and real estate mortgage investment conduits (REMICs), where the underlying collateral is first mortgages on residential or commercial properties, except that Agency MBS (as defined below) will not be Prohibited Investments in connection with repurchase agreements as provided in paragraph G. Mortgage-backed securities where the underlying collateral is home-equity loans are not Prohibited Investments.

8.   Any units of a common trust fund or collective trust fund of the type referred to in Section 3 (c) (3) or Section 3 (c) (11) of the 1940 Act.

9.   Any security which derives all or a portion of its value from another security or index (for example, structured notes, futures or swaps). Notwithstanding the foregoing, a security that is a permissible investment for a money market fund shall not be a prohibited investment under this paragraph C.9.

### D.   LIMITATIONS ON AMOUNTS INVESTED/CASH RESERVE; PERMITTED BORROWING

1.    The Fund will seek to be invested fully in Eligible Securities as of the close of business on each day.

2.    On a temporary basis, not to exceed seven days and solely for the purpose of liquidity, the Fund may enter into reverse repurchase agreements with respect to U.S. Government Securities. While any such reverse repurchase agreement is outstanding, the Fund shall not make additional term investments.

**E.    CONCENTRATION GUIDELINES**

1.    No more than 10% of the Fund's total assets, measured at the time of purchase, may be invested in the securities of a single issuer (other than U.S. Government Securities and Repurchase Agreements and the commingled vehicles identified in Paragraph B.2, as to which there is no limitation).

**F.    MATURITY GUIDELINES**

1.    Fixed rate instruments must have a final maturity at the time of purchase that does not exceed one year.

2.    The Fund's maximum dollar weighted average days to maturity may not exceed 90. For purposes of calculating the Fund's dollar weighted average days to maturity, the maturity of a given instrument shall be, in the case of: (i) a fixed rate instrument, the date noted on the face of the instrument as the date on which the principal amount must be paid; (ii) an instrument with an unconditional put or unconditional demand feature, the date on which the principal amount of the instrument can be recovered by demand; and (iii) a floating rate instrument, the next readjustment of the interest rate.

3.    Floating rate instruments which are U.S. Government Securities must have a Final Maturity not exceeding 5 years at the time of purchase and all other floating rate instruments must have a Final Maturity not exceeding 2 years at the time of purchase; provided that, if the maturity of a floating rate instrument is determined by reference to an unconditional put or unconditional demand feature, the period remaining between adjustments of the interest rate must not exceed the period specified in paragraph F.1.

4.    Final Maturity for purposes of these Guidelines means the date noted on the face of the instrument (or equivalent) as the date on which the principal amount must be paid.

5.    A repurchase agreement shall be deemed to have a maturity equal to the period remaining until the date on which the repurchase of the underlying securities is scheduled to occur or, where no date is specified but the agreement is subject to a demand for the repurchase of the securities, the notice period applicable to such demand.

6.  Adjustable rate mortgages shall have a maturity equal to the period remaining until the last principal payment is required to be paid by the terms of the underlying obligation.

7.  Shares of a money market mutual fund (a "money market fund") registered with the Securities and Exchange Commission as an investment company under the Investment Company Act of 1940, as amended (the "1940 Act") shall be deemed to have a Final Maturity of one day.

## G.  REPURCHASE AGREEMENTS (Including term repurchase agreements, entered into using custodians deemed appropriate by Bank)

1.  **Permitted collateral:**

Bills, bonds or notes issued by the United States Treasury, or other securities guaranteed as to principal and interest by the Government of the United States, its agencies, instrumentalities or establishments; mortgage-backed securities sponsored by agencies of the Government of the United States; corporate obligations of domestic and foreign issuers with a minimum rating of AA- by Standard & Poor's Corporation ("S&P") or Aa3 by Moody's Investor Services, Inc. ("Moody's"); asset-backed securities with a minimum rating of AAA by S&P or Aaa by Moody's; or money market instruments (including, but not limited to, certificates of deposit, bank notes, deposit notes, banker's acceptances and commercial paper issued by domestic issuers with a minimum rating of A-1 by S&P and P-1 by Moody's).

