## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BOARD OF TRUSTEES OF THE AFTRA RETIREMENT FUND, in its capacity as a fiduciary of the AFTRA Retirement Fund, individually and on behalf of all others similarly situated, | Consolidated as Civil Action No. 09-00686 (SAS) (DF) ECF Case |

                                        Plaintiff,

        v.

JPMORGAN CHASE BANK, N.A.,

                                        Defendant.

BOARD OF TRUSTEES OF THE IMPERIAL
COUNTY EMPLOYEES' RETIREMENT
SYSTEM, in its capacity as a fiduciary of the
Imperial County Employees' Retirement
System, individually and on behalf of all others
similarly situated,

                                        Plaintiff,

        v.

JPMORGAN CHASE BANK, N.A.,

                                        Defendant.

THE INVESTMENT COMMITTEE OF THE
MANHATTAN AND BRONX SURFACE
TRANSIT OPERATING AUTHORITY
PENSION PLAN, in its capacity as a fiduciary
of the MaBSTOA Pension Plan, individually
and on behalf of all others similarly situated,

                                        Plaintiff,

        v.

JPMORGAN CHASE BANK, N.A.,

                                        Defendant.

## DECLARATION OF GEOFFREY P. MILLER

I, Geoffrey P. Miller, declare as follows:

1. I am the Stuyvesant P. Comfort Professor of Law at New York University located in New York, New York. I have been retained to provide an expert opinion as to the appropriateness of this case for class certification. I make the following representations on the basis of my own personal knowledge. If called as a witness, I could and would competently testify to the matters stated herein.

Background and Qualifications

2. For more than twenty years I have been involved in the area of class action litigation as a teacher, scholar, attorney, consultant, and expert witness.

3. I am presently teaching or have taught classes covering class action litigation, including Civil Procedure, Complex Litigation, Corporations, Professional Responsibility, and Securities Regulation. I regularly lecture on class action litigation in continuing legal education seminars and participate in academic conferences and meetings devoted to class action issues.

4. I have acted as counsel in class actions and shareholders derivative litigation, including cases alleging claims of breach of fiduciary duty by corporate directors.

5. I have written approximately two dozen research articles dealing with class action law and practice. My articles on class actions have been cited by state and federal courts across the United States.

6. I have frequently consulted with attorneys to assist with issues pertaining to class certification, class settlement, and awards of class counsel fees. I have been qualified as an expert and testified in class action cases in state and federal courts across the United States, including testimony on the topic of the appropriateness of cases for class certification.

7. Further information on my background and qualifications is set forth my resume, attached hereto as Appendix A.

2

## Summary of Opinion

8. For the reasons stated below, it is my opinion, based on the materials I have reviewed, that this case is appropriately certifiable as a class action under Federal Rule 23.

## Materials Relied On

9. In preparing this opinion, I have reviewed pleadings and other documents in this case, including but not limited to (1) Amended Class Action Complaint, Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase Bank, N.A.; (2) Class Action Complaint, Board of Trustees of the Imperial County Employees' Retirement System v. JPMorgan Chase Bank, N.A.; (3) Class Action Complaint, The Investment Committee of the Manhattan and Bronx Surface Transit Operating Authority Pension Plan, in its capacity as a fiduciary of the MaBSTOA Pension Plan v. JPMorgan Chase Bank, N.A.; (4) Answer of JPMorgan Chase Bank, N.A. to the three operative complaints; (5) Stipulation and Protective Order; (6) Plaintiffs' Confidential Statement prepared for settlement discussions; (7) Securities Lending Agreement dated December 1, 2005 between AFTRA Retirement Fund and JPMorgan Chase Bank; (8) Securities Lending Agreement dated June 19, 2002 between Imperial County Employees' Retirement System and JPMorgan Chase Bank; (9) Securities Lending Agreement dated May 14, 1998 between MaBSTOA Pension Plan and JPMorgan Chase Bank and Amendment thereto dated January 18, 2005; (10) the depositions of Christine Dubois, Carol Micalizzi, Enrique Rubano and David Prince; (11) a compilation of 76 securities lending agreements between JPMorgan Chase and its securities lending clients; and (12) the resume of interim lead class counsel. I have also discussed this matter with counsel and investigated appropriate case law and secondary authorities.

The Litigation

10.  The Litigation consists of three consolidated actions concerning JPMorgan Chase Bank's ("JPMorgan" or "Defendant") actions and conduct relating to approximately $490 million of investments made for its securities lending clients in medium term notes (the "Notes") issued by Sigma Finance, Inc. ("Sigma"). The consolidated actions are brought by the Board of Trustees of the AFTRA Retirement Fund ("AFTRA"), Board of Trustees of the Imperial County Employees' Retirement System ("ICERS"), and The Investment Committee of the Manhattan and Bronx Surface Transit Operating Authority Pension Plan ("MaBSTOA" and, collectively with AFTRA and ICERS, the "Plaintiffs"). The Plaintiffs brought their respective cases on behalf of similarly situated participants in JPMorgan's securities lending program.  Plaintiffs seek to certify a class defined as follows:

> All plans and entities for which JPMorgan Chase Bank, N.A., pursuant to a securities lending agreement, invested cash collateral, either directly or through a collective investment vehicle, in one or more debt securities of Sigma Finance, Inc. and continued to hold those debt securities as of the close of business on September 30, 2008 (the "class").

Plaintiffs propose, to the extent the Court deems it necessary or appropriate, the class be sub-classed into (a) a sub-class consisting of those class members governed by ERISA, and (b) a sub-class consisting of those class members not governed by ERISA.  Essentially, the class (with the proposed sub-classes) consists of all investors that participated in Defendant's securities lending program and incurred losses relating to Defendant's investments in the Sigma Notes.

11.  Each class member was party to a securities lending agreement under which Defendant loaned securities owned by class members to third-party borrowers in return for cash collateral. Defendant then invested the cash collateral with a view to earning a net profit for the lenders of the

securities.  The securities lending agreements provided that Defendant would receive a fee based on a percentage of the net revenues generated for its class member clients.

12.  The complaints allege that Defendant also earned fees by providing short-term repurchase ("repo") financing for Sigma.  This repo financing allegedly created a conflict of interest between Defendant's interest in protecting its clients' investments, on the one hand, and continuing to earn fees on repo deals, on the other; it also allegedly gave Defendant an inside track on problems at Sigma which should have alerted it to the risks associated with continued investment in the Notes.  The repo financing allegedly created an additional conflict of interest between Defendant and class members because, through the repo financing, Defendant took a senior lien interest in the very same Sigma assets that secured the Sigma Notes.  Defendant ultimately foreclosed on these assets, forcing Sigma into receivership, and subordinated its own clients' security interests in Sigma's assets for its own financial benefit.  In addition, the complaints allege that Defendant managed money market funds that also invested in earlier maturities of the Sigma Notes, which Defendant allowed to mature before foreclosing its repo security interest.  The complaints allege this activity also created a conflict of interest for Defendant.

13.  The complaints allege the class members incurred large losses in the Fall of 2008 when Sigma's repo creditors (including Defendant) seized the great majority of Sigma's assets and forced Sigma into receivership.  The complaints allege Defendant placed class members' assets in a risky and improvident investment, subject to severe conflicts of interest, in breach of fiduciary duties as well as obligations under ERISA and the securities lending agreements.  The complaints seek recovery for class members' losses as well as associated equitable relief.

<u>Opinion</u>

14.   The issue presented to this Court on motion for class certification is whether the requirements of Rule 23 are met. The analysis of that question turns on the facts of the case and its susceptibility to efficient litigation within the framework of class proceedings. It is my opinion that the prerequisites of the Rule are easily satisfied in the present case, the action therefore should be certified as a class for litigation purposes, Plaintiffs should be appointed as class representatives, and interim lead class counsel should be appointed as class counsel.

<u>General Considerations</u>

15.   Class action litigation, as this Court is aware, potentially serves important public values. In appropriate cases, class treatment can achieve significant economies both for the courts and for the parties in consolidating similar claims in a single proceeding. Class treatment obviates the need for multiple, overlapping pleading, discovery, and proof of fact. It facilitates settlement negotiations that can lead to a global resolution of a controversy, in furtherance of the important federal policy of encouraging the private resolution of disputes. Class treatment can also provide a means for litigating claims that, in the absence of certification, would not be economically viable given the litigation costs involved. It provides a potentially effective means for enforcing substantive legal rights, for deterring large-scale misconduct by corporations and governments, and for supplementing the strained resources of public enforcement agencies. Class treatment can benefit both plaintiffs and defendants by reducing the costs of litigation and by facilitating the global resolution of controversies in a fair, equitable and expeditious manner. Courts appropriately consider these policies when evaluating motions for class certification under Rule 23.

16. The policies of Rule 23 would be furthered by certifying the class in the present case. Class certification would achieve substantial economies of scale by consolidating numerous claims that have similar factual and legal predicates. For example, in this case the litigation and discovery costs are significant, especially given the complexity of the issues surrounding JPMorgan's transactions with Sigma, the millions of pages of documents produced and reviewed in this case to date, the need for numerous expert opinions and depositions, and the international discovery conducted thus far and that will continue to be pursued. Without the class device, these costs would easily consume the entire amount potentially recoverable by many class members if brought as individual actions. Through class certification, however, the burden on this Court, the parties, and prospective plaintiffs would be substantially alleviated. Moreover, certification of the class, and the eventual resolution of the case by judgment or settlement, would result in a comprehensive resolution of the dispute, thereby administering justice equitably to all class members while allowing Defendant a full and fair opportunity to present its defenses and to obtain a comprehensive resolution of its potential liability for the challenged transactions.

## Rule 23

17. I now turn to an analysis of Rule 23. That rule requires the proponent of certification to establish that every element of Rule 23(a) be satisfied and that at least one element of Rule 23(b) be satisfied as well. The four elements of Rule 23(a) are often referred to as those of numerosity, commonality, typicality and adequacy of representation.

