**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------- X

**BOARD OF TRUSTEES OF THE AFTRA**
**RETIREMENT FUND, in its capacity as a**
**fiduciary of the AFTRA Retirement Fund,**
**individually and on behalf of all others**
**similarly situated,**

                    **Plaintiff,**

      **- against -**

**JPMORGAN CHASE BANK, N.A.,**

                  **Defendant.**

------------------------------------------------------- X

**BOARD OF TRUSTEES OF THE**
**IMPERIAL COUNTY EMPLOYEES'**
**RETIREMENT SYSTEM, in its capacity**
**as a fiduciary of the Imperial County**
**Employees' Retirement System,**
**individually and on behalf of all others**
**similarly situated,**

                    **Plaintiff,**

      **- against -**

**JPMORGAN CHASE BANK, N.A.,**

                  **Defendant.**

------------------------------------------------------- X

**OPINION AND ORDER**

**09 Civ. 686 (SAS)**



**09 Civ. 3020 (SAS)**

**THE INVESTMENT COMMITTEE OF THE MANHATTAN AND BRONX SURFACE TRANSIT OPERATING AUTHORITY PENSION PLAN, in its capacity as a fiduciary of the MaBSTOA Pension Plan, individually and on behalf of all others similarly situated,**

                  **Plaintiff,**

       **- against -**

**JPMORGAN CHASE BANK, N.A.,**

                  **Defendant.**

-------------------------------------------------- X

**09 Civ. 4408 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

Plaintiffs Board of Trustees of the AFTRA Retirement Fund, in its capacity as a fiduciary of the AFTRA Retirement Fund ("AFTRA"), Board of Trustees of the Imperial County Employees' Retirement System, in its capacity as a fiduciary of the Imperial County Employees' Retirement System ("ICERS"), and Investment Committee of the Manhattan and Bronx Surface Transit Operating Authority Pension Plan ("MaBSTOA") bring three consolidated putative class actions against JPMorgan Chase Bank, N.A. ("JPMC"). Plaintiffs seek to recover

losses they suffered when the structured investment vehicle ("SIV"), Sigma

Finance, Inc. ("Sigma"), collapsed on September 30, 2008.  Plaintiffs move to

certify the following class:

> All plans and entities for which JPMorgan Chase Bank,
> N.A., pursuant to a securities lending agreement, invested
> cash collateral, either directly or through a collective
> investment vehicle, in one or more debt securities of Sigma
> Finance, Inc. and continued to hold those debt securities as
> of the close of business on September 30, 2008.[1]

Plaintiffs clarify in their Reply that this class definition is intended to include only

those investors who held Sigma Medium-Term Notes that were purchased in June

2007 and had a maturity date of June 2009 ("2009 Sigma MTNs").[2]  Plaintiffs also

seek an order appointing them as class representatives and approving plaintiffs'

selection of Barroway Topaz Kessler Metlzer & Check, LLP ("Barroway Topaz")

as class counsel.

JPMC objects to class certification only on a narrow aspect of

plaintiffs' motion.  According to JPMC, five direct account holders[3] – out of the

---

[1]     *See* Plaintiffs' Memorandum in Support of Motion for Class
Certification ("Pl. Mem.") at 3.

[2]     *See* Plaintiffs' Reply to Defendant's Memorandum in Opposition to
Plaintiffs' Motion for Class Certification ("Pl. Reply") at 18.

[3]     JPMC's expert, Michael Koehn, indicates that there were eight direct
account holders at the time of Sigma's September 2008 collapse. *See* Table: Key
Characteristics of Security Lending Agreements between JPMorgan Chase Bank

3

seventy-six total putative class members[4] – should not be included as class

members because they cannot satisfy the predominance or superiority requirements

of Rule 23(b) of the Federal Rules of Civil Procedure.[5] Despite their small

number, the implications of excluding these five direct account holders are

substantial as they collectively suffered approximately eighty percent of the total

losses alleged. Having carefully considered the arguments raised by the parties, I

conclude that plaintiffs have met their burden to demonstrate each of the Rule 23

requirements by a preponderance of the evidence. The individual issues identified

by JPMC do not threaten to overwhelm the class, require this Court to conduct

numerous mini-trials, or make the class as a whole unmanageable. Accordingly,

the direct account holders are properly included in the class and plaintiffs' motion

---

and Potential Class Members, Ex. 3 to Koehn Declaration ("Koehn Decl.") ("Key
Characteristics Table"). Because JPMC does not argue that the three additional
direct account holders identified by Koehn – assuming *arguendo* his
characterization is correct – should be excluded from the class, *see* Defendant's
Memorandum in Opposition to Plaintiffs' Motion for Class Certification ("Def.
Opp.") at 14-19, I address only JPMC's concerns relating to the five direct account
holders it names. I nevertheless note that even if there were eight direct account
holders, the outcome would be the same.

[4]      *See* Stipulation Regarding Plaintiffs' First and Second 30(b)(6)
Deposition Notices, Ex. A to the Declaration of Peter H. LeVan, Jr., plaintiffs'
counsel, in Support of Plaintiffs' Motion for Class Certification ("LeVan Decl.")
("Stipulation") ¶ II.2.

[5]      *See* Def. Opp. at 1.

for class certification is granted.

## II.   BACKGROUND

### A.   Parties and Claims

Plaintiffs are fiduciaries of three separate retirement plans that entered

into securities lending agreements with their custodial bank, JPMC.  AFTRA is an

Employment Retirement Income Security Act ("ERISA")-governed employee

benefit plan.  AFTRA asserts for itself and all other class members governed by

ERISA two claims for relief under ERISA: (1) breach of the fiduciary duty to

prudently and loyally manage plan assets (the "prudence claim"); and (2) breach of

the fiduciary duty of loyalty, which encompasses the obligation to avoid conflicts

of interest.[6]  ICERS and MaBSTOA, each of which is a governmental plan not

subject to ERISA, assert for themselves and all other class members not governed

by ERISA, three claims for relief that arise under New York law: (1) breach of the

fiduciary duty to prudently and loyally manage plan assets (the "prudence claim");

(2) breach of the fiduciary duty of loyalty, which encompasses the obligations to

avoid conflicts of interest; and (3) breach of the securities lending agreement with

---

[6]      *See* Amended Class Action Complaint of AFTRA ("AFTRA Compl.")
¶¶ 91-109.

5

JPMC.[7]  ICERS and MaBSTOA also assert negligence claims against JPMC, but

they do not seek class certification of those claims at this time.[8]

## B.     JPMC's Securities Lending Program

Each plaintiff, as well as each proposed member of the class,

participated in JPMC's securities lending program.[9]  The stated purpose of the

program was to "obtain an attractive return while minimizing risk."[10]  JPMC's

securities lending participants invested through JPMC's securities lending program

in one of two ways: (1) collective investment vehicles; or (2) individually directly-

managed accounts.  Collective investment vehicles invested participants' funds on

a communal basis while direct account holders each owned and controlled a

distinct investment portfolio.[11]

Decisions to purchase securities were made on an account-by-account

---

[7]      See Class Action Complaint of ICERS ("ICERS Compl.") ¶¶ 89-99,
108-116; Class Action Complaint of MaBSTOA ("MaBSTOA Compl.") ¶¶ 94-
101, 111-119.