## H.  QUALITY GUIDELINES

Except as otherwise provided with respect to repurchase agreement collateral in paragraph G:

1.  Specified Rating Categories at time of purchase:

> Short-term:  Short-term instruments must be rated any two of the following: A-1 by S&P, P-1 by Moody's, F-1 by Fitch Ratings.

> Long-term: Long-term instruments must be rated at least A- by S&P, A3 by Moody's, or A- by Fitch Ratings.

A security without its own rating will be considered to be rated if its issuer's comparable securities are rated with respect to: (i) a class of short-term debt obligations, in the case of short-term ratings, (ii) a class of long-term debt obligations, in the case of long-term ratings, or (iii) any security within the relevant class that is comparable in priority and security with the purchased security.

278763:v01

4

Long-term ratings will be used only if the security is not rated and no security of the same issuer that is comparable in priority with such security is rated.

2.    The Fund may not purchase Eligible Securities based on an NRSRO's rating where that NRSRO has announced publicly that it is examining the rating for a possible downgrade. This limitation does not apply to eligible securities rated A-1+ by Standard & Poor's Corporation.

## I    MISCELLANEOUS

1.    Lender hereby acknowledges that: (i) the Fund is a bank collective fund; (ii) its interest in the Fund is not guaranteed or insured by Bank or any Affiliate or by the Federal Deposit Insurance Corporation or any other government agency; (iii) its interest in the Fund shall consist of units; and (iv) Securities held in the Fund shall typically be valued based on their amortized cost, but Bank need not so value them.

2.    A copy of the Declaration of Trust for the Fund has been furnished to Lender for convenience of reference.

*    *    *

*Lender should analyze these Guidelines regularly to determine their continued appropriateness, recognizing that all investments bear risk and that the return of principal in respect of Fund investments is not assured.*

By: _____          By: _____
Name: Dean Fexis                       Name: Shelby Scott
Title: Chairperson                     Title: Co-Chairperson
Date: _____        Date: _____

Long-term ratings will be used only if the security is not rated and no security of the same issuer that is comparable in priority with such security is rated.

2.  The Fund may not purchase Eligible Securities based on an NRSRO's rating where that NRSRO has announced publicly that it is examining the rating for a possible downgrade.  This limitation does not apply to eligible securities rated A-1+ by Standard & Poor's Corporation.

**I    MISCELLANEOUS**

1.  Lender hereby acknowledges that: (i) the Fund is a bank collective fund; (ii) its interest in the Fund is not guaranteed or insured by Bank or any Affiliate or by the Federal Deposit Insurance Corporation or any other government agency; (iii) its interest in the Fund shall consist of units; and (iv) Securities held in the Fund shall typically be valued based on their amortized cost, but Bank need not so value them.

2.  A copy of the Declaration of Trust for the Fund has been furnished to Lender for convenience of reference.

＊        ＊        ＊

*Lender should analyze these Guidelines regularly to determine their continued appropriateness, recognizing that all investments bear risk and that the return of principal in respect of Fund investments is not assured.*

By: _____                By: ~~signature~~
Name: Dean Ferris                         Name: Shelby Scott
Title: Chairperson                        Title: Co-Chairperson
Date: _____              Date: _____

~~SIGNED WITH
INITIAL CONTRACT
DATED 12/1/05~~

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BOARD OF TRUSTEES OF THE AFTRA RETIREMENT FUND, in its capacity as a fiduciary of the AFTRA Retirement Fund, individually and on behalf of all others similarly situated, | No. 09-cv-00686 (SAS) (DF) |
| Plaintiff, | ECF Case |
| v. | |
| JPMORGAN CHASE BANK, N.A., | |
| Defendant. | |

### CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2009, I caused a true and correct copy of the foregoing to be served upon the following counsel by overnight delivery:

> Lewis R. Clayton, Esq.
> Jonathan H. Hurwitz, Esq.
> Paul, Weiss, Rikfind, Wharton & Garrison, LLP
> 1285 Avenue of the Americas
> New York, NY 10019

_____

Peter H. LeVan, Jr.