18. The numerosity requirement of Rule 23(a)(1) demands that the class be "so numerous that joinder of all members is impracticable." This requirement, like the other prerequisites under Rule 23, is appropriately interpreted in the context of the policies of Rule 23. The present action involves a total of 76 class members. While this number is not large compared with many consumer class actions,

7

which may run into the thousands or even millions of class members, it is sufficiently substantial so as to offer significant efficiencies from class treatment. Further, there can be no assurance that if class action status is denied, the claims of all class members will be joined in a single proceeding. Given these difficulties of joinder as compared with the ease and simplicity of the class method, it is my opinion that the numerosity requirement is satisfied in the present case.

19. The commonality requirement of Rule 23(a)(2) demands that there be "questions of law or fact common to the class." This requirement is clearly met given the essential overlap of many of the claims pertinent to class members – a matter I will discuss below under the heading of predominance.

20. The typicality requirement of Rule 23(a)(3) demands that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." The claims of the Plaintiffs are typical of the claims of the class as a whole. Like all class members, the Plaintiffs suffered harm as a result of Defendant's alleged imprudent and conflicted management of their assets and its alleged failure to take appropriate precautions to prevent a clear risk of financial loss associated with investments in the Notes. Although the class includes both ERISA plans and non-ERISA investors, Plaintiffs' factual allegations and legal theories are similar for *all* class members—*i.e.,* Defendant breached its fiduciary duties by failing to prudently and loyally manage plan assets and by putting itself in substantial and severe conflicts of interest. Obviously, the ERISA class members' claims are governed by a federal statute that imposes a uniform fiduciary duty on Defendant. Similarly, because virtually every class member's securities lending agreement provides that New York law governs,[1] the non-ERISA class members' claims are governed by one state's law which likewise imposes a uniform fiduciary duty on Defendant. *See, e.g., The Independent Order of Foresters v. Donald, Lufkin &*

---

[1] Only one class member has a securities lending agreement that requires application of a state's law other than New York's.

8

*Jenrette, Inc.*, 157 F.3d 933 (2d Cir. 1998) (recognizing the fiduciary duty inherent in a broker/customer relationship where the customer has delegated discretionary trading authority to the broker (citing *Press v. Chemical Inv. Servs. Corp.*, 988 F. Supp. 375 (S.D.N.Y. 1997)).[2]  In the context of the claims of this case, the New York common law fiduciary duty claim is not materially different than the ERISA claim,[3] and both arise from precisely the same conduct.  Accordingly, in my opinion, the fiduciary duty claims of all class members are typical.  The differences between the ERISA claims and common law claims of class members, albeit immaterial from a class certification standpoint in my opinion, may nonetheless be properly managed, if the Court deems it necessary, through the use of the proposed sub-classes.

21.    Plaintiffs additionally allege, for those class members not governed by ERISA, that Defendant breached its obligations under the securities lending agreements by failing to comply with investment guidelines, failing to discharge its fiduciary duties, failing or refusing to assume liability for the losses class members suffered as a result of Defendant's negligent, bad faith or willful misconduct, and failing to act in conformance with the duty of good faith and fair dealing.  These claims arise from identical factual allegations and legal theories and, with the one exception noted above, are governed by New York law.  Accordingly, in my opinion, each of the contract claims is typical and, if deemed necessary, may be properly managed through the use of the proposed sub-classes.

22.  In sum, Plaintiffs' and the class's fiduciary duty and conflict claims rely on the same legal theories (that Defendant breached fiduciary duties to its class member clients) and factual theories (that

---

[2] The regulations of the Office of the Comptroller of Currency also establish a uniform fiduciary duty applicable to national banks such as Defendant.  *See* 12 CFR Ch. 9 (establishing a uniform fiduciary duty standard for national banks that prohibits self dealing and conflicts of interest, including the investment of funds of fiduciary accounts in organizations "with whom there exists an interest that might affect the exercise of the best judgment of the bank").

[3] *Compare, e.g.*, 29 U.S.C. § 1104(a)(1) (ERISA fiduciary "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and, among other things, must act prudently) *with Matter of Estate of Schulman*, 165 A.D.2d 499, 503, 568 N.Y.S.2d 660, 663 (A.D. 3 Dept. 1991) (fiduciary must comply with "prudent man rule" and owes duty of utmost loyalty).

Defendant acted out of conflicting loyalties and knew or should have known of the serious risks associated with the Notes).  The same is true for the breach of contract claim.  I have seen nothing in the record or my research that suggests anything distinctive about any named Plaintiff that would serve to differentiate it from other class members with respect to its fundamental interest in this litigation. Any such differences can, if deemed necessary, be properly managed through the use of the proposed sub-classes.

23.    The adequacy-of-representation requirement of Rule 23(a)(4) demands that the representative parties will "fairly and adequately protect the interests of the class."  This requirement involves both the adequacy of the representative plaintiff as well as the adequacy of class counsel. Plaintiff AFTRA, founded in 1954, provides retirement benefits to eligible members of the American Federation of Television and Radio Artists, a national labor union representing over 70,000 performers, journalists, and other artists working in entertainment and news media, through the AFTRA Retirement Fund.  Plaintiff ICERS provides retirement benefits to employees of Imperial County, California. Plaintiff MaBSTOA, created by New York State law in 1962 as a public benefit corporation and subsidiary of the New York City Transit Authority, provides retirement and death benefits to its eligible members, including New York City's transit workers, through the MaBSTOA Pension Plan.  The Plaintiffs are reputable organizations with significant interest in the subject matter of this controversy, and with the sophistication and incentives to monitor class counsel in order to ensure that class members receive diligent, un-conflicted, and competent representation.  There are no conflicts among segments of the class of the sort that defeats class certification in cases, such as *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), which involve vulnerable clients with radically opposing interests in the litigation.

10

24. Attorneys for the class are persons of extraordinary talent and outstanding reputations who have demonstrated by their work product in this case, success in other class action litigation, and appointment as class counsel by numerous federal courts across the country, that they are fully capable of prosecuting this action vigorously on behalf of class members. I know of no conflicts of interest or other reasons to doubt that these attorneys will provide first-class representation of class interests.

25. In addition to demonstrating that the elements of Rule 23(a) are met, the proponent of class certification must also demonstrate that the case satisfies one of the subsections of Rule 23(b). I understand from counsel that this case will be framed as a Rule 23(b)(3) "opt-out" class action. Rule 23(b) requires the Court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The requirements of Rule 23(b) are usually referred to as those of "superiority" and "predominance."

26. Class action treatment is clearly the superior means for resolving this controversy. The practicable alternatives to class treatment are individual lawsuits or no litigation at all. The latter does not resolve the controversy but only leaves potential legal rights unenforced. The former approach of individual litigation has all the problems of duplication, inefficiency, burden, and unequal treatment already discussed. A class action, in contrast, offers the potential for an efficient and complete resolution of the controversy between Defendant and class members.

27. Predominance is also satisfied here. Like all class actions under Rule 23(b)(3), this case presents individual issues of determining the amount of damages. Individualized damages questions, however, are never sufficient to defeat class certification under Rule 23(b)(3); otherwise the rule would become a dead letter. And in this case, the calculation of damages for each class member is very straightforward. This case is overwhelmingly dominated by two common issues: whether the

11

Defendant violated a fiduciary duty of loyalty by engaging in transactions involving inappropriate conflicts of interest; and whether the Defendant violated a fiduciary duty of prudence by placing class members' funds in an inappropriate and improvident investment at a time when Defendant knew or should have known of the risks associated with the investment. Both predominating issues may be established through common proof of Defendant's knowledge and conduct, without reference to any individual or particular class member. Thus, not only do these issues predominate this case, they are certainly common to all class members.

28. Included within these two overriding common issues are numerous more specific issues of law or fact common to the class, including:

(a) whether Defendant owed a fiduciary duty of loyalty to class members;

(b) whether Defendant owed a fiduciary duty of prudence to class members;

(c). whether Defendant's provision of repo financing to Sigma created a conflict of interest between Defendant's interest in obtaining a superior lien position in the assets of Sigma (which subordinated the security interest of class members) and its fiduciary obligation to stringently protect the interests of the class members;

(d) whether Defendant's seizure of the repo collateral it received from Sigma created a conflict of interest between Defendant's interest in protecting its financing activities (by depriving class members of the very assets that partially secured the Notes) and its fiduciary obligation to stringently protect the interests of the class members;

(e) whether Defendant's provision of repo financing to Sigma created a conflict of interest between Defendant's interest in obtaining profits from its financing activities and its interest in providing quality investment services to class members;

12

(f) whether Defendant breached its fiduciary duty of prudence by investing in and continuing to hold the Notes when it knew or should have known that it was not prudent to do so;

(g) whether Defendant breached class members' securities lending agreements by investing in and continuing to hold the Notes when it knew or should have known that it was not prudent to do so;

(h) whether Defendant knew of, or with reasonable diligence could have discovered, Sigma's precarious financial position at the time it invested and continued to hold the class members' assets in the Notes;

(i) when Defendant knew or should have known of Sigma's precarious financial position;

(j) whether Defendant had a duty to inform class members of Sigma's precarious financial position and the risk that the Notes would not be paid in full;

(k) whether Defendant had a duty to inform class members that it had significant conflicts of interest in assessing the prudence of the Notes;

(l) whether class members sustained losses as a consequence of Defendant's breach of fiduciary duty and breach of the securities lending agreements; and

(m) the appropriate measure for calculating the losses sustained by class members as a result of Defendant's breach of fiduciary duty and breach of the securities lending agreements.

29.    The factors set forth in Rule 23(b)(3)(A)-(D) for evaluating the predominance and superiority requirements also confirm that this case is suitable for class action treatment. Regarding factor (A), given the substantial overlap in the claims of all class members and the adequacy of representation provided by Plaintiffs and class counsel, there is no special or unique reason why a class member should wish to bear the burden and expense of individually controlling the prosecution of its claims. Indeed, many class members may be intimidated by the prospect of suing their securities custodian with whom they have active, on-going relationships for fear of reprisal that could result in

13

lower quality service, reduced responsiveness to their needs and/or termination of their custodial relationship, thereby resulting in significant burdens and expense of moving custodial accounts and disruption of ordinary business activities. Likewise, many class members would not want to undertake the expense, burden, and disruption caused by such complex litigation, including the significant burdens of document, deposition, and written discovery. Regarding factor (B), I understand the cases pending in this Court represent the only such litigation currently pending. Regarding factor (C), the litigation is already concentrated in this forum and it is desirable that all class members' claims be resolved in this one litigation with a judge who has a proven record of efficiently adjudicating complex claims. Finally, regarding factor (D), the case is easily manageable on a class-wide basis, and in fact is far more manageable than many class actions because of the discrete nature of the controversy, the fact that all class members are readily identifiable (and, in fact, have been identified), the coherence of the claims, and the fact that damages appear to be calculable according to an objective and reasonably administrable methodology. Any differences among segments of the class, such as those between ERISA and non-ERISA plaintiffs, can readily be managed either through careful attention to these factors in class-wide litigation or, as appropriate in the Court's discretion, through the creation of the proposed sub-classes.