[8]      See Pl. Mem. at 5 n.4.

[9]      See AFTRA Compl. ¶ 21; ICERS Compl. ¶ 20; MaBSTOA Compl. ¶
22.

[10]      AFTRA Compl. ¶ 21; ICERS Compl. ¶ 20;  MaBSTOA Compl. ¶ 22.

[11]      See Declaration of Matthew B. Sarson, JPMC portfolio manager,
("Sarson Decl.") ¶ 7.

basis by a JPMC securities lending portfolio manager.[12]   Such decisions were

subject to the account's investment guidelines.[13]   Individual participants in

collective investment vehicles had no authority to direct the purchase of specific

securities or to impose investment restrictions beyond those set forth in each fund's

investment guidelines.[14]   Direct account holders retained high level authority over

their accounts – meaning that they could limit the issuers from which securities

could be purchased for their account – but direct account holders could not order

any specific purchases.[15]   Direct account holders also had full authority to direct

JPMC to hold or sell particular securities, tailor their investment guidelines to

reflect their risk-return preferences, include or exclude permitted categories of

securities, and change their guidelines as the markets or their preferences change.[16]

---

[12]      *See id.* ¶ 11; Deposition of Matthew B. Sarson, Ex. B to LeVan Decl.,
Ex. B to the Declaration of Samuel E. Bonderoff, JPMC's counsel ("Bonderoff
Decl."), and Ex. A to the Declaration of Joseph H. Meltzer, plaintiffs' counsel, in
Support of Plaintiffs' Reply to Defendant's Memorandum in Opposition to
Plaintiffs' Motion for Class Certification ("Meltzer Decl.") ("Sarson Dep.") at
260:24-261:16 (identifying the portfolio managers that managed the class
members' accounts).

[13]      *See* Sarson Decl. ¶ 6.

[14]      *See id.*

[15]      *See* Sarson Dep. at 238:21-239:23.

[16]      *See* Sarson Decl. ¶ 7; Sarson Dep. at 239:24-240:13.

### C.    JPMC's 2009 Sigma MTN Investment

As of June 2007, Sigma was listed on JPMC's "buy list."[17]  An issuer's presence on the list meant that JPMC's asset management arm ("JPMAM") had performed due diligence and an independent credit analysis on the issuer and found that it was investment worthy.[18]  Even though some direct account holders could provide JPMC with a pre-approved list of issuers, JPMC would only purchase securities from those issuers if they were also on JPMAM's buy list.[19]

That same month, JPMC purchased approximately five hundred million dollars of the 2009 Sigma MTNs on behalf of six accounts.[20]  One of the purchases was for a direct account holder that subsequently instructed JPMC to sell its 2009 Sigma MTN holdings and is not part of the putative class;[21] the remaining five held the 2009 Sigma MTNs until Sigma entered receivership on September 30,

---

[17]    *See* Deposition of Adam Brinton, JPMC portfolio manager, Ex. F to Meltzer Decl. ("Brinton Dep.") at 18:2-24.

[18]    *See id.* at 18:2-24; Deposition of David Reddy, JPMC portfolio manager ("Reddy Dep.") at 63:20-24.

[19]    *See* Sarson Dep. at 109:5-11.

[20]    *See* Stipulation ¶ 2; Sarson Dep. at 199:11-15.

[21]    *See* Sarson Decl. ¶ 26.  When that direct account holder sold its 2009 Sigma MTNs, it reduced JPMC's total 2009 Sigma MTN holdings to $490 million. *See* Sarson Dep. at 199:21-200:23.

2008.[22]

As of June 2007, three of the five accounts were the collective investment vehicles CashCo, DSTI, and ConCas.[23]  JPMC purchased approximately one hundred million dollars worth of 2009 Sigma MTNs for CashCo, of which AFTRA, ICERS and MaBSTOA, among others, were members.[24]  JPMC placed approximately sixty-five million dollars worth of 2009 Sigma MTNs with DSTI, of which putative class members – but not named plaintiffs – NYMEX and World Bank, among others, were members.[25]  JPMC placed approximately fifty million dollars worth of 2009 Sigma MTNs in ConCas.[26]  ConCas was a collective investment vehicle limited to a group of pension plans affiliated with and managed by General Motors Asset Management ("GMAM").[27]

The remaining two allocations of the June 2007 purchase were made to direct account holders New York State Common Retirement Fund ("NYSCRF")

---

[22]     *See* Sarson Decl. ¶ 13.

[23]     *See id.* ¶ 6.

[24]     *See id.*

[25]     *See id.* ¶ 25 n.3.

[26]     *See id.* ¶¶ 10, 22; Sarson Dep. at 259:20-260:13.

[27]     *See* Sarson Decl. ¶ 6 n.1; Sarson Dep. at 59:13-19.

and IBM Retirement Fund ("IBM").  Approximately $175 million of 2009 Sigma

MTNs was allocated to NYSCRF[28] and approximately one hundred million dollars

of the MTNs was allocated to IBM.[29]

  In March 2008, GMAM disbanded ConCas and distributed the assets

among the ConCas participants.[30]  GMAM became a direct account holder at that

time.[31]  In June 2008, NYMEX, and World Bank withdrew from DSTI and opened

their own direct accounts with JPMC.[32]  NYMEX, GMAM, and World Bank held

their 2009 Sigma MTNs throughout the class period.[33]

  **D. JPMC's Alleged Wrongdoing**

  When JPMC purchased the 2009 Sigma MTNs in June 2007 the

residential mortgage market had already begun to collapse.[34]  As early as August

---

[28] *See* Sarson Decl. ¶ 15.

[29] *See id.*

[30] *See* Sarson Dep. at 63:13-18.

[31] *See id.*

[32] *See* Sarson Decl. ¶ 25 n.3.

[33] *See id.* ¶ 25.

[34] *See* Rebuttal Declaration of Daniel J. Nigro, plaintiffs' expert, Ex. G to Meltzer Decl. ("Nigro Decl.") ¶ 21 (listing nineteen "red flag events impacting the residential mortgage market, and financial markets generally, prior to June 4, 2007").

2007, analysts following Sigma and other SIVs warned that the lack of liquidity in the credit market, as well as sharp declines in the market value of assets backing many SIVs, threatened their financial viability.[35]  JPMC's securities lending program even halted any new investments in SIVs as of August 2007.[36]  More than a dozen SIVs failed between August and October 2007[37] and JPMC's internal analysts became concerned about whether Sigma would be able to pay par value of the MTNs upon maturity.[38]  Nevertheless, JPMC never tried to sell or recommend

---

[35]     *See* AFTRA Compl. ¶¶ 43-69; ICERS Compl. ¶¶ 41-67; MaBSTOA Compl. ¶¶ 45-85.

[36]     *See* Sarson Dep. at 272:3-8.

[37]     *See* AFTRA Compl. ¶ 45; ICERS Compl. ¶ 43; MaBSTOA Compl. ¶ 47.