30. This action also satisfies other, non-statutory criteria for class certification. Class members can readily be ascertained by an objective and easily-administered class definition. They can readily be located and the relief generated by the litigation (if any) can be distributed cheaply and expeditiously. This is not a "fail-safe" class defined with reference to the ultimate outcome of the case. The issues can be framed for adjudication in the ordinary course, including the usual pre-trial discovery, motions, and presentation of evidence and arguments.

14

## Conclusion

31. Based on the materials I have reviewed, it is my opinion that this case is suitable for class certification under Federal Rule 23(a) and (b)(3) as the prerequisites of the Rule are easily satisfied. Therefore, in my opinion, the action should be certified as a class for litigation purposes, Plaintiffs should be appointed as class representatives, and interim lead class counsel should be appointed as class counsel.

Geoffrey P. Miller
April 19, 2010

15

Appendix A: Resume

## GEOFFREŸ P. MILLER

New York University Law School
40 Washington Square South Suite 411G
New York, New York 10012
 (212) 998-6329 (office)
(212) 995-4659 (fax)
geoffrey.miller@nyu.edu

### Work Experience

New York University Law School (1995-present)
  Stuyvesant P. Comfort Professor of Law
  Director, NYU Center for the Study of Central Banks and Financial Institutions (1994-present)
  Co-Director, NYU Center for Law, Economics and Organization (2006-present)
  Co-Founder and Co-President, Society for Empirical Legal Studies (2006-2007)
  Chair, Academic Personnel Committee (1999-2000; 2004-2006)
  Chair, Promotions and Tenure Committee (2007-2009)

University of Chicago Law School (1983-1995)
  Kirkland & Ellis Professor (1989-1995)
  Editor, Journal of Legal Studies (1989-1995)
  Director, Program in Law and Economics (1994-1995)
  Director, Legal Theory Workshop (1989-1993)
  Associate Dean (1987-1989)
  Professor of Law (1987-1989)
  Assistant Professor of Law (1983-1987)

Robert B. and Candace J. Haas Visiting Professor of Law, Harvard Law School,
      Fall 2009
Max Schmidheiny Guest Professor, University of St. Gallen, Switzerland
      Summer 2009
Fresco Endowed Professor of Law, University of Genoa, Italy, Summer 2008,
      Spring 2009, Summer 2010 (invited)
Visiting Scholar, University of Minnesota Law School, Spring 2008
Visiting Lecturer, University of Bolzano, Italy, Summer 2007
Commerzbank Visiting Professor, Institute for Law & Finance, University of
      Frankfurt, Germany, Summer 2004, Summer 2005, Summer 2010 (invited)
Visiting Professor, Columbia Law School, Fall 2001
Visiting Professor, University of Sydney, Australia, Summer 2002; Summer 2006;

16

Spring 2009

Zaeslin Visiting Professor, University of Basel, Switzerland, Summer 2001, 2002, 2003,
    2004, 2005, 2007, 2008, 2009, 2010 (invited)

Visiting Scholar, CentER for Economic Research, Tilburg, Holland, Summer 1996

John M. Olin Visiting Scholar, Cornell University Law School, Summer 1992,
    Spring 1996; Winter 1997, Summer 2005, Spring 2008, Spring 2009

Visiting Scholar, Bank of Japan, Spring 1995

Visiting Scholar, Universidad Tocurata de Tella, Buenos Aires, Argentina, Fall 1994

Visiting Professor of Law, New York University, Fall 1994

Consultant, Federal Reserve Bank of Chicago, 1992-1994

Visiting Scholar, New York University Law School, Fall 1993

Simpson Grierson Butler White Visiting Professor, University of Aukland,
    New Zealand, Summer 1993

Associate, Ennis, Friedman, Bersoff & Ewing
Washington, D.C. (1982-83)

Attorney Adviser, Office of Legal Counsel
U.S. Department of Justice (1980-82)

Clerk, Hon. Byron R. White
Supreme Court of the United States (1979-80)

Clerk, Hon. Carl McGowan
U.S. Court of Appeals, District of Columbia (1978-79)

### Education

Columbia Law School, J.D. (1978)
Editor-in-Chief, Columbia Law Review (1977-78)
Princeton University, A.B. *magna cum laude* (1973)

### Publications

### Books

The Economics of Ancient Law (editor) (Edward Elgar, forthcoming 2010)

Bank Mergers and Acquisitions (editor, with Yakov Amihud) (Kluwer Academic Publishers 1998)

La Banca Central en América Latina: Aspectos Económicos y Juridicos [Central Banks in Latin
America and Their New Legal Structure] (in Spanish) (editor, with Ernesto Aguirre and Roberto
Junguito Bonnet) (Tercer Mundo: Bogotá 1997)

Costly Policies: State Regulation and Antitrust Exemption in Insurance Markets (AEI Press 1993) (with Jonathan R. Macey)

Banking Law and Regulation, Little, Brown & Co. 1992 (with Jonathan R. Macey); Second Edition, Aspen Law & Business 1997 (with Jonathan R. Macey), Third Edition, Aspen Law & Business 2001 (with Jonathan R. Macey and Richard Scott Carnell); Fourth Edition, Aspen Law & Business 2008 (with Richard Scott Carnell and Jonathan R. Macey)

Banking Law and Regulation: Statutory and Case Supplement (Little, Brown & Co. 1992; Second Edition, Aspen Law & Business, 1997) (with Jonathan R. Macey), Third Edition, Aspen Law & Business, 2000) (with Jonathan R. Macey and Richard Scott Carnell); Fourth Edition, Aspen Law & Business 2008 (with Richard Scott Carnell and Jonathan Macey)

Banking Law and Regulation: Teacher's Manual (1992; Second Edition 1997; Third Edition 2001, Fourth Edition 2008) (with Jonathan R. Macey and Richard Scott Carnell)

### Articles

### Legal Ethics/Legal Profession

Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008, ___ Journal of Empirical Legal Studies ___ (forthcoming 2010) (with Theodore Eisenberg)

Ethical Considerations in Class Action Practice, in Practising Law Institute, Class Action Litigation 2007: Prosecution & Defense Strategies (2007)

From Club to Market: The Evolving Role of Business Lawyers, 74 Fordham Law Review 1105 (2005)

Bad Judges, 83 Texas Law Review 431 (2004)

Attorneys' Fees in Class Action Settlements: An Empirical Study, 1 Journal of Empirical Legal Studies 27 (2004) (with Theodore Eisenberg)

Professional Independence and the Corporate Lawyer (with William T. Allen), in Jay W. Lorsch, Leslie Berlowitz, and Andy Zelleke, Restoring Trust in American Business 113-126 (American Academy of Arts and Sciences 2005)

Conflicts of Interest in Class Action Litigation: An Inquiry into the Appropriate Standard, 2003 University of Chicago Legal Forum 581-630 (2003)

Payment of Expenses in Securities Class Actions: Ethical Dilemmas, Class Counsel, and Congressional Intent, 22 Review of Litigation 557 (2003)

Ethical Considerations in Class Action Practice, in Practising Law Institute, Class Action Litigation: Prosecution & Defense Strategies (2003)

Conflicts of Interest in Negotiation: An After-word and a Reply, 84 Iowa Law Review 1133-1139 (1999) (with Jonathan R. Macey)

Second Opinions in Litigation, 84 Virginia Law Review 1411-1437 (1998)(with Michael Klausner and Richard Painter)

Kaye, Scholer as Original Sin: The Lawyer's Duty of Candor and the Bar's Temptations of Evasions and Apology, 23 Law & Social Inquiry 305-313 (1998)

An Economic Analysis of Conflict of Interest Regulation, 82 Iowa Law Review 965-1005 (1997) (with Jonathan R. Macey), republished in Foundations of the Law and Ethics of Lawyering, George Meredith Cohen and Susan P Koniak, editors. New York: Foundation Press (2004)

Reflections on Professional Responsibility in a Regulatory State, 63 George Washington Law Review 1105 (1995) (with Jonathan R. Macey)

Government Lawyers' Ethics in a System of Checks and Balances, 54 University of Chicago Law Review 1293 (1987)

Civil Procedure

The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal, 63 Vanderbilt Law Review 107 (2010) (with Charles Silver)

Will Aggregate Litigation Come to Europe?, 62 Vanderbilt Law Review 177-210 (2009) (with Samuel Issacharoff)

Preliminary Judgments, 2010 University of Illinois Law Review 165 (2009)

A New Look at Judicial Impact: Attorneys' Fees in Securities Class Actions after Goldberger v. Integrated Resources, Inc., 29 Washington University Journal of Law & Policy 5-35 (2009) (with Theodore Eisenberg and Michael Perino)

Punti cardine in tema di class action negli Stati Uniti e in Italia (Cutting-Edge Issues in U.S. and Italian Class Action Litigation), 2008 Analisi Giuridica dell'Economia 211-230 (2008)

Compensation and Deterrence in Consumer Class Actions in the United States, in Fabrizio Cafaggi and Hans W. Micklitz, eds., New Frontiers in Consumer Protection: The Interplay Between Private and Public Enforcement 263-282 (2009)

Pleading after *Tellabs*, 2009 Wisconsin Law Review 507-534 (2009)

Mandatory Arbitration for Customers But Not For Peers, 92 Judicature 118-123 (2009) (with Theodore Eisenberg and Emily Sherwin)

Arbitration's Summer Soldiers: An Empirical Study of Arbitration Clauses in Consumer and Non-Consumer Contracts, 41 University of Michigan Journal of Law Reform 871-96  (2008) (with Theodore Eisenberg and Emily Sherwin); reprinted in 7 ICFAI University Journal of Alternative Dispute Resolution (Hyderabad, India)