[38]     *See* 10/4/07 Internal JPMC Email, Ex. D to LeVan Decl., at 5 (stating that "we are still confident senior note holders get paid out at par" with regard to SIVs generally, but noting more specifically that "[Sigma] Sr. management, however, does not seem to acknowledge there is a problem despite the lack of senior funding; from our conversations I do not believe they have sold assets. They continue to pay out the full coupon on their capital notes (which they have the option to suspend or defer).  We know they are aggressively using repo [financing] to fund themselves but come October, I expect them to come under more pressure.  Developing."); 2/8/08 Internal JPMC Bloomberg Message, Ex. D to LeVan Decl., at 18 ("should I be more nervous about sigma the non-siv?  cuz I am. . . . feel like these guys are running out of options"); 6/5/08 Internal JPMC Email, Ex. I to Bonderoff Decl., at 7 (reporting that the month end May 2008 report showed that "[a]s Sigma continues to dispose of assets . . . the portfolio composition has shifted . . . away from structured product and towards financials . . . with AAA's decreasing to 38% from 51% over the same time period," but noting that "[w]hile Sigma faces significant maturing liabilities in the coming months,

the sale of the 2009 Sigma MTNs.[39]

Beginning in February 2008, JPMC – without disclosure to the class members – began providing repurchase financing ("repo financing") to Sigma.[40] In exchange, JPMC collected substantial fees of more than $228 million between February and September 2008 allegedly creating a conflict of interest between JPMC and the securities lending participants.[41]

---

thus far they have demonstrated their ability to meet cash needs through the tools available to them (repo, asset sales, ration trades). Based on our analysis of the portfolio, we believe even in a worst case scenario, the intrinsic value of the bond is worth more than a potential sale price of 70 cents on the dollar.").

[39]    *See* Sarson Dep. at 274:12-275:6.

[40]    *See* Stipulation ¶ II.5. In repo financing, the borrower sells the collateral to the lender and at the same time agrees to buy it back later from the lender at a higher price. The difference in price between the original sale price and the later repurchase price is the interest on the loan. In the case of a default, the lenders are already the legal owners of the collateral and do not have to take further legal action to obtain it. *See* Rebuttal Declaration of James J. Angel, plaintiffs' expert, Ex. H to Meltzer Decl. ("Angel Decl.") ¶ 17 n.6.

[41]    *See* Defendant's Amended Responses and Objections to Plaintiffs' Second Set of Interrogatories, Ex. C to LeVan Decl., at No. 7; *see also* 2/11/09 Internal GMAM Email, Ex. G to Bonderoff Decl., at 6 (noting that GMAM had discussed whether to hold or sell the 2009 Sigma MTNs with JPMC in September 2008, which had recommended that GMAM hold the MTNs because GMAM "would maximize our principal return by holding the positions" and that the information provided by JPMC about the underlying assets "gave a general indication that it was a fairly high quality portfolio", but "[i]f the repo financing hadn't fallen apart so dramatically at the end of last year, we think we probably would have been paid. *Who knew?*") (emphasis added).

12

On September 30, 2008, after Sigma failed to meet one of JPMC's margin calls, JPMC declared Sigma in default of its repo agreements, seized the assets that had been pledged to support the repo facilities, and forced Sigma into receivership proceedings.[42] As a result, JPMC's securities lending participants suffered significant losses.[43]

## III.    APPLICABLE LAW

### A.    Class Certification

#### 1.    Requirements Under Rule 23(a)

Rule 23 of the Federal Rules of Civil Procedure governs class certification. "'Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility.'"[44] To be certified, a putative class must first meet all four prerequisites set forth in Rule 23(a), commonly referred to as numerosity, commonality, typicality, and adequacy.[45]

-----

[42]    *See* AFTRA Compl. ¶ 84; ICERS Compl. ¶ 82; MaBSTOA Compl. ¶ 87.

[43]    *See* AFTRA Compl. ¶ 13; ICERS Compl. ¶ 13; MaBSTOA Compl. ¶ 17.

[44]    *Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997) (quoting *Sharif ex rel. Salahuddin v. New York State Educ. Dep't*, 127 F.R.D. 84, 87 (S.D.N.Y. 1989)).

[45]    *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201-02 (2d Cir. 2008).

13

The numerosity requirement mandates that the class be "so numerous that joinder of all members is impracticable."[46] Commonality requires a showing that common issues of fact or law affect all class members.[47] "Typicality 'requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events[] and each class member makes similar legal arguments to prove the defendant's liability.'"[48] Adequacy demands that "the representative parties will fairly and adequately protect the interests of the class."[49]

Finally, the courts have added an "implied requirement of ascertainability" to the express requirements of Rule 23(a).[50] "[T]he requirement that there be a class will not be deemed satisfied unless the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."[51] "'An identifiable class exists if its

---

[46]    Fed. R. Civ. P. 23(a)(1).

[47]    *See* Fed. R. Civ. P. 23(a)(2).

[48]    *Central States*, 504 F.3d at 245 (quoting *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001)).

[49]    Fed. R. Civ. P. 23(a)(4).

[50]    *In re IPO Sec. Litig.*, 471 F.3d 24, 30 (2d Cir. 2006).

[51]    7A Wright, Miller, & Kane, *supra*, § 1760. *See also In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 395 (S.D.N.Y. 2008) (quoting *Rios v.*

members can be ascertained by reference to objective criteria.'"[52]

### 2.    Rule 23(b)

In addition to showing that the proposed class satisfies the four

prerequisites of Rule 23(a), plaintiffs must show that the class is "maintainable"

under Rule 23(b).  A class satisfies this requirement if it fits into one of the three

alternative categories delineated by Rule 23(b), subdivisions (1), (2), and (3).  In

the case at bar, plaintiffs move for class certification pursuant to subdivision (b)(3).

Under Rule 23(b)(3), certification is appropriate where "questions of

law or fact common to the members of the class predominate over any questions

affecting only individual members," and the court finds that class litigation "is

superior to other available methods for the fair and efficient adjudication of the

controversy."[53]  Generally, "'[t]he predominance requirement is met if the plaintiff

can establish that the issues in the class action that are subject to generalized proof,

and thus applicable to the class as a whole, . . . predominate over those issues that

---

*Marshall*, 100 F.R.D. 395, 403 (S.D.N.Y. 1983)).

[52]     *In re Fosamax*, 248 F.R.D. at 395 (quoting *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002)).

[53]     Fed. R. Civ. P. 23(b)(3).

are subject only to individualized proof.'"[54]   The Second Circuit has observed that

this subdivision

> encompasses those cases in which a class action would
> achieve economies of time, effort, and expense, and
> promote uniformity of decision as to persons similarly
> situated, without sacrificing procedural fairness or bringing
> about other undesirable results.[55]

That some class members may be subject to a unique defense that is

inapplicable to other class members does not undermine a conclusion that common

issues predominate.

> [A]lthough "a defense may arise and may affect different
> class members differently, [this occurrence] does not
> compel a finding that individual issues predominate over
> common ones." So "long as a sufficient constellation of
> common issues binds class members together, variations in
> the sources and application of a defense will not
> automatically foreclose class certification."[56]

---

[54]   *Brown v. Kelly*, --- F.3d ---, No. 07 Civ. 3356, 2010 WL 2520040, at
*11 (2d Cir. June 24, 2010) (quoting *Cordes & Co. Fin. Servs., Inc. v. A.G.
Edwards & Sons, Inc.*, 502 F.3d 91, 107-08 (2d Cir. 2007)) (alteration and ellipsis
in original). *Accord In re Nassau County Strip Search Cases*, 461 F.3d 219, 225
(2d Cir. 2006) ("[P]redominance inquiry tests whether proposed classes are
sufficiently cohesive to warrant adjudication by representation.") (quotation marks
omitted).