Reversal, Dissent, and Variability in State Supreme Courts: The Centrality of Jurisdictional Source, 89 Boston University Law Review 2009 (2009) (with Theodore Eisenberg)

All-or-Nothing Versus Proportionate Damages, 38 Journal of Legal Studies 345-382 (with Shmuel Leshem)

Judicial Review of Class Action Settlements, 1 Journal of Legal Analysis 167-205 (2008) (with Jonathan R. Macey)

Do Juries Add Value? Evidence From an Empirical Study of Jury Trial Waiver Clauses in Large Corporate Contracts, 4 Journal of Empirical Legal Studies 539 (2007) (with Theodore Eisenberg)

The Flight from Arbitration: An Empirical Study of *Ex Ante* Arbitration Clauses in Publicly-Held Companies' Contracts, 56 DePaul Law Review 335 (2007) (with Theodore Eisenberg), reprinted in 49 Corporate Practice Commentator323 (2007)

Rethinking Certification and Notice in Opt-Out Class Actions, 74 University of Missouri Kansas City Law Review 637 (2006)

Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA Law Review 1303 (2006) (with Theodore Eisenberg)

Review of the Merits in Class Action Certification, 33 Hofstra Law Review 51 (2004)

The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues, 57 Vanderbilt Law Review 1529 (2004) (with Theodore Eisenberg)

Competing Bids in Class Action Settlements, 31 Hofstra Law Review 633-650 (2003)

On the Costs of Civil Justice, 80 University of Texas Law Review 2115 (2002)

Class Actions in the Gulf States: Empirical Analysis of a Cultural Stereotype, 74 Tulane Law Review 681 (2000)

Full Faith and Credit to Settlements in Overlapping Class Actions: A Reply to Kahan and Silberman, 73 New York University Law Review 1167-1178 (1998)

Nonpecuniary Class Action Settlements, 60 Law and Contemporary Problems 97-155 (1997) (with Lori Singer)

Class Actions, in I New Palgrave Dictionary of Economics and the Law 257-262 (Peter Newman, ed., Macmillan Press 1998)

The Legal-Economic Analysis of Comparative Civil Procedure, 45 American Journal of Comparative Law 905-19 (1997)

Overlapping Class Actions, 71 New York University Law Review 514 (1996)

Settlement of Litigation: A Critical Retrospective, in Larry Kramer, ed., Reforming the Civil Justice System 13-37 (NYU Press 1996)

Expanding on the Fifty Percent Hypothesis: A Multimodal Approach to the Selection of Cases for Litigation, 25 Journal of Legal Studies 233 (1996) (with Daniel Kessler and Thomas Meites)

A Market Approach to Tort Reform Via Rule 23, 80 Cornell Law Review 909 (1995) (with Jonathan R. Macey)

Settlement Escrows, 24 Journal of Legal Studies 87 (1994) (with Robert Gertner)

Introduction: Economic Analysis of Civil Procedure, 23 Journal of Legal Studies 303 (1994)

Auctioning Class Action and Derivative Suits: A Rejoinder, 87 Northwestern Law Review 701 (1992) (with Jonathan R. Macey)

The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform, 58 University of Chicago Law Review 1 (1991) (with Jonathan R. Macey), reprinted in Franklin A. Gevurtz, Corporate Law Anthology 186-194 (1997)

Some Thoughts on the Equilibrium Hypothesis, 69 Boston University Law Review 561 (1989)

Some Agency Problems in Settlement, 16 Journal of Legal Studies 189 (1987)

An Economic Analysis of Rule 68, 15 Journal of Legal Studies 93 (1986)

The Public Interest in Attorneys' Fees Awards for Public Interest Litigation, 47 Law and Contemporary Problems 233 (1984) (with Robert V. Percival), reprinted in University of Chicago Law School Record (1989)

Note, Aldinger v. Howard and Pendent Jurisdiction, 77 Columbia Law Review 127 (1977)

Corporate, Contract and Securities Law

Process as Currency with the Courts: Judicial Scrutiny of Directors' Decisions, 1 International Journal of Corporate Governance 337-365 (2010) (with Jonathan R. Macey)

A Simple Theory of Takeover Regulation in the United States and Europe, 42 Cornell International Law Journal 301 (2009) (with Guido Ferrarini), reprinted in __ Rivista Delle Societá __ (2010)

Bargains Bicoastal: New Light on Contract Theory, __ Cardozo Law Review __ (forthcoming)

Flight to New York: an Empirical Analysis of Choice of Law and Forum Selection Clauses in Large Commercial Contracts, 30 Cardozo Law Review 1475 (2009) (with Theodore Eisenberg)

The Market for Contracts, 30 Cardozo Law Review 2073 (2009) (with Theodore Eisenberg)

Ex Ante Choices of Law and Forum: An Empirical Analysis of Corporate Merger Agreements, 59 Vanderbilt Law Review 1975 (2006) (with Theodore Eisenberg)

Catastrophic Failures: Enron and Beyond, 89 Cornell Law Review 423-455 (2004)

Capital Markets on the Internet: An Introduction, 5 New York University Journal of Legislation and Public Policy 1 (2001-2002)

Das Kapital: Solvency Regulation of the American Business Enterprise, in Eric Posner, ed., Chicago Lectures in Law and Economics 65-81 (2000)

Takeovers: English and American, 6 European Financial Management 533-542 (2000)

Choice of Law as a Pre-Commitment Device, in F.H. Buckley, ed., The Fall and Rise of Freedom of Contract 357-69 (Duke University Press 1998)

On the Advantages of Defined Contribution Plans, in Samuel Estreicher, ed., Proceedings of the 50th Annual Conference on Labor (Kluwer Academic Press, forthcoming 1998)

Political Structure and Corporate Governance: Some Points of Contrast Between the U.S. and the U.K., 1998 Columbia Business Law Review 51-78 (1998), reprinted in Sloan Project on Corporate Governance at Columbia Law School, Corporate Governance Today 629-648 (1998)

Finance and the Firm, 152 Journal of Institutional and Theoretical Economics [Zeitschrift fur die Gesamte Staatswissenschaft] 89-107 (1996)

Corporate Governance and Commercial Banking: A Comparative Examination of Germany, Japan and the United States, 48 Stanford Law Review 73 (1995) (with Jonathan R. Macey)

Comment on "Brokerage, Market Fragmentation, and Securities Market Regulation," in Andrew W. Lo, ed., The Industrial Organization and Regulation of the Securities Industry, University of Chicago Press (1996)

Corporate Stakeholders: A Contractual Perspective, 43 University of Toronto Law Review 401 (1993) (with Jonathan R. Macey)

The Culture of Capital: Comments on Conley and O'Barr, 71 North Carolina Law Review 201 (1992)

The Economic Efficiency of Close Corporation Law: A Comment, 70 Washington University Law Quarterly 399 (1992)

Lessons from Financial Economics: Materiality, Reliance, and the Utility of Empirical Methodology in Extending the Reach of Basic v. Levinson, 77 Virginia Law Review 1015 (1991) (with Jonathan R. Macey, Jeffrey Netter, and Mark Mitchell)

The Fraud on the Market System Revisited, 77 Virginia Law Review 999 (1991) (with Jonathan R. Macey)

Politics, Bureaucracies, and Financial Markets: Bank Entry into Commercial Paper Underwriting in the United States and Japan, 139 University of Pennsylvania Law Review 369-453 (1990) (with David Litt, Jonathan R. Macey, and Edward L. Rubin)

Good Finance, Bad Economics: An Analysis of the Fraud on the Market Theory, 42 Stanford Law Review 1059 (1990) (with Jonathan R. Macey)

Trans-Union Reconsidered, 98 Yale Law Journal 127 (1988)(with Jonathan R. Macey)

Toward an Interest Group Theory of Delaware Corporate Law, 65 Texas Law Review 469 (1987) (with Jonathan R. Macey)

<u>Constitutional Law</u>

The President's Power of Interpretation: Implications of a Unified Theory of Constitutional Law, 56 Law and Contemporary Problems 35 (1993)

The Unitary Executive in a Unified Theory of Constitutional Law: The Problem of Interpretation, 15 Cardozo Law Review 201 (1993)

Liberty and Constitutional Architecture: The Rights-Structure Paradigm, 16 Harvard Journal of Law & Public Policy 87 (1993)

Rights and Structure in Constitutional Theory, 8 Social Philosophy & Policy 196 (1991), reprinted in E. Frankel Paul, ed., Reassessing Civil Rights (1991)

The Appropriations Power and the Necessary and Proper Clause, 68 Washington University Law Quarterly 640 (1990) (panel)

From Compromise to Confrontation: Separation of Powers in the Reagan Era, 57 George Washington Law Review 401 (1989)

Rediscovering Economic Liberties, 41 Rutgers Law Review 773 (1989) (panel)

War Powers and the Constitution: A Middle Ground, 43 University of Miami Law Review 35 (1988) (panel)

The Debate Over Independent Agencies in Light of the Empirical Evidence, 1988 Duke Law Journal 215 (1988)

Independent Agencies, 1986 Supreme Court Review 41 (1986)

Financial Institutions

Intellectual Hazard: (with Gerald Rosenfeld)

Helping Law Catch Up to Markets: Applying Broker-Dealer Law to Subprime Mortgages, 34 Journal of Corporation Law 789 (2009) (with Jonathan Macey, Maureen O'Hara and Gabriel D. Rosenberg)

The Basel Committee, Global Administrative Law, and the Developing World, in Benedict Kingsbury and Richard Stewart, eds, India, the South and the Shaping of Global Administrative Law (forthcoming, Oxford University Press India 2008) (with Michael Barr)

Comment: Credit Risk Transfer, Hedge Funds, and the Supply of Liquidity, in Peter Nobel and Marina Gets, eds., Law and Economics of Risk in Finance, University of St. Gallen Series in Law and Economics 73 (2008)

Global Administrative Law – The View from Basel, 17 European Journal of International Law 15 (2006) (with Michael Barr)

Three Myths about Central Banks, Federal Reserve Bank of Cleveland Economic Commentary (November 2002)