[55]   *Brown*, 2010 WL 2520040, at *11 (quotations marks omitted).

[56]   *In re Nassau County*, 461 F.3d at 225 (2d Cir. 2006) (quoting *In re
Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 138 (2d Cir. 2001),
*abrogated on other grounds by In re IPO*, 471 F.3d 24) (quotation marks and
alteration omitted).

"Therefore, the question for purposes of determining predominance is not whether a defense exists, but whether the common issues will predominate over the individual questions raised by that defense."[57]

Under Rule 23(b)(3), a court must also determine whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."[58]  In determining whether the class action mechanism is the most "fair and efficient" method of resolving a case, courts must consider the following four nonexclusive factors: "(1) the interest of the class members in maintaining separate actions; (2) 'the extent and nature of any litigation concerning the controversy already commenced by or against members of the class'; (3) 'the desirability or undesirability of concentrating the litigation of the claims in the particular forum'; and (4) 'the difficulties likely to be encountered in the management of a class action.'" [59]

### 3.    Rule 23(g)

"[A] court that certifies a class must appoint class counsel."[60]  In

---

[57]     *In re Visa Check*, 280 F.3d at 138.

[58]     Fed. R. Civ. P. 23(b)(3).

[59]     *In re Nassau County*, 461 F.3d at 230 (quoting Fed. R. Civ. P. 23(b)(3)).

[60]     Fed. R. Civ. P. 23(g)(1).

doing so, a court must consider the following: (1) "the work counsel has done in identifying or investigating potential claims in the action;" (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;" (3) "counsel's knowledge of the applicable law;" and (4) "the resources that counsel will commit to representing the class."[61]  "The court may also consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."[62]

### 4.    Standard of Review

Plaintiffs bear the burden of demonstrating – by a preponderance of the evidence – that the proposed class meets the requirements for class certification.[63]  This Court must "'assess all of the relevant evidence admitted at the class certification stage' when determining whether to grant a Rule 23 motion."[64] "[T]he obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a

---

[61]    Fed. R. Civ. P. 23(g)(1)(A).

[62]    Fed. R. Civ. P. 23(g)(1)(B).

[63]    *See Teamsters*, 546 F.3d at 202.

[64]    *Id.* (quoting *In re IPO*, 471 F.3d at 42).

Rule 23 requirement."[65]   However, "in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement."[66]

## B.   ERISA and Common Law Breach of Fiduciary Duty

The elements of a claim for breach of fiduciary duty under ERISA are "(1) that defendant was a fiduciary who, (2) was acting within his capacity as a fiduciary, and (3) breached his fiduciary duty."[67]   The elements of a claim for breach of fiduciary duty under New York law are "breach by a fiduciary of a duty owed to plaintiff; defendant's knowing participation in the breach; and damages."[68]

A fiduciary is any individual or entity that "'exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,' or 'has any discretionary authority or discretionary responsibility in the

---

[65]   *In re IPO*, 471 F.3d at 41.  *Accord In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 34-35 (2d Cir. 2009).

[66]   *In re IPO*, 471 F.3d at 41.

[67]   *In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d 345, 353 (S.D.N.Y. 2009).

[68]   *SCS Commc'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d Cir. 2004) (citing *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 281-82 (2d Cir. 1992)).

administration of such plan.'"[69] Where an investment account held with a broker is nondiscretionary – that is, the alleged fiduciary lacks investment discretion – no fiduciary relationship exists.[70]

ERISA, codifying the common law "prudent man rule,"[71] provides that a fiduciary is required to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of: providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan."[72] This should be done "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent

---

[69] *Id.* at 354 (quoting 29 U.S.C. § 1002(21)(A)). *Accord Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir. 1991) (explaining that a fiduciary relationship exists under New York law "when one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.") (quotation marks and alteration omitted).

[70] *See Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940 (2d Cir. 1998) ("Under New York law, as generally, there is no general fiduciary duty inherent in an ordinary broker/customer relationship. Such a duty can arise only where the customer has delegated discretionary trading authority to the broker.") (citation omitted).

[71] *Morrissey v. Curran*, 567 F.2d 546, 548 & n.8 (2d Cir. 1977).

[72] 29 U.S.C. § 1104(a)(1)(A). *Accord Matter of Estate of Schulman*, 568 N.Y.S.2d 660, 663 (3d Dep't 1991) (noting that under New York law, a fiduciary must comply with the "prudent man rule"); *see also Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984).

man" would use.[73]  These obligations have been referred to as "'the highest known

to the law.'"[74]  A fiduciary that breaches these obligations "shall be personally

liable to make good to such plan any losses to the plan resulting from each such

breach . . . and shall be subject to such other equitable or remedial relief as the

court may deem appropriate . . . ."[75]

## IV.  DISCUSSION

JPMC does not dispute that plaintiffs have demonstrated numerosity,

commonality, typicality or adequacy.[76]  I have carefully reviewed plaintiffs'

submissions and find that plaintiffs have met each of these requirements by a

preponderance of the evidence.[77]  I am also convinced that the class is ascertainable

---

[73]     29 U.S.C. § 1104(a)(1)(B).

[74]     *LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)).

[75]     29 U.S.C. § 1109(a).

[76]     *See* Def. Opp. at 7 n.2.

[77]     *See* List of Sigma Holders, Ex. A to Stipulation (demonstrating that the class includes seventy-six geographically-dispersed class members, each of which has thousands of plan beneficiaries); AFTRA Compl. ¶ 90 (listing five common questions of law and fact); ICERS Compl. ¶ 88 (same); MaBSTOA Compl. ¶ 93 (same); Pl. Mem. at 26-31 (explaining for establishing typicality and adequacy that the claims of the proposed class representatives arise from the same events and course of misconduct as the claims of other class members and are based on the same legal theory, there are no conflicts of interest between the proposed class representatives and other putative class members, and no unique defenses apply only to proposed class representatives); Declaration of Denny Delk,

using objective criteria[78] and that Barroway Topaz satisfies the requirements of Rule 23(g).[79]

The analysis with regard to predominance and superiority is more complex. JPMC does not dispute that common questions predominate with regard to *all* plaintiffs' – including the direct account holders' – conflict of interest and breach of contract claims.[80] JPMC also does not dispute that the prudence claims of the seventy-one class members who were members of JPMC's collective investment vehicles throughout the class period should be afforded class treatment.[81] Moreover, JPMC concedes superiority for those claims and class members.[82] Indeed, I find that plaintiffs have demonstrated that common questions predominate over individual issues in connection with those claims and class

---

member of the Board of Trustees of the AFTRA Retirement Fund (explaining that AFTRA is ready, willing, and able to serve the class as its representative); Declaration of Julie Villeneuve, Trustee of ICERS (same); Declaration of Kevin McKenna, chairman of the Investment Committee of MaBSTOA Pension Plan (same).

[78]   *See* List of Sigma Holders (demonstrating that putative class members can be readily identified).

[79]   *See* Firm Resume of Barroway Topaz, Ex. F to LeVan Decl.

[80]   *See* Def. Opp. at 7 n.2.