Central Bank Independence in Ordinary and Extraordinary Times, in Jan Kleiniman, ed., Central Bank Independence: the Economic Foundations, the Constitutional Implications, and Democratic Accountability (Kluwer Academic Press 2000) 31-51 (with Rosa Lastra)

External Review of Central Bank Decisions, in 1 International Monetary Fund, Current Developments in Monetary and Financial Law 535-51 (1999)

Bank Mergers and American Bank Competitiveness, in Yakov Amihud & Geoffrey Miller, eds., Bank Mergers and Acquisitions 175-190 (Kluwer Academic Publishers, 1998) (with Jonathan R. Macey)

Introduction: Bank Mergers and Acquisitions, in Yakov Amihud & Geoffrey Miller, eds., Bank Mergers and Acquisitions vii-xiii (Kluwer Academic Publishers, 1998)

Deposit Insurance for Economies in Transition, in Kluwers Yearbook of International and Financial Law 103-138 (1997) and R. Lastra and H. Schiffman, eds., Bank Failures and Bank Insolvency Law in Economies in Transition 37-70 (Kluwers Academic Press 1998)

Central Bank Independence, Liberalization and Inflation in Transition Economies: An International Perspective, 49 Journal of Monetary Economics 237 (2002) (with Alex Cukierman and Bilin Neyapti)

An Interest-Group Theory of Central Bank Independence, 27 Journal of Legal Studies 433-453 (June 1998)

On the Obsolescence of Commercial Banking, 154 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 61-73 (1998)

Banking Crises in Perspective: Two Causes and One Cure, in Gerard Caprio, Jr, William C. Hunter, George G. Kaufman, and Danny M. Leipziger, eds., Preventing Banking Crises: Lessons from Recent Global Bank Failures 279-287 (Federal Reserve Bank of Chicago, 1998)

Universal Banks are Not the Answer to America's Corporate Governance "Problem": A Look at Germany, Japan, and the U.S., 9 Journal of Applied Corporate Finance 57-73 (1997)(with Jonathan R. Macey), republished in The Revolution in Corporate Finance, Joel M Stern and David H. Chew, editors, Marlden, MA: Blackwell (2003)

Cooperation, Conflict, and Convergence in Japanese Finance: Evidence from the "Jusen" Problem, 29 Law and Policy in International Business 1-78 (1998)(pre-published as Washington University School of Law, Working Paper No. 97-3-1) (with Curtis Milhaupt)

Nihon no kin'yu ni okeru jusenmondai hoteki bunsekito keizaiteki bunseki [The Jusen Problem in Japanese Finance: A Legal and Economic Analysis], 1132 Jurisuto 140-49; 1134 Jurisuto 86-92; 1136 Jurisuto 83-89 (1998) (with Curtis Milhaupt) (in Japanese)

A Regulatory Cartel Model of Decisionmaking in Japanese Finance, 4 Zeitschrift fur Japanisches Recht 18-29 (1997)(with Curtis Milhaupt)

Banco de Fondos Mutuos Para América Latina? [Mutual Fund Banking for Latin America?], in La Banca Central en América Latina: Aspectos Económicos y Juridicos [Central Banks in Latin America and Their New Legal Structure], Ernesto Aguirre, Roberto Junguito Bonnet, and Geoffrey Miller, eds. 272-280 (1997) (in Spanish)

The Role of a Central Bank in A Bubble Economy, 18 Cardozo Law Review 1053 (1996)

Decisionmaking at the Bank of Japan, 28 Law and Policy in International Business 1 (1996)

Is Deposit Insurance Inevitable? Lessons From Argentina, 16 International Review of Law and Economics 211 (1996), reprinted in Jagdeep Bandhari and Alan Sykes, eds., Economic Dimensions in International Law: Comparative and Empirical Perspectives 392-404 (Cambridge University Press, 1998)

El Papel del Banco Central en una Economia Especulativa [The Role of a Central Bank in a Speculative Economy], in Miguel Mancera Aguayo, ed., El Banco de México en la Reconstrucción Económica Nacional 137 (Centro Cultural Manuel Gómez Morin, A.C., 1996)

Comments on Rajan and James, in A. Saunders & I. Walter, eds., Universal Banking: Financial System Design Reconsidered 330-333 (Irwin & Co. 1996)

Deposit Insurance, the Regulatory Contract, and the Mismatch in the Term Structure of Banks' Assets and Liabilities, 12 Yale Journal on Regulation 1-50 (1995)(with Jonathan R. Macey), reprinted as L'Assurance Des Depots, Le Contrat Reglementaire Implicite, et la Destruction des Eschances des Actifs et Passifs Bancaires, 6 Journal des Economistes et des Etudes Humaines 531 (1995)

Double Liability of Bank Shareholders: A Look at the New Data, 28 Wake Forest Law Review 933 (1993) (with Jonathan R. Macey)

Politics of Deposit Insurance Reform: The Case of Argentina, Federal Reserve Bank of Chicago, Proceedings of a Conference on Bank Structure and Competition 473 (1993) and 1 University of Chicago Law School Roundtable 129 (1994), republished as "Políticas de Reforma de Seguro de Depósito. El Caso de la Argentina," in Revista de Derecho Bancario y de la Actividad Financiera, Año 4, Enero-diciembre 1994, No. 19/24, at 221-239 (1995) (Argentine journal)

Comment on Universal Banks and Financial Stability, 19 Brooklyn International Law Journal 197 (1993)

Kaye, Scholar, FIRREA and the Desirability of Early Closure: A View of the Kaye, Scholar Case from the Perspective of Bank Regulatory Policy, 66 University of Southern California Law Review 1115 (1993) (with Jonathan R. Macey)

Constitutional Moments, Pre-commitment, and Fundamental Reform: The Case of Argentina, 71 Washington University Law Quarterly 1061 (1993)

Legal Restrictions on Bank Consolidation: An Economic Analysis, 77 Iowa Law Review 1083 (1992)

The Community Reinvestment Act: An Economic Analysis, 79 Virginia Law Review 291 (1993) (with Jonathan R. Macey)

Drunken Sailors on a Sinking Ship? The Rehnquist Court and the Bank Failure Problem, 1993 Public Interest Law Review 83 (1993)

Comments on Calomiris, in M. Klausner & L. White, eds., Structural Change in Banking 212 (1993)

The McCarran-Ferguson Act: A Case Study of Regulatory Federalism, 68 New York University Law Review 13 (1993), republished in 7 National Insurance Law Review 521 (1995)(with Jonathan R. Macey)(study prepared originally under the auspices of the American Enterprise Institute's Project on Federalism)

Bank Failure: The Politicization of a Social Problem, 45 Stanford Law Review 289 (1992) (with Jonathan R. Macey)

Toward Enhanced Consumer Choice in Banking: Uninsured Depository Facilities as Financial Intermediaries for the 1990s, 1991 N.Y.U. Annual Survey of American Law 865 (1992) (with Jonathan R. Macey)

Nondeposit Deposits and the Future of Bank Regulation, 91 Michigan Law Review 237-273(1992) (with Jonathan R. Macey)

America's Banking System: The Origins and Future of the Current Crisis, 69 Washington University Law Quarterly 769 (1991) (with Jonathan R. Macey)

Bank Failures, Risk Monitoring, and the Market for Corporate Control (with Jonathan R. Macey), 88 Columbia Law Review 1153 (1988) (study conducted under the auspices of the Administrative Conference of the United States)

The Future of the Dual Banking System, 53 Brooklyn Law Review 1 (1987)

Public Policy Implications of Legislation Limiting the Growth of Interstate Banks, Federal Reserve Bank of Chicago, Proceedings of a Conference on Bank Structure and Competition 602 (1986)

Interstate Branching and the Constitution, 41 Business Lawyer 337 (1986)

Interstate Banking in the Court, 1985 Supreme Court Review 179 (1985)

Legal History

The Common Law Origins of the Necessary and Proper Clause, 79 George Washington University Law Review 1 (2010), and forthcoming in Gary Lawson, ed., The Origins of the Necessary and Proper Clause (Cambridge University Press 2010)

*Meinhard v. Salmon,* in Jonathan R. Macey, ed., Corporate Law Stories (2008)

The Industrial Organization of Political Production: A Case Study, 149 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 769 (1993)

Comments on Priest, 36 Journal of Law and Economics 325 (1993)

Toward "Neutral Principles" in the Law: Selections from the Oral History of Herbert Wechsler, 93 Columbia Law Review 854 (1993) (with Norman Silber)

Double Liability of Bank Shareholders: History and Implications, 27 Wake Forest Law Review 31 (1992) (with Jonathan R. Macey)

Origin of the Blue Sky Laws, 70 Texas Law Review 347 (1991) (with Jonathan R. Macey), reprinted in 34 Corporate Practice Commentator 223 (1992)

Public Choice at the Dawn of the Special Interest State: The Story of Butter and Margarine, 77 California Law Review 83 (1989)

The True Story of Carolene Products, 1987 Supreme Court Review 397 (1987), reprinted in Michael J. Glennon, et al., eds., Constitutional Law Anthology (Anderson Publishing 1997), pp. 94-103; reprinted in J. Ely, Property Rights in American History: Reform and Regulation of Property Rights (Garland Publishing 1997), pp. 165-197.