[81]   *Id.*

[82]   *Id.*

22

members[83] and that those claims can be resolved efficiently in a single proceeding. Thus, the only real dispute is whether plaintiffs can demonstrate predominance and superiority insofar as the class seeks to include the prudence claims of the direct account holders – NYSCRF, IBM, GMAM, NYMEX, and World Bank.

### A.    Rule 23(b) Predominance

According to JPMC, adjudicating plaintiffs' prudence claims on a class-wide basis will require the fact finder to determine both whether the decision to invest in and hold the 2009 Sigma MTNs was prudent and whether it was JPMC or the client that was responsible for making the decision.[84]   JPMC contends that the answers to these questions require an account-by-account analysis.  JPMC further argues that assessing damages on a class-wide basis creates an irreconcilable conflict between direct account holders and the rest of the class.   I now address each of these arguments.

### 1.    Predominance of Common Questions Regarding the Decision to Purchase and Hold the 2009 Sigma MTNs

Plaintiffs' prudence claim is overwhelmingly dominated by a number of common issues of law and fact.  They include whether: (1) JPMC owed a

---

[83]    *See* Pl. Mem. at 33-36 (identifying thirteen common questions of law and fact that predominate in this action as well as identifying common evidence that will be offered to prove JPMC's liability).

[84]    *See* Def. Opp. at 25.

fiduciary duty of prudence to all of the class members; (2) JPMC knew or should

have known that its investment in the 2009 Sigma MTNs was imprudent; (3)

JPMC violated its fiduciary duty of prudence by investing in, and holding, the

2009 Sigma MTNs on behalf of all of the class members; (4) JPMC knew of, or

with reasonable diligence could have discovered, Sigma's precarious financial

position at the time it invested in, and continued to hold, the 2009 Sigma MTNs;

and (5) class members sustained losses as a result of JPMC's alleged breach of its

fiduciary duty of prudence.

      In addition to the existence of these common and predominant issues,

plaintiffs have demonstrated that their proof on these questions will focus on class-

wide common evidence.  For example, the investment guidelines and risk-return

profiles of both the collective investment vehicles and direct account holders were

"very, very conservative in nature."[85]  As explained by JPMC portfolio manager

---

[85]    Reddy Dep. at 29:16-30:3. *Accord* Sarson Dep. at 174:3-10 (stating
that maintaining the accounts in the securities lending program focuses on
preserving the account's capital); Nigro Decl. ¶¶ 15, 16 (explaining that the
conservative mandate of the guidelines and portfolios is also evidenced by their
requisite high credit ratings and short length of investments, both of which are
designed to mitigate the risk of default and price volatility); Koehn Dep. at 75:12-
24 (acknowledging that the guidelines of all class members shared the same goal of
investing in "high-quality fixed-income securities that return principal and a little
bit of interest").

David Reddy, all accounts were subject to "standard guidelines."[86] These standard guidelines created investment mandates similar to those for 2a-7 money market funds.[87] 2a-7 money market funds are widely regarded in the financial industry as one of the most conservative, liquid, and safe investments available.[88] Pursuant to these guidelines and profiles, JPMC was to invest in conservative, high-quality, low-risk assets.[89] Plaintiffs claim, however, that the 2009 Sigma MTNs were an imprudent investment in light of the market conditions that existed at the time – evidence of which will also be common to all class members.[90]

With regard to the decision to purchase the 2009 Sigma MTNs, the evidence shows JPMC conducted the due diligence on Sigma on behalf of *all* class members – members in collective investment vehicles and direct account holders.[91] While those efforts did not analyze the appropriateness of the 2009 Sigma MTNs

---

[86]    Reddy Dep. at 26:10-30:3.

[87]    *See id.* at 29:16-30:3.

[88]    *See* Nigro Decl. ¶ 15.

[89]    *See* Reddy Dep. at 29:16-30:3; Koehn Dep. at 75:12-24; Nigro Decl. ¶ 9.

[90]    *See* Nigro Decl. ¶ 21 (listing nineteen "red flag events impacting the residential mortgage market, and financial markets generally, prior to June 4, 2007").

[91]    *See* Stipulation ¶ II.3.

for a particular client or portfolio, they resulted in JPMC's decision to purchase the 2009 Sigma MTNs for securities lending participants generally – *i.e.*, because they were sufficiently conservative.[92]

Once the due diligence was complete, the portfolio managers agreed among themselves to purchase a block of five hundred million dollars worth of 2009 Sigma MTNs.[93] They determined how to allocate the MTNs across the direct accounts and collective investment vehicles.[94] Although each portfolio manager was to make the allocation decision based on his or her account's guidelines and portfolio composition, no investor in a collective investment vehicle nor any direct account holder "directed specific purchases of a specific security."[95] Thus, JPMC treated the direct account holders in the same way as the rest of the proposed class at the time of purchase.

After the purchase was made, JPMC continued to conduct due diligence on Sigma and the Sigma MTNs "on behalf of the Sigma Holders as a

---

[92]     *See id.* ¶ II.4.

[93]     *See* Sarson Dep. at 260:20-23, 261:19-262:8; Brinton Dep. at 24:2-16; Reddy Dep. at 15:6-21.

[94]     *See* Sarson Dep. at 260:20-23, 261:19-262:8; Brinton Dep. at 24:2-16; Reddy Dep. at 15:6-21.

[95]     Sarson Dep. at 42:10-17.

whole . . . ."[96]  JPMAM was responsible for monitoring the issuer's ongoing

creditworthiness and the securities lending portfolio managers relied on JPMAM

for all post-purchase due diligence.[97]  JPMAM was also responsible for making

recommendations to hold or sell a specific investment.[98]  Those recommendations

were made without regard to any particular securities lending participant's account

details, investment guidelines, or portfolio characteristics.[99]  JPMAM's

recommendations were then forwarded to direct account holders or the portfolio

managers of the collective investment funds who, using that information, would

decide whether to hold or sell the investment.[100]

JPMC – through JPMAM – uniformly recommended to direct account

holders and portfolio managers that they should hold the 2009 Sigma MTNs.[101]

The same questions that underlie JPMC's decision to hold the 2009 Sigma MTNs

on behalf of the collective investment vehicles underlie JPMAM's

---

[96]     Stipulation ¶ II.4.

[97]     *See* Sarson Dep. at 170:2-10; Reddy Dep. at 56:19-57:19.

[98]     *See* Reddy Dep. at 73:2-75:24, 89:12-91:25.

[99]     *See id.*; *see also id.* at 121:25-122:6.

[100]    *See id.*; *see also id.* at 121:25-122:6.

[101]    *See* 8/4/08 JPMAM Fixed Income Research-Sigma Finance
Corporation, Ex. G to Bonderoff Decl., at 5; Reddy Dep. at 121:25-122:6.

recommendation to direct account holders.  Thus, the overwhelmingly dominant question is whether the 2009 Sigma MTNs were a prudent investment and the evidence offered to prove or disprove plaintiffs' prudence claims is common to all class members.