Interviewer, Columbia University Oral History Collection, Life of Herbert Wechsler (1980-1982) (with Norman Silber)

Jurisprudence

The Case of the Speluncean Explorers: Contemporary Proceedings, 61 George Washington Law Review 1798 (1993)

The End of History and the New World Order: The Triumph of Capitalism and the Competition Between Liberalism and Democracy, 25 Cornell International Law Journal 277 (1992) (with Jonathan R. Macey)

The Canons of Statutory Construction and Judicial Preferences, 45 Vanderbilt Law Review 647 (1992) (with Jonathan R. Macey)

Pragmatics and the Maxims of Interpretation, 1990 Wisconsin Law Review 1179 (1990)

Economic Efficiency and the Lockean Proviso, 10 Harvard Journal of Law and Public Policy 401 (1987)

Ancient Law

Design for Rule: The Hebrew Bible's Theory of Political Leadership (manuscript)

Economics of Ancient Law, in Geoffrey P. Miller, ed., The Economics of Ancient Law (Edward Elgar, forthcoming 2010)

Patriarchy: The Political Theory of Family Authority in the Book of Genesis (manuscript 2010)

Of Floods and Towers: The Bible's Affirmative Case for Law and Government (NYU School of Law, Public Law Research Paper No. 10-19)

The Dark Age: How the Biblical Narratives Demonstrate the Necessity for Law and Government (NYU School of Law, Public Law Research Paper No. 10-18)

Origin of Obligation: Genesis 2:4b-3:24 (NYU School of Law, Public Law Research Paper No. 09-60)

Golden Calves, Stone Tablets, and Fundamental Law: A Political Interpretation of Exodus 32 (NYU School of Law, Public Law Research Paper No. 10-02)

A Riposte Form in the Song of Deborah, in Tikva Frymer-Kensky, Bernard Levinson and Victor Matthews, eds., Gender and Law in the Hebrew Bible and the Ancient Near East 113-27 (1998)

Foreword: The Development of Ancient Near Eastern Law, 70 Chicago-Kent Law Review 1623 (1996)

Why Ancient Law?, 70 Chicago-Kent Law Review 1465 (1995)(with James Lindgrin and Laurent Mayali)

Foreword: Land Law in Ancient Times, 71 Chicago-Kent Law Review 233 (1996)

The Song of Deborah: A Legal-Economic Analysis, 144 University of Pennsylvania Law Review 2293 (1996)

The Legal-Economic Approach to Biblical Interpretation, 150 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 755 (1994)

J as Constitutionalist: A Legal-Economic Interpretation of Exodus 17:8-16 and Related Texts, 70 Chicago-Kent Law Review 1829 (1995)

Verbal Feud in the Hebrew Bible: Judges 3:12-30 and 19-21, 55 Journal of Near Eastern Studies 105 (1995)

Contracts of Genesis, 22 Journal of Legal Studies 15-45 (1993)

Ritual and Regulation: A Legal-Economic Analysis of Selected Biblical Texts, 22 Journal of Legal Studies 477 (1993)

### Law and Society

Parental Bonding and the Design of Child Support Obligations, in William S. Comanor, ed., The Law and Economics of Child Support Payments 210-240 (Edward Elgar 2004)

The Legal Function of Ritual, 80 Chicago-Kent Law Review 1181 (2005)

Handicapped Parking, 29 Hofstra Law Review 81 (2000) (with Lori S. Singer)

Custody and Couvade: The Importance of Paternal Bonding in the Law of Family Relations, 33 Indiana Law Review 691 (2000)

Norm Enforcement in the Public Sphere: The Case of Handicapped Parking, 71 George Washington Law Review 895-933 (2004)

Norms and Interests, 32 Hofstra Law Review 637 (2003)

Female Genital Mutilation: A Cultural-Legal Analysis (manuscript)

Circumcision: A Legal-Cultural Analysis, 9 Virginia Journal of Social Policy and the Law 498-585 (2002), pre-published as New York University Public Law and Legal Theory Working Paper Series, Working Paper 5 (2000)

Law, Pollution, and the Management of Social Anxiety, 7 Michigan Women's Law Journal 221-289 (2001)

Other:

Richard Posner, 61 N.Y.U. Annual Survey of American Law 13 (2004)

Introduction: The Law and Economics of Risk, 19 Journal of Legal Studies 531 (1990) (with Richard A. Epstein)

Law School Curriculum: A Reply to Kennedy, 14 Seton Hall Law Review 1077 (1984) (under pen name of Chris Langdell)

### Book Reviews

Love & Joy: Law, Language and Religion in Ancient Israel, by Yochanan Muffs, 58 Journal of Near Eastern Studies 144-45 (1999)

Jesus and the Jews: The Pharisaic Tradition in John; The Trial Of Jesus; Jesus And The Law, by Alan Watson, 1 Edinburgh Law Review 273 (1997)

No Contest: Corporate Lawyers and the Perversion of Justice in America, by Ralph Nader and Wesley J. Smith, Washington Post (October 13, 1996)

The Rise and Fall of the Classical Corporation: Hovenkamp's Enterprise and American Law: 1836-1937, 59 University of Chicago Law Review 1677 (1993)

Property Rights and the Constitution: A Review of James W. Ely, Jr.'s The Guardian of Every Other Right, 37 American Journal of Legal History 378 (1993)

Anatomy of A Disaster: Why Bank Regulation Failed, 86 Northwestern University Law Review 742 (1992)

The Glittering Eye of Law, 84 Michigan Law Review 1901 (1986)

A Rhetoric of Law, 52 University of Chicago Law Review 247 (1985)

### Major Lectures

The European Union's Takeover Directive and Its Implementation in Italy (University of Rome III, 2008)

Catastrophic Financial Failures: Enron, HIH and More (Ross Parsons Lecture, Sydney, Australia, 2002)

Das Kapital: Solvency Regulation of the American Business Enterprise (Coase Lecture, University of Chicago Law School, 1993)

Banking in the Theory of Finance; The Simple Economics of Litigation and Settlement; The Economic Structure of Corporation Law (University of Auckland, New Zealand, 1993)

### Journal Referee Reports

American Law and Economics Review
Journal of Legal Studies
Journal of Law, Economics and Organization

### Conferences Organized

Finlawmetrics 2009: After The Big Bang: Reshaping Central Banking, Regulation and Supervision (Milan, Italy, Spring 2009) (member of Steering committee)

Third Annual Conference on Empirical Legal Studies (Cornell University, Ithaca, New York, Fall 2008) (co-organizer)

NYU Global Economic Policy Forum (April 14, 2007). Major conference on economic policy. Keynote address by Jean Claude Trichet, President of the European Central Bank; presentations by Tevi Troy, Deputy Secretary of the Department of Health and Human Services; Kevin Warsh, Member of the Board of Governors of the Federal Reserve System; and Donald B. Marron, Jr., Senior Economic Advisor, President's Council of Economic Advisors. Co-organized with Professor Alan Rechtschaffen.

Second Annual Conference on Empirical Legal Studies (New York, New York, November 10-11, 2007). Major conference (425 participants) exploring all aspects of the empirical study of law. Co-organized with Jennifer Arlen, Bernard Black, Theodore Eisenberg and Michael Heise.

NYU Global Economic Policy Forum (April 11, 2007). Major conference on economic policy. Keynote address by Ben S. Bernanke, Chairman of the Board of Governors of the Federal Reserve System; presentations by Stanley Druckenmiller, Founder of Dusquesne Capital, Tevi Troy, Domestic Policy Advisor for President George W. Bush, and Jeffrey Rosen, Vice Chair of Lazard. Co-organized with Professor Alan Rechtschaffen.

First Annual Conference on Empirical Legal Studies (Austin, Texas, October 2006). Major conference exploring all aspects of the empirical study of law. Co-organized with Jennifer Arlen, Bernard Black, Theodore Eisenberg and Michael Heise.

Conference on Legal Aspects of the International Activities of Central Banks, Lima Peru, October 1997. This conference, co-sponsored by the central bank of Peru, brought together leaders in the legal and economic issues facing central banks in the management of their external reserves.

Conference on the Governance of Institutional Investors (New York, New York, February 14, 1997). This conference, sponsored by the NYU Stern School of Business Salomon Center in association with the New York University Law School Center for the Study of Central Banks, brought together top executives, attorneys, scholars and others interested in the management and organization, both economic and legal, of the nation's large institutional investors, including its mutual fund industry.

Conference on Bank Mergers and Acquisitions (New York, New York, October 11, 1996). This conference, sponsored by the NYU Stern School of Business Salomon Center in association with the New York University Law School's Center for the Study of Central Banks, brought together leading academics, lawyers, and investment bankers to discuss some of the broader implications of bank mergers and acquisitions. Co-organizer of this conference was Professor Yakov Amihud of the Stern School's Finance Department.

Conference in Central Banks in Latin America (Bogota, Colombia, February, 1996). This conference, co-sponsored by the central bank of Colombia with technical assistance from the Legal Affairs Department of the International Monetary Fund, brought together leaders of Latin American central banks, the international financial community, and scholars from a variety of disciplines, to discuss issues related to the independence of central banks and economic development.

Conference on Central Banks in Asia (Shanghai, China, October, 1995). This conference, co-sponsored with KPMG-Peat Marwick, brought together leaders from commercial banks, investment banks, and industrial firms, as well as central bankers, to discuss Asian central banks to address issues such as the proposed law granting a degree of independence to the central bank of China.

Conference on Ancient Law (Berkeley, California, March 1995). This conference, organized with Professors James Lindgren of Chicago-Kent Law School and Laurent Mayali of the University of California at Berkeley Law School, brought together important figures from a variety of disciplines

interested in Ancient Law. The proceedings are being published as two special issues of the Chicago-Kent Law Review, and as a book published by the Robbins Collection, Berkeley, California.

Conference on Central Banks in Eastern Europe and the Newly Independent States (Chicago, Illinois, April 1994). This conference brought together the Prime Minister of Estonia, three present or former Ministers of Finance of Eastern European states (including Boris Fyoderov, former Finance Minister of the Russian Republic), the heads of the central banks of eleven nations in Eastern Europe and the Newly Independent States, together with a wide variety of highly-placed officials from these countries and from the west, to discuss issues related to the independence of central banks and economic development.