JPMC disputes this conclusion and urges this Court to focus on the minutiae of the direct account holders' investment guidelines, risk-return portfolios, and the control each could have exerted over their accounts.  JPMC first argues that the direct account holders' investment guidelines and risk-return portfolios were materially different from those of the collective investment vehicles – making the question of whether the 2009 Sigma MTNs investment was prudent an individualized inquiry.[102]  For example, GMAM's investment guidelines permitted a maximum concentration of five percent for a single issuer while CashCo permitted a maximum concentration of ten percent.[103]  GMAM was also more restrictive in requirements for long-term investment quality than several

---

[102]    See Def. Opp. at 24-29; 7/8/08 JPMC Sur-Reply Letter ("Def. Sur-Reply") at 3; Koehn Decl. ¶ 31 (opining that the investment guidelines and portfolios of the direct account holders are different from those of the rest of the class "with respect to permissible investments, concentration, maturity, and quality guidelines"); Key Characteristics Table.

[103]    See Koehn Decl. ¶ 32.

other funds.[104]  Furthermore, some direct account holders' guidelines permitted

investments only with pre-approved issuers, while the CashCo guidelines, for

example, did not require such pre-approval.[105]

      JPMC also contends that differences existed with regard to risk-return

profiles.  For instance, between 2005 and 2008, CashCo and NYSCRF differed in

the concentration of their portfolios among corporate, money market, bank, repo

and U.S. Treasury securities.[106]  NYSCRF had a consistently higher percentage of

assets in corporate securities and a consistently lower percentage in bank securities.

"[E]ach portfolio was therefore exposed to different industry-specific risks."[107]

      Moreover, the composition of asset ratings at the time of purchase

varied between CashCo and NYSCRF.  "For example, during the first half of 2007,

the assets purchased by NYSCRF were mainly rated AAA or were very short-term

unrated securities, while the ratings of the assets bought by CashCo were spread

across different rating categories."[108]  JPMC argues that to determine whether the

---

[104]    *See id.*

[105]    *See id.*

[106]    *See id.* ¶ 44; Table: Fund Investment Composition (CashCo Fund versus New York State Common Retirement Fund), Ex. 5 to Koehn Decl.

[107]    Koehn Decl. ¶ 44.

[108]    *Id.* ¶ 48. *Accord id.* ¶¶ 48-49 (opining that "these differences reflect the different risk-return profiles of the CashCo and NYSCRF portfolios" and such

2009 Sigma MTNs were a prudent investment for the direct account holders, the

fact finder must consider the guidelines and portfolio of each, thereby creating

individualized questions that will predominate over all common issues.

I disagree. While JPMC has identified some differences among the

guidelines and risk-return profiles, these differences are "extremely minor" and

"[n]one of them differentially affect the imprudence of the Sigma investment."[109]

The guidelines and risk-return profiles of both the collective investment vehicles

and the direct accounts

> explicitly permit most of the common safe short-term
> money market instruments such as commercial paper,
> Treasury bills, repurchase agreements, floating rate notes,
> and corporate notes. They all have concentration
> guidelines. They all have maturity guidelines that keep the
> maturity fairly short. They all require the highest credit
> rating for short-term investments and that long-term paper
> be rated somewhere in the A category or higher. None of
> them permit investment in common stock, preferred stock,
> junk bonds, hedge funds, real estate, or collectibles.[110]

Plaintiffs' position is not that the Sigma MTNs could have been

---

"differences directly bear on a decision to hold or sell the Sigma notes"); Table: Percentage of Floating Rate Assets (Measure of Interest Rate Risk), Ex. 6 to Koehn Decl.; Table: Fund Composition by Asset Rating at Purchase (CashCo Fund versus NYSCRF), Ex. 8 to Koehn Decl.

[109]     Angel Decl. ¶ 30.

[110]     *Id.*

appropriate investments for some securities lending participants, but not others.

Rather, plaintiffs argue that the Sigma MTNs were too risky an investment for *any*

securities lending participant by virtue of the basic, low-risk, high-quality structure

that a securities lending program entailed. That there were slight variations in

guidelines and portfolios is irrelevant to the common thread that links the prudence

claims of the direct account holders to those that invested in the collective

investment vehicles – that, according to plaintiffs, the Sigma MTNs were not a

conservative, high-quality, low-risk investment.

JPMC also argues that variations in direct account holders' control

over their accounts as well as their communications with JPMC present highly

individualized questions.[111] For example, NYSCRF granted its portfolio manager

authority to purchase securities issued by Sigma specifically,[112] but the portfolio

manager had the discretion to determine exactly which Sigma securities were

purchased without prior approval.[113] Similarly, IBM set parameters for

investments made on its behalf, but did not direct its portfolio manager to invest in

---

[111]     *See* Def. Opp. at 24-29; *see also* Def. Sur-Reply at 1-2.

[112]     *See* Sarson Dep. at 265:10-13.

[113]     *See id.* at 41:4-11.

2009 Sigma MTNs or expressly consent to the purchase.[114]  By contrast, none of

the investors in the collective investment vehicles provided pre-approved lists of

issuers and portfolio managers neither needed, nor obtained, the consent or

approval of the client in order to purchase the 2009 Sigma MTNs.[115]

JPMC also contends that control over the decision to *hold* the 2009

Sigma MTNs varied among the accounts.[116]  In April 2008, following a Moody's

downgrade of Sigma's long term rating from Aaa to A2, JPMC alerted NYSCRF

and IBM to the downgrade.[117]  JPMC advised NYSCRF and IBM that it would

continue to hold the 2009 Sigma MTNs in their accounts unless JPMC was

instructed to sell them.[118]  NYSCRF did not instruct JPMC to sell the 2009 Sigma

MTNs.[119]  NYSCRF documents dated August 2008 indicate that NYSCRF may

have relied, at least in part, on JPMC's recommendation to hold the 2009 Sigma

---

[114]    *See id.* at 264:6-23.

[115]    *See id.* at 263:20-264:5; Reddy Dep. at 63:25-64:5.

[116]    *See* Koehn Decl. ¶¶ 35-40.

[117]    *See* Sarson Decl. ¶¶ 17, 20.

[118]    *See id.*

[119]    *See* Brinton Dep. at 48:6-17; Sarson Dep. at 292:12-298:25.

MTNs until maturity.[120]

After posing a series of questions regarding its Sigma investment,
IBM asked for guidance from its portfolio manager as to how to proceed and
received the same recommendation to hold the 2009 Sigma MTNs to maturity.[121]
IBM also received advice from a third party – not JPMC – regarding its Sigma
investment.[122] Ultimately, IBM instructed JPMC to sell all securities issued by
SIVs except for those specified on an attached list.[123] That list included Sigma and
thus indicated that IBM wished to hold its 2009 Sigma MTNs.[124] After similar
communications, GMAM, NYMEX and World Bank – direct account holders at

---

[120] *See* 8/11/08 Internal NYSCRF Email, Ex. G to Bonderoff Decl., at 4-6
("Based upon the financial information we have on Sigma to date and the current
prospects for a full payout, I recommend (as does JPM) continuing to hold the
2009's until maturity.").

[121] *See id*; *see also* 5/23/08 Internal JPMC Email, Ex. E to Bonderoff
Decl., at 4-5 (expressing concern that "IBM may possibly instruct us to liquidate
Sigma *in spite of the fact that we have recommended a hold* based on the
information available from the analyst"); 6/6/08 Email from IBM to JPMC, Ex. G
to Bonderoff Decl., at 6-7 (expressing frustration that JPMC had not answered
IBM's questions satisfactorily or provided recommendations).

[122] *See* 5/15/08 Internal IBM Email, Ex. J to Bonderoff Decl., at 1.