## Professional Memberships and Positions

New York State Bar
District of Columbia Bar
American Bar Association
American Law Institute (1988-1996)
Member, Paolo Baffi Centre Scientific Advisory Board, Milan, Italy (2008- present)
Member, International Academic Council, University of St. Gallen,
    Switzerland (2004-present)
Chairman, Section on Business Associations, American Association of Law
    Schools (1995)
Member of the Board of Directors, American Law and Economics Association
    (1995-1998)
Member of the Foreign Advisory Committee, Latin American Law and
    Economics Association (1995-2000)
Member of the Foreign Advisory Board, Universitad Tocurato Di Tella School of Law,
    Buenos Aires, Argentina (1992-1999)
Member of the Editorial Board, Supreme Court Economic Review
Member of the Editorial Board, The Independent Review
Member of the Advisory Board, Yearbook of International Financial and
    Economic Law
Member of the Advisory Board, University of Hong Kong Faculty of Law Asian Institute
    of International Financial Law (2001-present)
Member of the Advisory Board, LSN Comparative Law Abstracts

## Courses

Legal Profession (1985-93; 1996-98; 2003-2007)
The Crisis of 2008 (2009, 2010)
Reading Class: Restructuring Finance (2009)
Property (1986-87)
Corporations (1985-88; 1991-93; 1997-2000; 2005; 2008)
Seminar on Separation of Powers (1985, 1987)
Civil Procedure (1983-84; 2004-2005)

Federal Regulation of Banking (1983, 1989-93; 1995-97; 2003, 2006-2010)
Land Development (1984-85)
Securities Law (1990-91)
Workshop in Legal Theory (1989-91)
Seminar on Financial Institutions (1992-93 (with Merton Miller); 1996-97)
Ethics in Class Action Practice (Continuing Legal Education Seminar 2002-2005)
Law and Economics (University of Basel, Switzerland 2005, 2007, 2008, 2009, 2010 (invited)))
Advanced Seminar on Law and Economics (University of Genoa, Italy 2008)
Banking and the Financial Crisis (University of Genoa, Italy 2009)
International Banking (University of Sydney, Australia, 2002, 2006)
Introduction to Banking Law (University of Basel, Switzerland 2001, 2002, 2003, 2004, 2009, 2010 (invited))
Banking in the Theory of Finance (University of Frankfurt, Germany 2004, 2005, 2010 (invited))

## Litigation and Alternative Dispute Resolution

Brief and Reply Brief for Plaintiff-Appellant, Glancy v. Taubman Centers, Inc. No. 03-1609 (6th Cir. 2003).

Amicus Brief for American Bankers Association, et al., In Re: Visa Check/Mastermoney Antitrust Litigation, 280 F.3d 124 (2d Cir. 2001) (of counsel)

Briefed and argued Moran v. Household Finance Corp. (the "Poison Pill" case) in the Supreme Court of Delaware (1985)

Briefed cases in the U.S. Supreme Court, U.S. Court of Appeals, U.S. District Courts, and state trial and appellate courts. Conducted depositions and other pretrial discovery. (1982-1983)

Briefed and argued Hodges v. Metts, 676 F.2d 1133 (6th Cir. 1982), on behalf of the United States.

Conducted trial of American Psychological Association v. Birch Tree Press, et al. (U.S. District Court, Washington, D.C. 1983).

Deposit Insurance for Thailand. Prepared a draft deposit insurance law for Thailand, at the request of the International Monetary Fund (1999)

Schatz v. Blanchard. Neutral arbitrator in a commercial arbitration (2000)

### Expert Witness Testimony (past five years)

Estate of Hampton v. Beverly Enterprises, No. CV 2004-95-3, Circuit Court of Bradley County, Arkansas, Civil Division (2006) (affidavit on fees)

In re Enron Corporation Securities Litigation, Civil Action No. H-01-3624, United States District Court, Southern District of Texas (2006) (expert report and deposition on attorney liability)

Parker v. Time Warner Entertainment Co., No. CV-98-4265 (ILG) (JMA), Eastern District of New York (2006) (declaration and testimony)

In re AT&T Wireless Tracking StockSecurities Litigation, Civil Action No. 1:00-cv-08754, Southern District of New York (2006) (declaration)

Cox v. Microsoft Corp., Index No. Index No. 105193/00, New York State Supreme Court (2006) (affidavit and testimony on settlement and fees)

Lundell v. Dell, Inc., Civil Action No. C05-3970 JW/RS, Southern District of California (2006) (declaration on fees)

Kehoe v. Fidelity Federal Bank, Case No. 03-80593, United States District Court for the Southern District of Florida (2006) (affidavit and testimony on fees)

Acosta v. Trans Union LLC, Case No. CV 06-05060 DOC (MLG), United States District Court for the Central District of California (2006) (declaration on fees)

Lasker v. Kanas (North Fork Bancorporation Litigation), Index No. 06/103557, Supreme Court of the State of New York, County of New York (2007) (affidavit on fees)

John Hancock Life Insurance Co. v. Goldman, Sachs & Co., No. 01-10729-RWZ, United States District Court, District of Massachusetts (2007) (declaration on fees)

Comes v. Microsoft Corp., No. CL8211, Iowa District Court for Polk County (2007) (affidavit on merits relief and affidavit on fees)

Figueroa v. Sharper Image Co., Case No.: 05-21251, United States District Court, Southern District of Florida (declaration and testimony on coupon relief).

Love v. Blue Cross & Blue Shield Association, et al., No. 03-21296-CIV-MORENO/SIMONTON, United States District Court, Southern District of Florida (2007) (declaration in opposition to settlement)

Feuerabend v. UST, Inc., Case No. 02-CV-7124, Wisconsin Circuit Court for Milwaukee County (2007) (affidavit on fees and settlement; testimony at fairness hearing)

White v. Experian Information Solutions, Inc., Case No. 05-cv-1070, United States District Court for the Central District of California (2009) (declaration on fairness of settlement and fee award)

In re Trans Union Corp. Privacy Litigation, MDL Docket No. 1350, United States District Court for the Eastern District of Illinois (2008) (declaration on certification)

Hoffman v. American Express, Case No. 2001-022881, Superior Court for the State of California, Alameda County (2008) (deposition on claim preclusion issue)

In re Pet Foods Products Liability Litigation, MDL Docket No. 1850, Civil Action No. 07-2867 (NLH), United States District Court for the District of New Jersey (declaration on attorneys' fees)

Hensley v. Computer Sciences Corp., No. CV-2005-59-3, Circuit Court of Miller County, Arkansas (2008) (affidavit and deposition on certification)

EM Ltd. and NML Capital, Ltd. v. The Republic of Argentina and Banco de La Nación Argentina, No. 08 Civ 7974 (TPG), United States District Court for the Southern District of New York (declaration and responsive declaration on whether a state-owned financial institution is an alter-ego of the government) (2009)

Tucker v. Scrushy, et al., Nos. CIV-02-5212, CV 03-3522, CV 03-2023, CV 03-2420, CV 98-6592, Circuit Court of Jefferson County, Alabama, 2008 (affidavit on fees) (2009)

In Re: 2007 Wildfire Class Litigation, Master Case No. 2008-00093086, Superior Court of California, County of San Diego (2009) (affidavit and deposition on certification)

In re: Columbia Hospital for Women Medical Center, Inc., Case No. 09-00010 (Teel, J.), United States Bankruptcy Court for the District of Columbia (declaration on fees) (2009)

In re Vioxx Products Liability Litigation, Civil Action No. 2:05-MD-01657-EEF-DEK, United States District Court, Eastern District of Louisiana (affidavit on fee-capping order) (2009)

Chivers v. State Farm Fire & Casualty Co., NO.: CV-2004-294-3, Circuit Court of Miller County, Arkansas (2008) (affidavit on certification)

State of Missouri v. SBC Communications, Inc., No. No. 044-02645, Circuit Court of the City of St. Louis, Missouri (2009) (affidavit on fees)

Alexander v. Nationwide Mutual Insurance Co., No. CV-2009-120-3, Circuit Court of Miller County, Arkansas (2009) (affidavit on fees)

Peterman v. North American Company for Life and Health Insurance, Case No. BC357194, Superior Court of the State of California, County of Los Angeles (declaration on fees)

Holman v. Student Loan Xpress, Inc., Case No. 8:08-cv-00305-SDM-MAP (Middle District of Florida, Tampa Division) (declaration on fees)

Other Activities

Member, Board of Directors, American Law and Economics Association (1996-1999)

Member, Board of Advisors, The Independent Review (1996-present)

Member, Board of Advisors, Asian Institute of International Financial Law (2001-present)

Member, Editorial Advisory Board, Supreme Court Economic Review (1995-present)

Member, Editorial Advisory Board, The Brookings-Wharton Papers on Financial Policy (1997-present)

President, Section on Financial Institutions and Consumer Financial Services, American Association of Law Schools (1999)

President, Section on Business Associations, American Association of Law Schools (1995)

Member, Board of Contributors, American Bar Association Preview of Supreme Court Cases (1985-1993)

Consultant, Administrative Conference of the United States (1988-89; 1991-1992)

Board of Directors and Volunteer Listener, D.C. Hotline (1980-83)

Awards

1992 Paul M. Bator Award for Excellence in Teaching, Scholarship and Public Service, from the Federalist Society for Law and Public Policy Studies

Languages

Reading knowledge of Spanish, French, and Italian.

Personal

Born October 17, 1950

Children Jason (b. 1986) and Forrest (b. 1987).

Shorter Works

Defusing The Banks' Financial Time Bomb: Without Tough Reforms, Writes Robert Pozen, We'll Probably Face An Ugly Repeat of Recent History (Business Week, March 11, 2010)

Why Interstate Banking is in the National Interest, Testimony Before the Subcommittee on Financial Institutions Supervision, Regulation and Deposit Insurance of the House Committee on Banking, Housing and Urban Affairs (September 29, 1993)

Challenging the Concept of the Common Law as a Closed System, Columbia Law School Report, Autumn, 1993 (with Norman Silber)

The Insurance Industry's Antitrust Exemption: A Longstanding Tradition Faces its Greatest Challenge, 1992-93 ABA Preview of Supreme Court Cases 198 (1993)

Shootout at the Escheat Corral, 1992-93 ABA Preview of Supreme Court Cases (1993)

Choices and Chances for Consumers, Legal Times, Oct. 12, 1992, at 29-30.