[123] *See* Deposition of Nicole Devine, JPMC portfolio manager (submitted
electronically to the Court after the motion was fully briefed, but not filed)
("Devine Dep.") at 112:12-20; IBM Amended and Restated Investment
Management Agreement, Ex. I to Bonderoff Decl. ("IBM Amended Agreement"),
at 1-6.

[124] *See* Devine Dep. at 112:12-20; IBM Amended Agreement at 6.

the time or soon thereafter – continued to hold their 2009 Sigma MTNs.[125]  Of

course these clients likely considered, at least in part, JPMAM's recommendations.

JPMC argues that, based on this evidence, the analysis of investor preferences for

collective investment vehicle participants is fundamentally different from the

analysis for direct account holders.[126]

       JPMC exaggerates these differences and their importance.  For

purposes of determining liability, it is JPMC's conduct – rather than that of

individual class members – that is the key issue.[127]  JPMAM made the decision that

---

[125]     *See* Sarson Decl. ¶¶ 24, 25 & n.3; 4/7/08 Letter from JPMC to
GMAM, Ex. D to Bonderoff Decl. at 15; 2/11/09 Internal GMAM Email, Ex. G to
Bonderoff Decl., at 6-7 (explaining that although GMAM questioned JPMC's
initial decision to invest in 2009 Sigma MTNs on their behalf, GMAM
"discuss[ed] Sigma with JPM on several occasions" and "ma[d]e a choice" to hold
the Sigma notes rather than "lock in losses immediately by trying to sell in a credit
impaired market", but noting that it made this decision in part because "JPM
thought that we would maximize our principal return by holding the positions . . .
[a]nd what information JPM did provide about the underlying assets gave a general
indication that [Sigma] was a fairly high quality portfolio").

[126]     *See* Def. Opp. at 24-29; Koehn Decl. ¶ 40.

[127]     *See Stanford v. Foamex, L.P.*, 263 F.R.D. 156, 165 (E.D. Pa. 2009)
("'[T]he appropriate focus in a breach of fiduciary duty claim is the conduct of the
defendants, not the plaintiffs.'") (quoting *In re IKON Office Solutions, Inc.*, 191
F.R.D. 457, 465 (E.D. Pa. 2000)); *In re Merck & Co. Sec., Deriv. & ERISA Litig.*,
No. 05 Civ. 1151, 2009 WL 331426, at *8 (D.N.J. Feb. 10, 2009) (finding that
"determination of whether Defendants breached a fiduciary duty of prudence to the
Plans will not turn on the details of individual plaintiffs' subjective opinions"); *see
also In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 76 (S.D.N.Y. 2006) (relying on
similar statements to find the typicality element was satisfied).

the 2009 Sigma MTNs were an appropriate investment for its securities lending

participants.  It was based on that recommendation that JPMC's portfolio managers

purchased the 2009 Sigma MTNs.  That two out of the seventy-six class members

had the authority to dictate which issuers JPMC could purchase from for their

accounts has little bearing on the question on whether the purchase of the 2009

Sigma MTNs was prudent.

  Similarly, JPMAM made the recommendation to hold the 2009 Sigma

MTNs – a recommendation that both the portfolio managers of the collective

investment vehicles and the direct account holders followed.  The direct account

holders' ability to direct JPMC to sell the 2009 Sigma MTNs does not detract from

the overarching question of whether JPMAM's recommendation to hold the notes

was prudent.  Accordingly, these differences do not create individual issues that

threaten to predominate over those that are common to the entire class.[128]

---

[128] JPMC's citations to *Amchem Products, Inc. v. Windsor*, 521 U.S. 591
(1997), *McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2007), and
*Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002), are also
inapplicable. *See* Def. Opp. at 28-29. Unlike those cases, plaintiffs' claims are
brought under only ERISA and New York law, concern a common set of operative
facts, and, at most, involve individual questions limited to a subset of five class
members on one claim and on limited issues. There is no threat of a series of mini-
trials. *Cf. Amchem*, 521 U.S. at 597, 624, 626 (denying class certification in a case
involving thousands, if not millions, of individuals exposed to asbestos and dozens
of differing state laws where individualized issues included whether each
individual suffered from one of numerous asbestos-related diseases, type of
asbestos exposed to, length of exposure, manner of exposure, and individual

Even if the differences outlined above were as substantial as JPMC

suggests, JPMC has, at best, identified defenses that are unique to five out of

seventy-six class members – approximately 6.6 percent.  The existence of these

defenses are insufficient to find that individual issues predominate.[129]

---

smoking/medical history, each of which were considered significant in nature);
*McLaughlin*, 522 F.3d at 223 (holding that where reliance in a civil RICO claim
could not be proven with common, class-wide evidence, a class numbering into the
thousands could not be certified); *Moore*, 306 F.3d at 1253 (same).

[129]     *See In re Nassau County*, 461 F.3d at 229-30 ("The only
countervailing, individualized liability issue was whether, regardless of the policy,
some plaintiffs were strip searched based upon 'reasonable and contemporaneously
held suspicion.'  The existence of this defense does not foreclose class
certification. . . . [A]ny such reasonable suspicion inquiries will be de minimis;
indeed, defendants set forth that such an inquiry will only be sought regarding a
limited number of plaintiffs."); *see also Smilow v. Southwestern Bell Mobile Sys.,
Inc.*, 323 F.3d 32, 39-40 (1st Cir. 2003) ("[W]here common issues otherwise
predominated, courts have usually certified Rule 23(b)(3) classes even though
individual issues were present in one or more affirmative defenses. After all, Rule
23(b)(3) requires merely that common issues predominate, not that all issues be
common to the class."); *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288,
296 (1st Cir. 2000) (holding that although the existence of an affirmative statute of
limitations defense should be considered in assessing class certification, "the mere
fact that such concerns may arise and may affect different class members
differently does not compel a finding that individual issues predominate over
common ones. As long as a sufficient constellation of common issues binds class
members together, variations in the sources and application of statutes of
limitations will not automatically foreclose class certification under Rule
23(b)(3)."); *In re Worldcom, Inc. Sec. Litig.*, 219 F.R.D. 267, 303-04 (S.D.N.Y.
2003) (same); *Caleb & Co. v. E.I. DuPont de Nemours & Co.*, 110 F.R.D. 316, 321
(S.D.N.Y. 1986) ("The fact that the defendants may be able to assert affirmative
defenses against some shareholders . . . should not defeat this motion for class
certification.").

## 2.    Conflict of Interest

JPMC also contests predominance on the grounds that there may be conflicts among the purported class members with regard to the calculation of damages.[130]  Some of the direct account holders held significant quantities of Sigma notes during the relevant period other than the June 2009 MTNs at issue here.[131]  According to JPMC, these different Sigma securities holdings give rise to different litigation interests because the different direct account holders will have an incentive to argue for different dates on which they alleged JPMC should have sold their 2009 Sigma MTNs.[132]  JPMC urges this Court to hold that these conflicting litigation interests preclude certification of a class including direct account holders.[133]

JPMC's argument relies on the faulty premise that plaintiffs allege that JPMC was imprudent in buying and holding *all* Sigma MTNs.  However, plaintiffs allege only that JPMC's was imprudent in buying and holding the 2009

---

[130]    *See* Def. Opp. at 30-31.