Impeachment Procedures: An Unexplored Territory in the Separation of Powers, 1992-93 ABA Preview of Supreme Court Cases 39 (1992)

An (Ex)changing of the Guard, 21 Journal of Legal Studies iii (1992)

Revisiting the Contingency Factor in Fee-Shifting Awards, 1991-92 ABA Preview of Supreme Court Cases 327 (1992)

The Foreign Sovereign Immunities Act and the Market for Public International Debt, 1991-92 ABA Preview of Supreme Court Cases 307 (1992)

Return of the Tenth Amendment?: Federal Control and State Autonomy over Low Level Radioactive Wastes, 1991-92 ABA Preview of Supreme Court Cases 284 (1992)

What are the Limits on Congressional Power to Influence Pending Cases?, 1991-92 ABA Preview of Supreme Court Cases 158 (1991)

RICO Standing for Securities Fraud: Does the Purchaser-Seller Rule of Rule 10b-5 Apply?, 1991-92 ABA Preview of Supreme Court Cases 155 (1991)

Banking and Investment: Introduction to UPA Index and Microfiche Collection (University Publications of America 1991)

Source of Strength in the Court: Can Bank Holding Companies be Required to Support Failing Subsidiary Banks?, 1991-92 ABA Preview of Supreme Court Cases 42 (1991)

Source of Strength: A Source of Trouble, Legal Times, September 30, 1991 (Special Supplement, pp. 22-25)

The Once and Future American Banking Industry, The American Enterprise (with Jonathan R. Macey)(1991)

The Former Stockholder as Plaintiff in Short-Swing Trading Cases, 1990-91 ABA Preview of Supreme Court Cases (1991)

Disposing of Demand Excuse in Derivative Litigation, 1990-91 ABA Preview of Supreme Court Cases (1991)

Up in the Air: Can Congress Require States to Appoint Members of Congress to State Agencies?, 1990-91 ABA Preview of Supreme Court Cases 294 (1991)

The Statute of Limitations under Rule 10b-5, 1990-91 ABA Preview of Supreme Court Cases (1991)

Tort Claims Against Federal Banking Agencies: New Hope For Shareholders and Officers of Failed Depository Institutions?, 1990-91 ABA Preview of Supreme Court Cases 94 (1991)

Punitive Damages Redux: If the Eighth Amendment Doesn't Apply, What About the Due Process Clause?, 1990-91 ABA Preview of Supreme Court Cases 47 (1990)

Quandaries of Causation: Proxy Solicitation in Freeze-Out Mergers, 1990-91 ABA Preview of Supreme Court Cases 57 (1990) .

Racial Statesmanship, Legal Times S31 (July 23, 1990)

Eurodollars, Sovereign Risk, and the Liability of U.S. Banks for Deposits in Foreign Branches, 1989-90 ABA Preview of Supreme Court Cases 281 (1990)

When is a Note a Note?, 1989-90 ABA Preview of Supreme Court Cases 18 (1990)

Interstate Banking and the Commerce Clause, 1989-90 ABA Preview of Supreme Court Cases 168 (1990)

Federal Courts, Municipalities, and the Contempt Power, 1989-90 ABA Preview of Supreme Court Cases 37 (1989)

Shoe Could Still Drop on Issue of Punitive Damages, National Law Journal (August 21, 1989)

Punitive Damages and the Constitution, 1988-89 ABA Preview of Supreme Court Cases 391 (1989)

States, Bankruptcy and the Eleventh Amendment, 1988-89 ABA Preview of Supreme Court Cases 412 (1989)

Stockholders, Arbitration, and the Securities Act of 1933, 1988-89 ABA Preview of Supreme Court Cases 383 (1989)

Appropriations Riders, Nondisclosure Agreements, and the Separation of Powers, 1988-89 ABA Preview of Supreme Court Cases 375 (1989)

Judicial Appointments and the ABA: Business as Usual or Brand New World?, 1988-89 ABA Preview of Supreme Court Cases 379 (1989)

S & L Receiverships, State Law, and the Federal Courts, 1988-89 ABA Preview of Supreme Court Cases 255 (1989)

The Non-delegation Doctrine in Taxation: A Different Constitutional Calculus?, 1988-89 ABA Preview of Supreme Court Cases 261 (1989)

Bankruptcy, Tax Liens, and Post-Petition Interest, 1988-89 ABA Preview of Supreme Court Cases (1989)

Federal Courts, State Taxes: A Vexing Dilemma For the Enforcement of Civil Rights in a Federal System, 1989-90 ABA Preview of Supreme Court Cases 95 (1988)

Separation of Powers and the Sentencing Commission, 1988-89 ABA Preview of Supreme Court Cases 23 (1988)

Administering the Savings and Loan Crisis: New Problems for the FSLIC, 1988-89 ABA Preview of Supreme Court Cases (1988)

Federal Procurement and the Separation of Powers, 1988-89 ABA Preview of Supreme Court Cases 26 (1988)

Thinking About a Career in Law, 1988-89 Talbot's Student Planning Book 32 (1988)

Carl McGowan: A Great Judge Remembered, 56 George Washington Law Review 697 (1988)

Separation of Powers: The Independent Counsel Case Tests the Limits, 1987-88 ABA Preview of Supreme Court Cases 390 (1988)

Decisionmaking in Collegial Bodies, Judicature, April/May 1988

The FDIC, Bank Officers and the Due Process Clause, 1987-88 ABA Preview of Supreme Court Cases 326 (1988)

Farm Foreclosures in Bankruptcy, 1987-88 ABA Preview of Supreme Court Cases 199 (1988)

Equal Access to Justice and Government Litigation, 1987-88 ABA Preview of Supreme Court Cases 160 (1988)

The Time Value of Money in Bankruptcy Cases, 1987-88 ABA Preview of Supreme Court Cases 116 (1987)

Getting the Fee First?: Attorneys and the SSI Program 1987-88 ABA Preview of Supreme Court Cases 118 (1987)

The Farmer and the FDIC, 1987-88 ABA Preview of Supreme Court Cases 48 (1987)

Testing the Limits of Securities Fraud: Financial Gossip in the Court, 1987-88 ABA Preview of Supreme Court Cases 26 (1987)

Checks and Balances in the Twenty-First Century, 33 University of Chicago Law School Record 7 (1987)

Separation of Powers May Become Focus Over NSC, Legal Times, Dec. 15, 1986, at 15

If a Bank is a Broker, is a Brokerage a Branch? 1986-87 ABA Preview of Supreme Court Cases 65 (1986)

Attorney's Fees in the Supreme Court, American Bar Association Journal 40 (November, 1986)

The Contingency Factor in Attorney's Fees Reconsidered, 1986-87 ABA Preview of Supreme Court Cases 20 (1986)

Restitution and Bankruptcy in a Federal System, 1986-87 ABA Preview of Supreme Court Cases (1986)

Don't Limit Contingent Fees, Chicago Tribune, June 11, 1986

The Budget and the Separation of Powers: Gramm-Rudman in the Court, 1985-86 ABA Previews of Supreme Court Cases 359 (1986)

Keeping Attorneys Fees in Proportion, 1985-86 ABA Preview of Supreme Court Cases 325 (1986)

Must the Federal Government Pay Interest on Attorneys Fees Awards?, 1985-86 ABA Preview of Supreme Court Cases 241 (1986)

The Contingency Factor in Attorneys Fees Awards, 1985-86 ABA Preview of Supreme Court Cases 243 (1986)

The FCC as Cop: Forcing State Public Service Commissions to Obey Federal Agency Orders, 1985-86 ABA Preview of Supreme Court Cases 191 (1986)

Preemption, Public Utilities, and Power Over Telephone Rate-Setting, 1985-86 ABA Preview of Supreme Court Cases 187 (1986)

A Bank is a Bank is a Bank -- or is it?, 1985-86 ABA Preview of Supreme Court Cases 67 (1985)

Settlement Offers Conditioned on Waiver of Attorneys' Fees: A Legal and Ethical Dilemma Confronts the Court, 1985-86 ABA Preview of Supreme Court Cases 55 (1985)

Bankruptcy and the Environment: The Case of Hazardous Wastes, 1985-86 ABA Preview of Supreme Court Cases 25 (1985)

A Different Approach to Interstate Banking, American Banker (August 8, 1985)

The SEC as Censor: Is Banning an Investment Advice Newsletter a Prior Restraint of the Press?, 1984-85 ABA Preview of Supreme Court Cases 243 (1985)

Enforcing Federal Rights in State Courts, 1984-85 ABA Preview of Supreme Court Cases 277 (1985)

Interstate Banking and the Constitution, 1984-85 ABA Preview of Supreme Court Cases 364 (1985)

The "Sale of Business" Doctrine in the Supreme Court, 1984-85 ABA Preview of Supreme Court Cases 344 (1985)

Sale of Business Revisited: Does the Doctrine Apply to Partial Sales of Corporate Control, 1984-85 ABA Preview of Supreme Court Cases 347 (1985)

Six Cases Shape Business Law, American Bar Association Journal 124 (Jan. 1985)

Offers of Settlement in Civil Rights Cases Pose Attorneys' Fees Question, 1984-85 ABA Preview of Supreme Court Cases 105 (1984)

Using Bankruptcy to Avoid Liability for Cleaning up Toxic Wastes, 1984-85 ABA Preview of Supreme Court Cases 36 (1984)

A Judicial Footnote Cemented the New Deal, Wall Street Journal, September 13, 1984

May Bank Holding Companies Provide Discount Brokerage Savings?, 1984-85 ABA Preview of Supreme Court Cases 575 (1984)

Blum v. Stenson: Fundamental Questions About Attorneys' Fees Awards to Public Interest Lawyers, 1984-85 ABA Preview of Supreme Court Cases 301 (1984)

Myths on the Midway, 30 Chicago Law School Record 13 (1984)

Smith v. Robinson: Another Step Towards Solving the Attorneys' Fees Puzzle? 1983-84 ABA Preview of Supreme Court Cases 437 (1984)

Securities Industry Association v. Board of Governors: Can Banks Distribute Commercial Paper? 1983-84 ABA Preview of Supreme Court Cases 425 (1984)

The "7-Eleven" Case:  Arbitration v. Litigation in a Federal System, 1983-84 ABA Preview of Supreme Court Cases 161 (1983)

The Bildisco Case:  Reconciling Federal Bankruptcy and Labor Policies, 1983-84 ABA Preview of Supreme Court Cases 169 (1983)

The "Daily Income Fund" Case:  What Role Should a Mutual Fund's Board of Directors Play in Disputes over Investment Advisor Fees, 1983-84 ABA Preview of Supreme Court Cases 107 (1983)

Pulliam v. Allen:  Should State Judges who Act Unconstitutionally Pay the Plaintiff's Attorneys' Fees?, 1983-84 ABA Preview of Supreme Court Cases 115 (1983)

"Shortsighted" Bill Proposes D.C. Court Divestiture, Legal Time of Washington, August 16, 1982

The Tax Bill May Be Unconstitutional, Baltimore Sun, August 16, 1982 (with Donald N. Bersoff)