[131]    *See* Koehn Decl. ¶¶ 52-59 (outlining the "likely conflicts of interest with respect to *damages*") (emphasis added); Table: All Sigma Medium-Term Notes Maturing after August 2007 and Held by Potential Class Members, Ex. 1 to Koehn Decl. ("Sigma MTN Holdings Table").

[132]    *See* Def. Opp. at 30-31.

[133]    *See id.*

Sigma MTNs; plaintiffs take no position on whether it was prudent for JPMC to hold any other Sigma MTNs.[134] Each specific maturity of Sigma MTNs is a unique security with its own maturity date, pricing and CUSIP. Plaintiffs provide the following example:

> On December 17, 2007, an analyst estimated that Sigma would face a "liquidity squeeze" due to its obligations to repay $22.5 billion in MTNs by the end of September 2008. Given the news (and prior news of the liquidity crisis beginning in early 2007), it would have been imprudent to hold Sigma MTNs maturing after September 2008 (including the Sigma MTNs at issue here) but the conclusion may not be the same for Sigma MTNs scheduled to mature prior to that date.[135]

Moreover, Reddy and another JPMC portfolio manager, Adam Brinton, testified that a Sigma MTN with one maturity date can be sold without having to sell any other maturities.[136] Accordingly, the date on which JPMC allegedly should have sold the 2009 Sigma MTNs has little bearing on when and if JPMC should have sold any other Sigma notes.

Finally, JPMC's intraclass conflict argument centers on the issues of calculating damages. Even if JPMC's position had merit – which it does not –

---

[134]   *See* Pl. Reply at 18.

[135]   *Id.* at 19 (citing AFTRA Compl. ¶ 51).

[136]   *See* Reddy Dep. at 105:8-106:7.

individualized issues relating to damages are insufficient to defeat class

certification where other common issues predominate.[137]  Such a conclusion is

particularly true here where any individualized damages questions would be

limited solely to the prudence claims of only five class members.[138]

## B.    Rule 23(b) Superiority

I also find that plaintiffs have met their burden to establish superiority

by a preponderance of the evidence.  Here, the class consists of seventy-six

entities, with thousands of beneficiaries, whose claims can be resolved efficiently

in a single proceeding.  JPMC concedes superiority for the majority of the

proposed class, but argues that a class action is not a superior method of

---

[137]    *See In re NYSE Specialist Sec. Litig.*, 260 F.R.D. 55, 74 (S.D.N.Y. 2009) ("Conflicts over damages, at this early stage in the litigation, need not defeat a motion for certification.") (citing *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 302 (S.D.N.Y. 2003) ("When liability can be determined on a class-wide basis, individualized damage issues are not ordinarily a bar to class certification.")).

[138]    If further discovery and proceedings in this action reveal that, indeed, the interests of direct account holders and the rest of the class diverge on the question of damages, I am confident that there are sufficient case management tools to ensure that all members of the class are protected.  These tools include, but are not limited to, the authority to alter or amend the class certification order pursuant to Rule 23(c)(1)(c), to certify subclasses pursuant to Rule 23(c)(5), and the authority to issue orders ensuring "the fair and efficient conduct of the action" under Rule 23(d).  Advisory Committee Note on Subdivision (d).  *See also In re Flag Telecom*, 574 F.3d at 37; *Marisol A.*, 126 F.3d at 379.

adjudicating the prudence claims of the five direct account holders.[139]   JPMC

contends that the direct account holders are sophisticated institutional investors

that each held millions of dollars of the Sigma securities at issue and have ample

resources and incentive to pursue individual claims.[140]

> "[T]he existence of large individual claims that are sufficient for

individual suits is no bar to a class when the advantages of unitary adjudication

exist to determine the defendant's liability."[141]   For example, in *In re NASDAQ

Market-Makers Antitrust Litigation* – a case cited by JPMC – the court rejected

defendants' argument that the institutional investors should be excluded from the

proposed class because their trades were significantly different from those

executed by other investors.[142]   The court held that the large institutional investors

---

[139]   *See* Def. Opp. at 31-35.

[140]   *See id.* at 33.   JPMC also contends that the superiority element cannot
be met with regard to the direct account holders because their claims require an
individualized inquiry and their inclusion in the class creates serious manageability
problems because the "critical issues going to plaintiffs' claims cannot be decided
by class-wide proof applicable to direct account holders." *Id.* at 31-35.   Because I
have already found that these individualized issues do not threaten to overwhelm
the class and class-wide proof can be used on behalf of *all* class members, I need
not address JPMC's arguments here.

[141]   2 Newberg on Class Actions, § 4.29 at 260 (4th ed. 2010).   *Accord
Amchem*, 521 U.S. at 617 (Rule 23 "does not exclude from certification cases in
which individual damages run high.") (quotation marks omitted).

[142]   *See* 172 F.R.D. 119, 124 (S.D.N.Y. 1997).

should be included in the class upon finding that (1) multiple lawsuits would be costly and inefficient; (2) class certification would partially equalize the bargaining power between plaintiffs and defendants, and thus improve the chances of an equitable settlement; (3) although larger institutional investors may be capable of filing individual suits, smaller institutional investors may not be willing and able to hire counsel to "battle against the collective resources of the nation's largest financial industry firms"; and (4) including the institutional investors – who executed nearly seventy percent of all trades – would significantly improve the prospects for an overall resolution.[143]  The court's rationale rings true here as well. Moreover, this case has the added consideration that the direct account holders have a strong disincentive to "initiate individual lawsuits because they may not be willing to sue their securities custodian with whom they have active ongoing relationships."[144]  I therefore conclude that plaintiffs have met their burden of demonstrating superiority for all of their claims.

---

[143]     *Id.* at 129-30.

[144]     Pl. Reply at 23.  *Cf. In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 325 (E.D. Mich. 2001) (finding a class action superior where "[t]he companies involved may reasonably believe that given the size of the losses involved, even treble damages are not sufficient to outweigh the cost in good will of suing their suppliers") (quotation marks omitted).

## V.    CONCLUSION

For the foregoing reasons, plaintiffs' motion for class certification is granted.  AFTRA, ICERS, and MaBSTOA are appointed class representatives and Barroway Topaz is appointed class counsel.  The Clerk of the Court is directed to close this motion (Document No. 46 in 09 Civ.686).  A conference is scheduled for August 17, 2010 at 3:00 p.m. in Courtroom 15C.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    August 4, 2010
          New York, New York

## - Appearances -

**For Plaintiffs:**

Joseph H. Meltzer, Esq.
Peter H. LeVan, Jr., Esq.
Barroway Topaz Kessler Meltzer &
    Check, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

Milo Silberstein, Esq.
Dealy & Silberstein, LLP
225 Broadway, Suite 1405
New York, New York 10007
(212) 385-0066

Gregory M. Nespole, Esq.
Wolf Haldenstein Adler Freeman
    Herz LLP
270 Madison Avenue
New York, New York 10016
(212) 545-4761

Bradley E. Beckworth, Esq.
Brad Seidel, Esq.
Nix Patterson & Roach, LLP
205 Linda Drive
Daingerfield, Texas 75638
(903) 645-7333

David L. Wales, Esq.
Bernstein, Litowitz, Berger &
    Grossman, LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 554-1400

**For JPMC:**

Lewis Richard Clayton, Esq.
Jonathan H. Hurwitz, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3215