UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ X

BOARD OF TRUSTEES OF THE AFTRA
RETIREMENT FUND, in its capacity as a
fiduciary of the AFTRA Retirement Fund,
individually and on behalf of all others
similarly situated,

                Plaintiff,

      - against -

JPMORGAN CHASE BANK, N.A.,

              Defendant.

------------------------------------------------------ X

BOARD OF TRUSTEES OF THE
IMPERIAL COUNTY EMPLOYEES'
RETIREMENT SYSTEM, in its capacity
as a fiduciary of the Imperial County
Employees' Retirement System,
individually and on behalf of all others
similarly situated,

                Plaintiff,

      - against -

JPMORGAN CHASE BANK, N.A.,

              Defendant.

------------------------------------------------------ X

**OPINION AND ORDER**

09 Civ. 686 (SAS)

09 Civ. 3020 (SAS)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/5/11

THE INVESTMENT COMMITTEE OF
THE MANHATTAN AND BRONX
SURFACE TRANSIT OPERATING
AUTHORITY PENSION PLAN, in its
capacity as a fiduciary of the MaBSTOA
Pension Plan, individually and on behalf of
all others similarly situated,

          **09 Civ. 4408** (SAS)

                  **Plaintiff,**

          **- against -**

**JPMORGAN CHASE BANK, N.A.**,

                **Defendant.**

-------------------------------------------------------- **X**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

This class action arises out of JPMorgan Chase Bank, N.A.'s

("JPMC's") investment of certain "securities lending" clients' cash collateral in the

June 2009 Medium-Term Notes (the "MTNs") of Sigma Finance, Inc. ("Sigma"), a

structured investment vehicle ("SIV") that collapsed on September 30, 2008.[1]

Class members governed by the Employee Retirement Income Security Act

---

[1]    I granted Plaintiffs' motion for class certification on August 4, 2010.
*See Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase Bank,
N.A.*, 269 F.R.D. 340, 355 (S.D.N.Y. 2010).

("ERISA") assert claims for breach of the fiduciary duty to prudently and loyally manage plan assets (the "prudence claim") and for breach of the fiduciary duty of loyalty, which encompasses the obligation to avoid conflicts of interest (the "duty of loyalty" claim). Class members not governed by ERISA assert analogous prudence and duty of loyalty claims under New York common law, in addition to breach of their securities lending agreements with JPMC.

Both JPMC and Plaintiffs now move for partial summary judgment on Plaintiffs' claims that JPMC breached its duties of loyalty by investing its fiduciary clients' cash collateral in the 2009 Sigma MTNs while simultaneously extending billions of dollars of "repo" financing to Sigma. According to Plaintiffs,

> [t]he evidence of record . . . establishes that [JPMC] predicted Sigma's collapse; engaged in predatory repo with substantial haircuts to 'cherry-pick' the best assets in Sigma's portfolio for itself, immediately depleted the quantity and quality of Sigma's assets by taking title to assets in an amount that exceeded the financing it provided by nearly a billion dollars; and ultimately reaped nearly $2 billion of profits for itself while leaving the Class' notes virtually worthless.[2]

Plaintiffs also move for summary judgment that JPMC's "fail[ure] to disclose material information to the Class"[3] related to that repo financing also breached its

---

[2]    Plaintiffs' Response to the *Amicus Curiae* Brief of the Securities Industry and Financial Markets Association ("Pl. Response to SIFMA Mem.") at 3.

[3]    Plaintiffs' Memorandum of Law in Opposition to JPMC's Motion for Partial Summary Judgment ("Opp. Mem.") at 11.

duty of loyalty to the Class.

JPMC's motion is granted, and Plaintiffs' motions are denied.  While JPMC may have breached its duties to prudently manage plan assets – claims that are not at issue on this motion – its extension of repo financing to a non-fiduciary client (Sigma) in a non-fiduciary capacity did not constitute a conflict of interest. Nor did JPMC's extension of repo financing cause Plaintiffs' losses, which forecloses Plaintiffs' duty of loyalty claims.  Moreover, there is no evidence – and Plaintiffs' duty of loyalty claim is not based on the theory – that JPMC's status as a repo financier to Sigma influenced its management of plan assets, or that JPMC's failure to disclose that status was somehow motivated by a desire to protect itself to the detriment of its fiduciary clients.  Thus, Plaintiffs' claim that JPMC further breached its duties of loyalty by failing to disclose that status also fails.

## II.   BACKGROUND

### A.   Repurchase Agreements

A repurchase agreement ("repo") is a form of financing structured as a sale of securities with a simultaneous agreement to repurchase them at a later date.[4] "In effect, a repurchase agreement is a loan in the amount of the proceeds of the original sale, collateralized by the [security], with interest equal to the difference

---

[4]    *See* JPMC's Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("JPMC 56.1") ¶ 12.

4

between the sale and repurchase prices."[5]  The borrower and lender in a repo

transaction agree to a certain "haircut" – a percentage discount that the lender

applies to the market value of the repo'd assets, providing the lender with

additional protection in the event that the value of the asset declines.[6]  Although the

borrower passes legal title to the securities to the lender, it retains both the

economic benefits and market risk of the transferred collateral through retained

beneficial ownership, and continues to mark-to-market the price of the security on

its balance sheet.[7]

        In mid-2008, repo activity was estimated to exceed ten trillion dollars

in the American market (or seventy percent of U.S. GDP), and another six trillion

---

[5]        *United States v. Manko*, 979 F.2d 900, 902 (2d Cir. 1992).  *Accord Resolution Trust Corp. v. Aetna Cas. & Sur. Co. of Ill.*, 25 F.3d 570, 579-80 (7th Cir. 1994) (repos are "in economic substance collateralized lending"); *In re Comark*, 971 F.2d 322, 323 (9th Cir. 1992) ("Reverse Repos can function as a loan. . . . [T]he securities 'sold' to the dealer can be viewed as . . . collateral . . . ."); *In re Legal, Braswell Gov't Sec. Corp.*, 648 F.2d 321, 324 n.5 (5th Cir. 1981) ("A . . . repo 'is essentially a short-term collateralized loan' although it is in the form of a sale.") (quoting *SEC v. Miller*, 495 F. Supp. 465, 467 (S.D.N.Y. 1980)).

[6]        *See* Plaintiffs' Counter-Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Pl. 56.1") ¶ 13.  In other words, the lender takes title to collateral with a market value that exceeds the amount of financing provided by a certain percentage.  *See* 6/10/10 Deposition of Timothy Glasgow ("Glasgow Dep."), Ex. 9 to Declaration of Peter H. LeVan, counsel for Plaintiffs ("LeVan Decl."), at 119-120.  *See* Appendix A for a list of the *dramatis personæ* of this case (and their respective roles, pieced together from the parties' submissions).

[7]        *See* Moorad Choudhry, *The Repo Handbook* 116-17 (2010).

5

euros in the European market (or sixty-five percent of Euro area GDP).[8]

### B. Federal Banking Regulations Governing Multi-Service Financial Institutions

In 1999, Congress enacted the Gramm-Leach-Bliley Financial Services Modernization Act permitting modern multi-service diversified financial institutions to provide asset management, retail and commercial banking, investment banking, insurance, and treasury and securities services.[9]  The purpose of the Act, which repealed certain provisions of the Glass-Steagall Act, was "to reduce and, to the maximum extent practicable, to eliminate the legal barriers preventing affiliation among depository institutions, securities firms, insurance companies, and other financial service providers."[10]

Since 1913, federal law has also permitted national banks to manage trust accounts while simultaneously engaging in commercial lending[11] (to which

---

[8]     *See* Peter Hordahl & Michael King, *Developments in Repo Markets During the Financial Turmoil*, BIS Q. Rev. 37, 39 (Dec. 2008).

[9]     *See* Pub. L. No. 106-102, 113 Stat. 1338 (1999).

[10]    *See* H.R. Rep. No. 106-74 at 138 (1999).  *See also* Testimony of Sen. Evan Bayh, 145 Cong. Rec. S13883, S13912 (Nov. 4, 1999) (permitting multi-service financial institutions "will also lead to greater efficiency, lower interest rates, and greater access to credit.  It will also lead to greater innovation in the new marketplace with greater competition.").

[11]    *See* Federal Reserve Act of 1913, § 11(k), 38 Stat. 251, 262; U.S.C. § 92a(a) (authorizing the Comptroller of the Currency to grant permission to national

repo financing is the functional equivalent). For example, the Office of the

Comptroller of the Currency (the "OCC"), the federal agency charged with the

chartering, regulation, and supervision of national banks (including JPMC) under

the National Bank Act, permits the commercial arm of a national bank to make

secured loans directly to a fiduciary client.[12] The Federal Deposit Insurance

Corporation (the "FDIC"), the primary federal regulator for the 4,900 state-

chartered banks that do not join the Federal Reserve System, also permits the

simultaneous investment of fiduciary assets and commercial bank lending with

respect to the same issuer, provided that an information barrier is in place.[13]

---

banks to serve as fiduciaries); 12 U.S.C. § 92a(j) (authorizing the Comptroller to promulgate regulations concerning "proper exercise" of bank functions).

[12]     12 C.F.R. § 9.12(c) ("Self-dealing and conflicts of interest") ("A national bank may make a loan to a fiduciary account and may hold a security interest in assets of the account if the transaction is fair to the account and is not prohibited by applicable law."). *See also* 12/7/10 Deposition of Charles Grice, Plaintiffs' compliance expert ("Grice Dep."), Ex. K to Declaration of Jonathan Hurwitz in Support of JPMC's Motion for Partial Summary Judgment ("Hurwitz Decl."), at 256 ("Q. Do you agree . . . that national banks that have securities lending or asset management businesses regularly engage in commercial lending transactions with issuers of securities that are held in fiduciary accounts? . . . A. 'Regularly' meaning not infrequently? . . . Yes."); Lybecker, Martin, *Regulation of Bank Trust Department Investment Activities: Seven Gaps, Eight Remedies, Part I*, 90 Banking L.J. 912, 923-24 (1973) ("It is normal and necessary for large industrial corporations to have creditor, depositor, directoral, and still other relationships with banks.").

[13]     *See* FDIC, *Trust Examination Manual*, Section 8, §§ D-D.1 ("Material nonpublic information"), available at

Moreover, legislation passed in the aftermath of the financial crisis of 2007-2009

does not contemplate the disaggregation of banks' fiduciary asset management and

corporate finance functions.[14]

---

http://www.fdic.gov/regulations/examinations/trustmanual/section_8/section_viii.html ("Banks may come into possession of material, nonpublic information in a number of ways [such as] through information developed as a part of normal lending relationships with large commercial customers . . . . In general, trust accounts maintained in FDIC-supervised banks do not invest in corporations for which the commercial department has extended credit. . . .  However, *it is possible that a bank could lend to and invest in the same company*. . . .  Financial institutions should adopt policies and procedures, appropriate to its own circumstances, to prevent the flow of material, nonpublic information from the commercial department to the trust department. . . .  Appropriate procedures may include: [1] Denying trust personnel access to commercial credit files; [2] Prohibiting trust personnel from attending internal commercial loan meetings; [3] Prohibiting bank personnel from serving simultaneously on a trust investment committee and a commercial lending committee; and [4] Physically separating trust department personnel from commercial lending personnel.") (emphasis added).

[14]       *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 619(d)(1), 124 Stat. 1379, 1623 (2010) (codified at 12 U.S.C. § 1851(d)(1)).  The "Volcker Rule," or section 619 of the Dodd-Frank Act – which prohibits an insured depository institution and its affiliates from engaging in "proprietary trading" and from acquiring or retaining an ownership interest in or sponsoring a hedge fund or private equity fund – does not restrict bank lending or propose the separation of affiliated trust departments.  *See* 12 U.S.C. §§ 1851(a) & (d)(1). Although the "Cantwell-McCain Amendment" to the Dodd-Frank Act, S.A. 3884, sought the reinstatement of Glass-Steagall, separating *commercial* banking from *investment* banking, it did not contemplate the divestiture of *investment management* from commercial banking and, in any event, was not brought to a vote.  *See* Press Release of Sen. Maria Cantwell, *Cantwell, McCain Seek to Restore Glass-Steagall Safeguards by Separating Commercial and Investment Banking* (May 6, 2010), available at http://cantwell.senate.gov/news/record.cfm?id=324753.

### 1.      Information Barriers

Before section 10(b) of the Securities Exchange Act of 1934[15]

and Rule 10b-5[16] promulgated thereunder prohibited trading on material inside

information,

> a standard part of the investment decision making process of
> commercial bank trust departments involved seeking out and
> evaluating information about issuers of securities from
> commercial or other department files and personnel. This practice
> may have been thought to be dictated by a fiduciary's duty to use
> any relevant information available to it in making decisions for the
> benefit of the trust. . . . [However,] [t]his traditional view of a
> fiduciary's responsibility to isolate and use inside information was
> upset by a series of rule 10b-5 cases . . . in which the [Securities
> Exchange Commission] adopted and enforced the principle that
> the recipient of material inside information about a publicly traded
> security must either disclose such information to the public or
> abstain from trading in or recommending the securities involved
> until the information is adequately disclosed to the public.  In
> these cases, the Commission has consistently taken the position
> that a fiduciary's duty to obey rule 10b-5 is paramount to its
> common law duty to use material inside information in making
> investment decisions. . . .  Consistent with the doctrine that it is
> misuse of material inside information which is illegal – not mere
> possession of such information – and that inferences of misuse
> may be overcome where the facts establish an absence of misuse,
> *the Commission has repeatedly encouraged financial institutions*
> *possessing material inside information to adopt internal*
> *procedures to preserve the confidentiality of such information and*
> *to prevent misuse thereof by employees engaged in securities*
> *trading in the public market. The desirability of such procedures*

---

[15]      15 U.S.C. § 78j.

[16]      17 C.F.R. § 240.10b5.

> *for commercial banks with trust departments has been stressed by the Commission* . . . . For banks the purpose of these procedures is to prevent material inside information acquired by the bank's commercial department from being communicated to persons in the trust department who have discretion to invest for, or give advice to trust customers with regard to, investing in publicly traded securities. It is these procedures which are usually referred to as the Wall or Chinese Wall.[17]

OCC regulations require a national bank exercising fiduciary powers to "adopt and follow written policies and procedures adequate to maintain its fiduciary activities in compliance with applicable law," including "[m]ethods for ensuring that fiduciary officers and employees do not use material inside information in connection with any decision or recommendation to purchase or sell any security" and "[m]ethods for preventing self-dealing and conflicts of interest."[18] According to the OCC, "[a] so-called Chinese wall should prevent the passage of material

---

[17]     Herzel & Colling, *The Chinese Wall and Conflict of Interest in Banks*, 34 Bus. Law 73, 77-80 (1978) (hereinafter "Herzel & Colling") (citations omitted) (emphasis added) (cited with approval in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008)).  *Accord* H.R. Rep. No. 98-355 at 11 (1984) ("[T]here should be certain limits on the liability of a multi[-]service firm, such as a broker-dealer . . . , where one employee possesses information but another employee, not knowing of the information, trades for the firm's account before the information is made public. . . . [S]uch a firm with an effective 'Chinese Wall' would not be liable for trades effected on one side of the wall, notwithstanding inside information possessed by firm employees on the other side.").

          I refer to so-called "Chinese Walls" throughout this Opinion simply as "information barriers."

[18]     12 C.F.R. § 9.5(b)-(c).

inside information between a bank's fiduciary department and its commercial

department in violation of securities laws and regulations, as well as fiduciary

standards."[19]  However,

> this wall should not be considered an absolute barrier. The doctrine does not require the total separation of fiduciary and commercial functions within a bank, nor does it prohibit the joint marketing and servicing of customers.  Rather, it is intended to prevent the use of significant nonpublic information in making investment decisions.[20]

### C.   JPMC's Securities Lending Business and Its Investment in Sigma Notes

JPMC offers securities lending services, which include lending client

securities to third parties, who post collateral (generally cash), and investing the

---

[19]  OCC, *Conflicts of Interest: Comptroller's Handbook* 28 (citations omitted) (citing Scott and Fratcher, The Law of Trusts, § 170.23A).  *Accord* FDIC, *Trust Examination Manual*, Section 8, § D.1; Federal Reserve System, *Policy Statement Concerning Use of Inside Information*, 43 Fed. Reg. 12,755 (Mar. 27, 1978).

[20]  OCC, *Conflicts of Interest: Comptroller's Handbook* 28.  *Accord* Abney, David & Nadeau, Mark, *National Banks, The Impassable "Chinese Wall," and Breach of Trust: Shaping a Solution*, 107 Banking L.J. 251, 257 (1990) (hereinafter "Abney & Nadeau") ("It is to be expected . . . that there should be an exchange of information between the commercial and the trust departments of a bank, and, indeed, this normal exchange may be an obligation owed to and legally enforceable by the bank's fiduciary customers.  No one suggests that such an exchange should be curtailed unless the communication involves what may, subjectively, be characterized as 'material inside information.'").

collateral for its clients' benefit.[21]  Each securities lending client enters into a

Securities Lending Agreement setting forth, among other things, guidelines for the

investment of collateral,[22] over which JPMC Securities Lending personnel then

exercise discretionary authority.[23]  JPMC Securities Lending is part of the bank's

Treasury & Securities Services line of business.[24]  Securities Lending investment

professionals use research and analysis provided by Asset Management, a line of

JPMC's business that also manages mutual funds and provides other asset

management services.[25]

Pursuant to JPMC's internal policies, both Securities Lending

investment management personnel and the Asset Management research personnel

who assist Securities Lending operate on the "public side" of the firm's business.[26]

---

[21]     *See* JPMC 56.1 ¶ 1.

[22]     *See id.* ¶ 2.

[23]     *See* Plaintiffs' Response to JPMC's Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Pl. Response to JPMC 56.1") ¶ 2.

[24]     *See* JPMC 56.1 ¶ 3.

[25]     *See id.* ¶ 4.

[26]     *See id.* ¶ 5.  According to JPMC, public-side personnel are expected to make investment decisions and recommendations based solely on publicly available information, and are screened from the commercial segments of JPMC's business that may possess nonpublic information about clients or others.  *See id.* ¶ 6 (disputed by Plaintiffs).

JPMC purports to have an information barrier in place between the "public" and "private" sides of the firm's business to prevent public-side personnel from obtaining nonpublic information about clients or others from JPMC's private-side personnel.[27] JPMC's "private" or "commercial" side includes its Investment Bank and Chief Investment Office, through which JMPC executes its repo financing transactions.[28]

In June 2007, Securities Lending purchased for its clients five-hundred million dollars of Sigma MTNs scheduled to mature in June 2009.[29] The

---

[27] *See id.* ¶ 6; Pl. Response to JPMC 56.1 ¶ 6. *See, e.g.*, JPMorgan Chase & Co. Code of Conduct, Ex. S to Hurwitz Decl., at JPMC00382014-15 ("The firm's Policy on Information Barriers refers to a system of information barriers (also known as Chinese Walls) designed to limit the flow of inside information from areas that routinely have access to such information, such as Investment Banking, Capital Markets, [and] Commercial Lending . . . ('insider areas'), to those areas that trade in or sell securities or provide investment advice regarding securities, such as Sales, Trading, Research, and Asset Management ('public areas')."). However, JPMC policies allow for "wall straddlers" who "will have access to information on both sides of the Chinese Wall" such as "members of Legal and Compliance, senior management, internal auditors, and the heads of certain business departments." JPMorgan Chase & Co. Policy on Information Barriers Updated 22nd September 2009, Ex. S to Hurwitz Decl., at JPMC00382026.

[28] *See* JPMC 56.1 ¶¶ 13, 16.

[29] *See id.* ¶ 7; Pl. Response to JPMC 56.1 ¶ 7. Sigma was founded in the 1990s and was managed by Gordian Knot Ltd. ("Gordian Knot"). *See* JPMC 56.1 ¶ 8. In June 2007, Sigma held assets that it valued at approximately $56.2 billion and was, at that time, the largest SIV in terms of assets. *See id.* ¶ 9; Pl. Response to JPMC 56.1 ¶ 9.

MTNs were AAA-rated at the time of purchase[30] and were secured by a floating first priority lien on all of Sigma's eligible assets.[31]  Notwithstanding the floating first priority lien, Sigma retained the right to enter into repo agreements under which it could transfer title of specific assets to repo financiers; under such agreements, the repo financiers would thereby obtain a superior interest on those specific assets which, in an event of default, would be unavailable to support the MTNs.[32]

The holdings of JPMC Asset Management's investment funds are periodically reported in public documents.[33]  Sandra O'Connor, the JPMC executive in charge of the Securities Lending business line, testified that Jamie Dimon – JPMC's CEO – was aware that Securities Lending held Sigma MTNs for the Class.[34]  Other high-ranking officials in JPMC's Investment Bank, including Andrew Cox (chief credit officer), Bill Winters (then-head of the Investment

---

[30]     *See* JPMC 56.1 ¶ 7; Pl. Response to JPMC 56.1 ¶ 7.

[31]     *See* Pl. Response to JPMC 56.1 ¶ 7; Sigma Finance Medium-Term Notes Offering Circular ("MTN Offering"), Ex. 1 to LeVan Decl., at 3.

[32]     *See* MTN Offering at 3, 31.

[33]     *See* Grice Dep. at 271.

[34]     *See* Pl. 56.1 ¶ 17.

14

Bank), and John Hogan (then-chief risk officer), were equally aware.[35]  O'Connor regularly reported to Dimon about her department's substantial exposures, which included the Sigma MTN investments.[36]

### D.    JMPC's Commercial Side Extends Repo Financing to Sigma

Beginning in August 2007, the credit markets experienced a period of some of the greatest financial turmoil in the history of the United States.[37]  Sigma, like many other issuers, largely lost access to the commercial paper and MTN markets, and began increasingly to finance itself through repo agreements, asset sales, and other means.[38]  Between June 2007 and September 2008, Sigma's repo financing increased from $1.4 billion to $18 billion.[39]

On August 23, 2007 – less than three months after Securities Lending purchased five-hundred million dollars of Sigma MTNs for its clients – John Kodweis, head of Short-Term Fixed Income Origination (part of JPMC's

---

[35]    *See* 9/18/07 Email from Cox to Winters, Brian Sankey, Hogan and Tony Best, Ex. 14 to LeVan Decl., at JPMC0015770 ("I have heard JPM Asset Mgmt are large buyers of SIV and Sigma [commercial paper]."); 9/18/07 Email from Hogan to Cox, Winters, Sankey and Best, Ex. 14 to LeVan Decl., at JPMC0015770.

[36]    *See* Pl. 56.1 ¶ 17.

[37]    *See* JPMC 56.1 ¶ 10; Pl. Response to JPMC 56.1 ¶ 10.

[38]    *See* JPMC 56.1 ¶ 11.

[39]    *See id.*

Investment Bank), sent an email to high-ranking JPMC officials Eric Rosen and

Kevin Fion (private side) entitled "Structured Investment Vehicles – Challenges

and Opportunities":

> We think the current liquidity squeeze on the Structured
> Investment Vehicles is unlikely to abate. . . .  Although the
> environment remains unpredictable, we now think it possible –
> even probable – that the entire sector unwinds.
>
> To date, [JPMC's] efforts to aid the SIV managers have been a
> loosely coordinated effort among the various product teams that
> have traditionally done business with them. . . .  The bigger
> opportunity may well be in managing their potential wind-down
> and exit from the short-term debt markets, as almost $400 billion
> of high-grade assets are shifted.
>
> We may be too early on this, but we believe it would make sense
> for [JPMC] to establish a team that would be charged with
> working through this issue, in particular
> - identifying profit opportunities in portfolio sales or
>   restructuring
> - identifying opportunities to buy assets that demonstrate a
>   very attractive risk/reward profile for [JPMC] – given the
>   potential for forced selling
> - advising bank sponsors of SIVs – or even the capital note
>   holders directly – on unwinding the portfolios. . . .
> - guarding our own interests in light of the exposures we
>   have as a liquidity provider and swap counter-party
> - assisting senior debt investors with advice and guidance. .
>   . .
>
> We have changed our views based on:
> - Conversations with the top 12 investors.  As of now, none
>   are rolling paper or adding to positions.  Several have asked
>   for bids on their MTNs.  On a positive note, most investors
>   still have most of the SIV credits approved. . . .

- The rating agencies are clearly concerned. . . .  They are considering allowing SIVs to repo securities, which we believe is an allowance made only under extraordinary circumstances.  (We do not believe this works in any meaningful way.)
- Increasing panic at the SIVs. . . .[40]

In the same email, Kodweis listed JPMIM (a group that includes Securities Lending) as one of the top twelve investors in the SIV market with whom his team had "conversations."[41]  Kodweis testified that neither he nor his team relied upon any nonpublic information in identifying the "challenges and opportunities" described in the August 23, 2007 email.[42]

The email was forwarded several times, ultimately to Cox.  Seven days later, on August 30, 2007, John Tobin (Asset Management) sent the following email (entitled "SIV") to Lisa Shin, the credit analyst in Asset Management responsible for the Sigma MTNs JPMC held for the Class:

[Jamie] Dimon would like to understand the systemic risk of a complete unwind of all SIV's.  He would like as much detail as possible, initially on the names that we are exposed to . . . .  He would like to understand the time frame each can operate (best we can tell) if they do not see any additional funding.  In this scenario

---

[40]   8/23/07 Email from Kodweis to Rosen and Fion, Ex. 2 to LeVan Decl., at JPMC00157661-62.

[41]   *See id.* at JPMC00157662.

[42]   *See* 6/8/10 Deposition of John Kodweis ("Kodweis Dep."), Ex. 3 to LeVan Decl., at 140, 164-165.

17

"how does everyone get paid?". . . .  A breakout of their liability schedule would be helpful, also the context of what i[t] takes for them to have an orderly unwind and over what time frame does this take place.[43]

Six minutes later, he added, "Also, a very real picture of the assets that will be unwound with particular focus on Sigma (best we can do)."[44]

The next day, a collection of JPMC personnel from various divisions within the Bank – including Asset Management (Tobin and Shin), the Investment Bank (including Kodweis), Treasury, and Market Risk – compiled an analysis of an "SIV Unwind" that was emailed to a distribution list entitled "Dimon Markets Meeting" with the introduction, "Jamie [Dimon] asked us to analyze a potential unwind of SIVs scenario. . . .  All the information below is public side, so feel free to distribute internally."[45]  Earlier that day, Seth Bernstein (Asset Management) had sent a packet of information concerning SIVs directly to Dimon by email ("Follow Up SIV Information") with the following cover memo:

---

[43]     8/30/07 First Email from Tobin to Shin, Ex. 4 to LeVan Decl., at JPMC00400693.

[44]     8/30/07 Second Email from Tobin to Shin, Ex. 4 to LeVan Decl., at JPMC00400692.

[45]     8/31/07 Email from Robert Rupp to Dimon Markets Meeting, Ex. 4 to LeVan Decl., at JPMC002942353 .  The email states, "[i]n [our] [SIV] issuer-by-issuer analysis, we excluded [Gordian Knot] from the group that was 'likely to liquidate,'" noting that "their assets are high quality and their term funding is a bit longer than the other SIV's."  *Id.* at JPMC00294235.

Attached, please find summary information on the SIVs we currently own in our portfolios. . . .  I would direct you to the last attachment, Sigma Monthly Business Report 31 July 2007 for our latest data on this exposure. . . . [W]e have signed NDAs with respect to some of this information so none of it can be shared with the [Investment Bank].[46]

On September 18, 2007, Cox emailed Winters and others with an

"Update" on Sigma:

I believe we should not extend [JPMC's] committed repo, . . . but we need to keep our options open (see below) and will do this by discussing a $500 [million] uncommitted open repo with up-front and daily margining.  This could be terminated at anytime by JPM[C] selling the securities and if we get the right haircuts this may not add any material credit risk.  When we said to [a Sigma representative] why have the uncommitted repo when he can draw the committed line he became very agitated and this gave us some key insights. . . .

•      I do not believe there is a systemic bank problem with all SIVs going through an orderly liquidation, however is there a systemic asset management problem (the 'break the buck' argument)?

•      I have heard JPM Asset Mgmt are large buyers of SIV and Sigma [commercial paper].  Do we need to consider the firmwide position?  This is most acute with the largest

---

46      8/31/07 Email from Bernstein to Dimon, Ex. 4 to LeVan Decl., at JPMC00400602.  According to Plaintiffs, these emails indicate that "[f]rom the start, Dimon was keenly interested in Sigma's assets."  Opp. Mem. at 5.  As further support, Plaintiffs direct the Court to a February 9, 2008 email in which Best reminds a group of high-ranking private side personnel that "Bill/Jamie want the [Sigma] assets at this point."  2/9/08 Email from Best to Sankey, Mark Crawley, Cox, Guy America and Jonathan Adams, Ex. 5 to LeVan Decl., at JPMC00158142.

independent SIV manager.[47]

Hogan responded the same day:

> [A]gree that we should not extend our committed repo when it expires at the end of October but I'm not clear what replacing it with rolling overnight repo does for us exactly.  On your last two bullet [point] questions, I defer to Bill [Winters] but my view is that we need to protect our position irrespective of the broader "break the buck" issue or worry about what JPM Asset Mgmt has invested in.[48]

Between February and August 2008, through its Investment Bank and Chief Investment Office, JPMC entered into four agreements extending Sigma an aggregate of $8.4 billion in repo financing.[49]  Discussions among private-side personnel around the time of the first transaction, "Clove Hitch I," suggest that JPMC believed it was "likely" that Sigma would "unwind" or "wind down"[50] and

---

[47]    9/18/07 Email from Cox to Winters, Sankey, Hogan and Best, Ex. 14 to LeVan Decl., at JPMC0015770-71.

[48]    9/18/07 Email from Hogan to Cox, Winters, Sankey and Best, Ex. 14 to LeVan Decl., at JPMC0015770.

[49]    *See* JPMC 56.1 ¶ 13.  Those agreements were nicknamed "Clove Hitch I," "Clove Hitch II," "Selenium," and "Clove Hitch III."  *See* Pl. 56.1 ¶¶ 11, 15.

[50]    2/6/08 Email from Crawley (JPMC London) to Best, Marc Jones and America ("latest snapshot and summary of risks/variables ahead of meeting Gordian at 2:30"), Ex. 7 to LeVan Decl., at JPMC00158069.

carefully selected the securities that would serve as the collateral for the trade.[51]

For example, in a February 4, 2008 email entitled "SIGMA: risk/return, is it sufficient?," Jones wrote the following to Winters and Best:

> With structuring and diligence aspects of the SIGMA trade nearing a conclusion, we now have a short period to determine whether the risk/return is sufficiently attractive. . . .  The risk under a repo is much lower than an asset purchase as ongoing survival of Sigma means no assumption of asset risk. . . .  **By having control over assets in the portfolio there is a significant P&L opportunity should Sigma unwind as we retain "last look" on the assets** (in return we assume the risk that the assets cannot be sold at above valuation level less haircut – but we are structuring this robustly).[52]

---

[51]    *See* Deposition of Guy America (risk management), Ex. 6 to LeVan Decl., at 73 ("Q. At some point in time Gordian Knot provided your team with a list of securities which could potentially be part of the Clove Hitch I transaction, is that correct?"); *id.* at 71 ("A. . . I do think we discussed particular securities [that would be repo'd] and I think a list of securities [was] exchanged."); *id.* at 75 ("Q. . . . [W]as your team merely assigning a value to all of the securities on the list, or were they selecting which securities they thought were most attractive on the list and wanted to be a part of Clove Hitch [I]? . . . A. . . . I recall them valuing those securities and I recall them having conversations with respect to the suitability of securities with people at Sigma Finance.").  JPMC appears to have been focused primarily on Sigma's holdings of publicly-traded bank debt to collateralize the contemplated financing.  *See* 2/4/08 Email from Jones to Best, Winters, Cox, David Lewis and Crawley, Ex. 7 to LeVan Decl., at JPMC00158043 (listing, among "favorable" "key" aspects of the "trade," a "collateral pool of bank paper selected by JPM[C]").

[52]    *Id.* at JPMC00158042-43.  *See also* 2/6/08 Email from Crawley to Best, Jones and America ("latest snapshot and summary of risks/variables ahead of meeting Gordian at 2:30"), Ex. 7 to LeVan Decl., at JPMC00158069 ("The credit meeting yesterday maintained the view Sigma may survive as a going concern but this is unlikely (and even more unlikely given the recent [Financial Services

On February 9, 2008, Crawley inquired of Best, Sankey, Cox, America, Winters, and Adams whether "we need to stick with the 20% per week repo unwind if [Sigma] breach[es] limits on % of assets on repo?"[53]  Sankey responded, "Guys – don't you want the option to sell off fast if they've breached any repo limit because probability is it's caused by a market sell off – no?"[54]  Best agreed that "we need to remember that.  Bill [Winters]/Jaime [Dimon] want the assets at this point.  So – some selling but probably not all – no?"[55]

Five days later, on February 14, 2008, JPMC and Sigma executed

---

Authority (United Kingdom)] document giving the principle that liquidity facilities will attract a higher capital charge).  However, the likely scenario remains an orderly wind down (TBC) and therefore a trade of this nature can still be absolutely viable as long as the *market & legal/reputational risks are fully understood upfront and the P&L justifies this*."); *id.* (highlighting as a "[m]arket risk" the "likelihood of having to enforce collateral &, on top, likelihood of there being a firesale of all assets at that time"; highlighting as "[l]egal risks" "[l]itigation from debt holders / uncertainty over insolvency process"); 2/6/08 Email from Sankey to Cox, Ex. 7 to LeVan Decl., at JPMC00158067 ("[W]e should only do the repo as a stand-alone and if we can satisfy ourselves around the legal/rep risk.  Whether or not we can get comfortable with the 'market dump' scenario is another matter.  Do you agree?").

[53]     2/9/08 Email from Crawley to Best, Sankey, Cox, America, Winters and Adams, Ex. 5 to LeVan Decl., at JPMC00158142-43.

[54]     2/9/08 Email from Sankey to Crawley, Best, Cox, America and Adams, Ex. 5 to LeVan Decl., at JPMC00158142-43.

[55]     2/9/08 Email from Best to Sankey, Crawley, Cox, America and Adams, Ex. 5 to LeVan Decl., at JPMC00158142.

"Clove Hitch I," under which JPMC agreed to extend repo financing of up to five billion dollars to Sigma, with a haircut of eight percent applied to all securities (with some exceptions).[56]

Roughly three weeks later, in response to a question from Winters,[57] Crawley emailed Winters and Cox, copying Best, Ian Slatter, and America, informing them that there was "[c]urrently $3bn drawn" on the five billion dollar repo line from JPMC and it "[d]oesn't feel like [Sigma] ha[s] pressure to draw the other $2bn but we know the bulk of refi[nancing] falls in next few months."[58] Crawley noted that

> [t]here may be an opportunity to use the current volatility to do more repo trades with [Sigma] which are in effect asset financing at very attractive levels on high quality assets with excellent structural protection (ie lever the structure we have put in place but treat it as a trade rather than 'support' for sigma). . . . [Sigma is] keen to raise 3-5bn in short order as this may stave off the downgrade (they are on negative watch with moodys).[59]

---

[56]     *See* Clove Hitch I Repo Agreement, Ex. 8 to LeVan Decl., at JPMC00154560.

[57]     *See* 3/7/08 Email from Winters to Crawley, Cox and Best, Ex. 10 to LeVan Decl., at JPMC 00158402 ("pls update me on amount drawn, [mark-to-market] of pledged assets and aggregate collateral calls. [Is Sigma] borrowing to buy back debt or are they beginning to feel a real liquidity squeeze?").

[58]     3/7/08 Email from Crawley to Winters, Cox, Best, Slatter and America, Ex. 10 to LeVan Decl., at JPMC 00158402.

[59]     *Id.*

Winters responded, "If they have drawn $3 b[illion] and only purchased $1 b[illion] of debt, it sounds like they needed $2 b[illion] for liquidity – does not bode well."[60]  Cox responded, "The most pressing problem for Sigma will be gaining more repo capacity to meet the redemption profile into July.  They have more repo than we thought but this was always going to be a race against time."[61] Crawley responded to Cox only: "This strikes me as an opportunity for collaterlised lending using the robust docs from the sigma process and good assets. If we can keep a good discipline here then there are very big money making opportunities I think as the market deteriorates. . . but I would appreciate your thoughts on the 'grand scheme' within JPM. . . tks."[62]  A June 5, 2008 JPMC "Update on Sigma financing opportunities" states that the "[r]ationale for existing trades and pipeline" is "to provide secured financing on high quality assets within the Sigma portfolio":

> The structure of all trades is put in place to ensure:

---

[60]    3/7/08 Email from Winters to Crawley, Cox, America, Slatter and Best, Ex. 10 to LeVan Decl., at JPMC 00158401.

[61]    3/8/08 Email from Cox to Winters, Crawley, America, Slatter and Best, Ex. 10 to LeVan Decl., at JPMC 00158401.

[62]    3/8/08 Email from Crawley to Cox, Ex. 10 to LeVan Decl., at JPMC 00158401.

> 1. best possible return on capital if Sigma survives and
> 2. best possible protection if Sigma defaults (enforcement of
> collateral at discounted prices) . . .
>
> In summary, secured financing provides a number of
> opportunities:
>
> 1. Excellent returns on secured lending with high quality
> underlying assets
> 2. The chance to buy high quality assets in large blocks at deep
> discounts if Sigma defaults
> 3. By remaining close to Sigma, JPM will be aware at an early
> stage of a potential default . . .
>
> Internal JPM businesses and third party clients have expressed an
> interest[] in secured lending to Sigma. These are all driven by the
> same rationale as above. None of the trades contemplate entering
> into with the assumption that Sigma will survive. All parties
> know there is a material chance that Sigma will not survive due to
> funding difficulties.[63]

JPMC thereafter entered into three additional repo arrangements with

Sigma: Clove Hitch II (executed on June 28, 2008 for six billion dollars); Selenium

(executed on July 8, 2008 for $1.5 billion); and Clove Hitch III (executed on

August 28, 2008 for one billion dollars).[64] As of August 15, 2008, Sigma had repo

facilities with seven other providers, including HSBC and RBS, totaling

approximately $11.4 billion, at which point JPMC's outstanding repo to Sigma

---

[63]   6/5/08 Update on Sigma financing opportunities, Ex. 10 to LeVan
Decl., at JPMC00158636-37.

[64]   *See* Pl. 56.1 ¶ 15.

totaled approximately $6.5 billion.[65]  JPMC engaged in no analysis to determine

what effect the provision of repo financing would have on its Securities Lending

(or other) clients,[66] and it never disclosed to the Class that it was providing repo

financing to Sigma.[67]

E.   **JPMC's Securities Lending Division Remains Invested in Sigma MTNs with Knowledge of Extensive Repo Financing**

Although Securities Lending personnel were never told by the private

side of the bank that JPMC was providing repo financing to Sigma, several heard

market rumors that JPMC was one of Sigma's repo lenders.[68]  Moreover, on June

4, 2008, Shin (Securities Lending) emailed Juliette Saisselin (Gordian Knot)

---

[65]     *See id.* ¶¶ 14-15; Pl. Response to JPMC 56.1 ¶ 14.

[66]     *See* 7/12/10 Deposition of Andrew Cox, Ex. 18 to LeVan Decl., at 88.

[67]     *See* Pl. 56.1 ¶ 21.

[68]     *See* 7/23/10 Deposition of O'Connor, Ex. 24 to LeVan Decl., at 42-43 (testifying that she first became aware of rumors in the market that JPMC had provided or was providing repo financing to Sigma "in 2008, mid-2008, and, again there were rumors of many major banking institutions in the marketplace providing repo financing.  So it would not shock me. . . .  I did ask the trading desk had we had any confirmation of that or had we read anything about that" and "they had just heard the rumors as well"); 6/29/10 Deposition of James Wilson, Securities Lending trader, Ex. 24 to LeVan Decl., at 265-66 (confirming that he had sent an internal email about a "rumor that the JPM repo line to Sigma was 12B" in order to "let the desk know that there was a rumor in the marketplace and I was passing it on"); 6/25/10 Deposition of Lisa Shin ("Shin Dep."), Ex. 24 to LeVan Decl., at 185.

inquiring whether "there is any information you can give on [Sigma's] repo

agreements?  Number/name of counterparties, maturity dates, etc, etc?"[69]  Saisselin

responded,

> [W]e have , I believe, 8 repo counterparties. . . I can't give you
> names as that is confidential but many of them are part of our
> liquidity bank list names. . . .  We continue to stay funded a week
> in advance ([]now up to June 12th) and still doing some ratio
> trades, asset sales and still working on getting new repo lines. . .
> crawling week to week. Collateral is indeed getting thinner.[70]

On August 12, 2008, in an email entitled "Sigma July 2008 update-OK FOR

CLIENTS," Shin emailed a number of JPMC personnel with an analysis of Sigma,

including "Ongoing concerns re: increasing risk of default:"[71]

> While it positive [sic] credit enhancement to the senior notes has
> been increasing as Sigma delevers the portfolio, there are a few
> other factors which pose a potential risk to the timely repayment
> of Sigma:
> •    Repo: We viewed the ability of Sigma to secure additional
>      (repo) financing through challenging market environments
>      as a plus.  It has also enabled Sigma to avoid asset sales and
>      better match the term of their assets and liabilities.
>      *However, repo also creates a super senior (secured) class
>      above senior MTNs.  In the worst case scenario of an event*

---

[69]    6/4/08 Email from Shin to Saisselin, Ex. 15 to LeVan Decl., at
JPMC00001588.

[70]    6/4/08 Email from Saisselin to Shin, Ex. Ex. 15 to LeVan Decl., at
JPMC00001588.

[71]    8/12/08 Email from Shin to Wilson and ten other JPMC personnel,
Ex. 16 to LeVan Decl., at JPMC00402202, JPMC00402205.

> *of default or insolvency event, it is expected the repo*
> *counterparties would seize the collateral pledged under*
> *repo, and those assets would not be available for the*
> *benefit of senior noteholders.* With repo now making up
> over half of total funding, and with no transparency on
> which assets are encumbered under repo, assessing the
> value of the remaining unencumbered assets is unclear. . .
> .[72]

Referring to a bar graph she created to highlight the composition of "pledged

[versus] unpledged assets under repo," Shin stated, "As you can see, repo is

secured by mostly financials and [Credit Card]/Autos *while the unencumbered*

*assets are heavily weighted towards the CLO/CDO bucket*."[73]  JPMC's expert,

Christopher Laursen, testified that JPMC's status as a repo financier of Sigma was

not material nonpublic information, although it may nonetheless have been subject

to a "need-to-know" restriction.[74]

## F.   Sigma's Collapse

On September 15, 2008, Lehman Brothers filed for Chapter 11

bankruptcy, resulting in a seizure of the credit markets and large losses in the value

---

[72]     *Id.* at JPMC00402205 (emphasis added).  *See also id.* at
JPMC00402202 ("Repo is a whopping 60% of total senior debt . . . increased $500
[million] on the month.").

[73]     *Id.* at JPMC00402204 (emphasis added).

[74]     *See* 12/2/10 Deposition of Christopher Laursen, Ex. 23 to LeVan
Decl., at 159, 160-61.

of the assets backing the Sigma MTNs.[75]  JPMC made numerous calls on Sigma for additional margin, one or more of which Sigma was unable to satisfy.[76]  On September 30, 2008, JPMC issued notices of default pursuant to the terms of its repo agreements, followed by Sigma's other repo counterparties.[77]  The next day, Sigma entered receivership.[78]  The receivers subsequently held an auction sale of all of Sigma's assets, whose results implied a recovery for MTN-holders of roughly six cents on the dollar.[79]  At the time JPMC first began providing repo financing to Sigma, JPMC valued the Class' MTNs at 97.3 percent of par.[80]

### G.  JPMC's Profits

The parties dispute the amount by which JPMC allegedly "profited" from its repo agreements with Sigma.  Based on a comparison of the values JPMC assigned to the Clove Hitch II and III assets at closeout versus the prices at which JPMC sold many of those same assets, Plaintiffs estimate that JPMC made $470

---

[75]     *See* JPMC 56.1 ¶ 20.

[76]     *See id.* ¶ 21; Pl. Response to JPMC 56.1 ¶ 21.

[77]     *See* JPMC 56.1 ¶ 22; Pl. Response to JPMC 56.1 ¶ 22.

[78]     *See* JPMC 56.1 ¶ 23.

[79]     *See id.*; Pl. Response to JPMC 56.1 ¶ 23; Shin Dep., Ex. 19 to LeVan Decl., at 345.

[80]     *See* Pl. 56.1 ¶ 26.

million in asset sales from October 2008 through September 2009.[81]  They further

assert that JPMC made $1.2 billion (in the form of asset appreciation) on the Clove

Hitch II assets it retained (based on their "well-recognized market values")[82] and

"made $228 million for itself in [repo] fees,"[83] for a total of almost $1.9 billion in

profits.  JPMC contends that "JPMC's decision to hold the collateral for years has

no bearing on [P]laintiffs' claim – any more than would [P]laintiffs' claim be

affected if some other bank had purchased the collateral in the auction and JPMC

then used the auction proceeds to make a profitable investment."[84]  JPMC further

asserts that "when Sigma collapsed in September 2008, JPMC's own position was

approximately $383 million underwater, even after fees earned on the repo

---

[81]      *See* Opp. Mem. at 10 & n.12.

[82]      *Id.* at 10 & n.13.

[83]      *Id.* at 10.

[84]      JPMC's Reply to Plaintiffs' Opposition to JPMC's Motion for Partial Summary Judgment ("Def. Reply") at 5 n.4.  Indeed, if the theory of Plaintiffs' duty of loyalty claim is that JPMC breached a duty to the Class by seizing assets that would otherwise have been available to satisfy their notes, there would seem to be no relevance to the *subsequent* appreciation of those assets – which would not have accrued to Plaintiffs even had those assets been available to satisfy their notes in October of 2008.  Any recovery would have been limited to the value of those assets in October of 2008, as determined by the "fire sale" prices at which they were sold.

transactions."[85]

## III.  LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[86]  "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'  A fact is material if it 'might affect the outcome of the suit under the governing law.'"[87]  "[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ."[88]  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence . . . on an essential element of the nonmovant's claim."[89]  In turn,

---

[85]    JPMC's Memorandum of Law in Support of Motion for Partial Summary Judgment ("Def. Mem.") at 8 (citing 10/6/08 Excerpted Letters to Sigma Finance Corporation, Ex. R to Hurwitz Decl., at 1-6).

[86]    Fed. R. Civ. P. 56(c).

[87]    *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[88]    *Miner v. Clinton County*, 541 F.3d 464, 471 (2d Cir. 2008).  *Accord Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

[89]    *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). *Accord In re September 11 Litig.*, 500 F. Supp. 2d 356, 361 (S.D.N.Y. 2007)

to defeat a motion for summary judgment, the non-moving party must raise a

genuine issue of material fact.  To do so, the non-moving party must do more than

show that there is "'some metaphysical doubt as to the material facts,'"[90] and

"'may not rely on conclusory allegations or unsubstantiated speculation.'"[91]

However, "'all that is required [from the non-moving party] is that sufficient

evidence supporting the claimed factual dispute be shown to require a jury or judge

to resolve the parties' differing versions of the truth at trial.'"[92]

"In ruling on a motion for summary judgment, a court must resolve

all ambiguities and draw all factual inferences in favor of the nonmoving party."[93]

However, "[i]t is a settled rule that '[c]redibility assessments, choices between

conflicting versions of the events, and the weighing of evidence are matters for the

---

("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.") (quotation marks and citations omitted).

[90]      *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[91]      *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

[92]      *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson*, 477 U.S. at 248-49).

[93]      *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citing *Anderson*, 477 U.S. at 242, 255).

jury, not for the court on a motion for summary judgment.'"[94]  Summary judgment is therefore "appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[95]

## IV.    APPLICABLE LAW

### A.    ERISA and New York Common Law Breach of Fiduciary Duty

The elements of a claim for breach of fiduciary duty under ERISA are "(1) that defendant was a fiduciary who, (2) was acting within his capacity as a fiduciary, and (3) breached his fiduciary duty."[96]  The elements of a claim for breach of fiduciary duty under New York law are "breach by a fiduciary of a duty owed to plaintiff; defendant's knowing participation in the breach; and damages."[97]

Under ERISA, a fiduciary is any individual or entity that "'exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,' or 'has any discretionary authority or discretionary responsibility in the

---

[94]    *Id.* (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).

[95]    *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009).  *Accord Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).

[96]    *In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d 345, 353 (S.D.N.Y. 2009).

[97]    *SCS Commc'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d Cir. 2004) (citing *Diduck v. Kaszycki & Sons Contractors, Inc*., 974 F.2d 270, 281-82 (2d Cir. 1992)).

administration of such plan.'"[98]  Where an investment account held with a broker is

nondiscretionary – that is, the alleged fiduciary lacks investment discretion – no

fiduciary relationship exists.[99]

　　　　"The 'threshold question' in an action charging breach of fiduciary

duty under ERISA 'is not whether the actions of some person employed to provide

services under a plan adversely affected a plan beneficiary's interest, but whether

that person was acting as a fiduciary (that is, performing a fiduciary function) when

taking the action subject to complaint.'"[100]  Thus, "[a]n ERISA fiduciary may be

---

　　[98]　　*In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d at 354 (quoting 29 U.S.C. § 1002(21)(A)).  *Accord Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir. 1991) (explaining that a fiduciary relationship exists under New York law "when one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation") (quotation marks omitted).

　　[99]　　*See Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940 (2d Cir. 1998) ("Under New York law, as generally, there is no general fiduciary duty inherent in an ordinary broker/customer relationship. Such a duty can arise only where the customer has delegated discretionary trading authority to the broker.") (citation omitted).

　　[100]　　*In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 757 (S.D.N.Y. 2003) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000)).  *See Pegram*, 530 U.S. at 225 ("[e]mployers . . . can be ERISA fiduciaries and still take actions to the disadvantage of employee beneficiaries, when they act as employers . . . , or even as plan sponsors . . . .").  New York common law similarly recognizes that a fiduciary's duties extend only to acts taken in a fiduciary capacity, and not to every other aspect of the fiduciary's business.  For example, in *EBC I, Inc. v. Goldman Sachs & Co.*, the New York Court of Appeals held that the defendant underwriter had a fiduciary relationship with a securities issuer insofar as it provided expert

liable for breaching his fiduciary duties through conduct adversely affecting the plan only to the extent that conduct occurs while the individual is a fiduciary and falls within the scope of his fiduciary authority."[101]

### 1.      The Duty of Loyalty

Under ERISA, "a fiduciary shall discharge his duties with respect to a plan *solely* in the interest of the participants and beneficiaries and--(A) for the *exclusive* purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."[102] "These responsibilities imposed by ERISA have the familiar ring of their source in the common law of trusts" which "charges fiduciaries with a duty of loyalty to guarantee beneficiaries' interests."[103] "It is a part of [the fiduciary's] obligation to

---

advice to the issuer about market conditions.  *See* 5 N.Y.3d 11, 21-22 (2005).  The Court "stress[ed], however, that the fiduciary duty we recognize is limited to the underwriter's role as advisor," and emphasized that "[w]e do not suggest that underwriters are fiduciaries when they are engaged in activities other than rendering expert advice." *Id.*

[101]      *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 471 (S.D.N.Y. 2005) (citing 29 U.S.C. § 1109; *Pegram*, 530 U.S. at 225-26).

[102]      29 U.S.C. § 1104(a)(1)(A)(i)-(ii) (emphasis added).

[103]      *Pegram*, 530 U.S. at 224 (citing *Central States, Southeast & Southwest Areas Pension Fund v. Cent. Transport, Inc.*, 472 U.S. 559, 569 (1985) ("[R]ather than explicitly enumerating all of the powers and duties of trustees and other fiduciaries, Congress invoked the common law of trusts to define the general scope of their authority and responsibility")).

give his beneficiary his undivided loyalty, free from any conflicting personal interest; an obligation that has been nowhere more jealously and rigidly enforced than in New York . . . ."[104]  "'The most fundamental duty owed by the trustee to the beneficiaries of the trust is the duty of loyalty.'"[105]

ERISA expressly identifies certain prohibited transactions between a plan and a fiduciary.  For example, a fiduciary may not

> (b)(1) deal with *the assets of the plan* in his own interest or for his own account,
>
> (2) in his individual or in any other capacity act in any transaction *involving the plan* on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

---

[104]    *Dabney v. Chase Nat. Bank of City of N.Y.*, 196 F.2d 668, 670 (2d Cir. 1952).  *Accord* Restatement (Third) of Trusts § 78(2) (a fiduciary is "strictly prohibited from engaging in transactions that . . . involve or create a conflict between the trustee's fiduciary duties and personal interests").  *See, e.g., Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982) (ERISA "imposes a duty on the trustees to avoid placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan").

[105]    *Pegram*, 530 U.S. at 224 (quoting 2A A. Scott & W. Fratcher, Trusts § 170, p. 311 (4th ed.1987) and citing *Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928) (Cardozo, J.) ("Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties.  A trustee is held to something stricter than the morals of the market place.  Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.")).  *Accord Dabney*, 196 F.2d at 670 ("[T]he duty of a trustee, not to profit at the possible expense of his beneficiary, is the most fundamental of the duties which he accepts when he becomes a trustee.").

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction *involving the assets of the plan*.[106]

## 2.    Duty to Disclose

"[A]n ERISA fiduciary [also] has both a duty not to make misrepresentations to plan participants, and 'an affirmative duty to inform when the [fiduciary] knows that silence might be harmful.'"[107]  This includes the duty "to disclose . . . any material conflicts of interest that [may] render . . . advice [given in

---

[106]    29 U.S.C. § 1106(b)(1)-(3) (emphasis added).

[107]    *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 478 (S.D.N.Y. 2005) (quoting *Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1993)).  *Accord In re Beacon Assoc. Litig.*, 745 F. Supp. 2d 386, 427 (S.D.N.Y. 2010) (citing *Glaziers & Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Sec., Inc.*, 93 F.3d 1171, 1182 (3d Cir. 1996) (defining the scope of the duty to disclose as "what a reasonable fiduciary, exercising care, skill, prudence and diligence, would believe to be in the best interest of the beneficiary to disclose")); Restatement (Second) of Trusts § 173, cmt. d (a trustee "is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection").  *See also Pegram*, 530 U.S. at 228 n.8 ("The fraud claims in [plaintiff]'s initial complaint . . . could be read to allege breach of a fiduciary obligation to disclose physician incentives to limit care, whereas her amended complaint alleges an obligation to avoid such incentives.  Although we are not presented with the issue here, it could be argued that [the HMO] is a fiduciary insofar as it has discretionary authority to administer the plan, and so it is obligated to disclose characteristics of the plan and of those who provide services to the plan, if that information affects beneficiaries' material interests.") (citing *Glaziers*, 93 F.3d at 1179-81 and *Varity Corp. v. Howe*, 516 U.S. 489, 505 (1996)).

a fiduciary capacity] suspect . . . ."[108]

### 3.    Causation

A fiduciary that breaches its obligations under ERISA "shall be personally liable to make good to such plan any losses to the plan *resulting from* each such breach."[109]  "Because both loss to the fund, and a causal connection between that loss and defendant's breach, are necessary elements of an ERISA claim for damages under 29 U.S.C. § 1109(a), if [a defendant] demonstrates an absence of a genuine issue of material fact as to either causation or loss on [a plaintiff's] ERISA claims, [defendant] is entitled to summary judgment on those claims."[110]

However, under New York law, "breaches of a fiduciary relationship in any context comprise a special breed of cases that often loosen normally

---

[108]    *EBC*, 5 N.Y.3d at 22.

[109]    29 U.S.C. § 1109(a) (emphasis added).

[110]    *Salovaara v. Eckert*, No. 94 Civ. 3430, 1998 WL 276186, at *4 (S.D.N.Y. May 23, 1998).  *Accord Silverman v. Mutual Ben. Life Ins. Co.*, 138 F.3d 98, 104 (2d Cir. 1998) (ERISA "requires a plaintiff to demonstrate in a suit for compensatory damages that the plan's losses 'result[ed] from' [the] Principal's breach of § 1105(a)(3)"); *Taylor v. United Techs. Corp.*, No. 3:06cv1494, 2007 WL 2302284, at *5 (D.Conn. Aug. 9, 2007) ("A fiduciary may only be liable for losses that would not have occurred but for the fiduciary's breach.") (citing *Silverman*, 138 F.3d at 105).

stringent requirements of causation and damages."[111]  Nevertheless, "the proponent

of a claim for a breach of fiduciary duty [under New York law] must, at a

minimum, establish that the offending parties' actions were 'a substantial factor' in

causing an identifiable loss."[112]

## V.    DISCUSSION

I first address JPMC's motion for summary judgment on Plaintiffs'

duty of loyalty claims.  Because those claims fail as a matter of law, I need not

separately address Plaintiffs' motion on those claims.  I then address Plaintiffs'

claims based on JPMC's alleged breach of the duty to disclose.

### A.    Duty of Loyalty Claims

Plaintiffs assert that JPMC breached its fiduciary duty of loyalty to the

Class by "*creat[ing]* a superior encumbrance on trust property by voluntarily

becoming a repo financier of Sigma with a higher priority claim to Sigma's assets

---

[111]    *Milbank, Tweed, Hadley & McCloy v. Chan Cher Boon*, 13 F.3d 537,
543 (2d Cir. 1994) (holding that law firm's representation of former client's agent
in same transaction was breach of fiduciary duty to former client that was
substantial factor in preventing former client from obtaining assets she sought in
transaction).

[112]    *Gibbs v. Breed, Abbott & Morgan*, 710 N.Y.S.2d 578 (1st Dep't 2000)
(quoting *Milbank*, 13 F.3d at 543).

in order to capitalize on 'profit opportunities' for itself."[113]   JPMC moves for

summary judgment dismissing Plaintiffs' duty of loyalty claims on three grounds:

*first*, that "as a matter of law, JPMC's duty of loyalty to [P]laintiffs extends only to

fiduciary conduct – here lending out [P]laintiffs' securities and investing their

collateral – and not to actions – such as the Sigma repo transactions – taken in a

nonfiduciary capacity";[114] *second*, that "JPMC's information barriers between

Securities Lending and the commercial segments of the bank responsible for the

repo transactions effectively prevented any potential conflict of interest";[115] and

*third*, that Plaintiffs cannot meet their burden of showing that JPMC's conduct in

extending repo financing to Sigma caused an injury to Plaintiffs.[116]   Plaintiffs

cross-move for summary judgment on the same claims.

### 1.     Because JPMC Extended Repo Financing to Sigma in Its

---

[113]     Opp. Mem. at 18 (asserting that JPMC knew that "(i) the Class' MTNs were secured only by a floating first priority lien; (ii) repo financiers took title to Sigma's assets and that, in the event of default, those assets would not be available to support the MTNs; (iii) Sigma would not likely survive as a going concern; and (iv) by providing Sigma with repo financing and taking title to more than $9.3 billion of Sigma's best assets, it was significantly impairing the value of the MTNs it held for the Class") (citations omitted).

[114]     Def. Mem. at 2 (citing *Pegram*, 530 U.S. at 225-26).

[115]     *Id.* at 3.

[116]     *See id.* at 3-4 ("Sigma failed – and plaintiffs incurred losses – because of the world-wide credit crisis, and because other repo lenders to Sigma, not just JPMC, foreclosed on those loans.").

### Nonfiduciary Capacity, JPMC Breached No Fiduciary Duty to Plaintiffs

In assessing Plaintiffs' claims, this Court must first address "the threshold question"[117] of whether JPMC, in extending repo financing to Sigma, was performing a fiduciary function.  JPMC argues from *Pegram* that in extending repo financing to Sigma, it was not acting in a fiduciary capacity, *i.e.*, it was not "acting in the capacity of manager, administrator, or financial adviser to a 'plan.'"[118]  It points to the *Pegram* Court's observation that "[e]mployers . . . can be ERISA fiduciaries and still take actions to the disadvantage of employee beneficiaries, when they act as employers (e.g., firing a beneficiary for reasons unrelated to the ERISA plan), or even as plan sponsors (e.g., modifying the terms of a plan as allowed by ERISA to provide less generous benefits)."[119]  "Nor is there any apparent reason in the ERISA provisions to conclude," the Court added, "that this tension is permissible only for the employer or plan sponsor, to the exclusion of

---

[117]    *Pegram*, 530 U.S. at 226.  *See id.* at 226, 237 (holding that health maintenance organization ("HMO"), acting through its physician owners, did not "breach[] its duty to act solely in the interest of beneficiaries by making decisions affecting medical treatment while influenced by the terms of [an] HMO scheme, under which the physician owners ultimately profit from their own choices to minimize the medical services provided" because "mixed eligibility decisions by HMO physicians are not fiduciary decisions under ERISA").

[118]    *Id.* at 222.

[119]    *Id.* at 224.

*persons who provide services to an ERISA plan*."[120]  In other words, although

JPMC provides services to ERISA plans through its Securities Lending

department, and must therefore act in the sole interest of those plans' beneficiaries

when providing investment advisory services to those plans, it may "take actions to

the disadvantage of [those] beneficiaries"[121] when acting as a repo lender to third

parties.  This "tension is permissible,"[122] JPMC argues, not just for employers or

plan sponsors, but also for multi-service financial institutions.

JPMC locates support for this proposition in two pre-*Pegram* federal

courts of appeal cases from 1991 and 1994.[123]  In *Ershick v. United Missouri Bank

of Kansas City, N.A.*, the Tenth Circuit held that a bank did not breach its ERISA

duty of loyalty to the beneficiaries of an Employee Stock Ownership Plan

("ESOP"), for which it served as trustee, by also serving as a major secured

creditor of Greb X-Ray, in whose stock the ESOP was "'intended to invest

primarily.'"[124]  The court adopted the district court's reasoning that "'[t]he court

---

[120]     *Id.* (emphasis added).

[121]     *Id.*

[122]     *Id.*

[123]     *See* Def. Mem. at 12-13 (citing *Friend v. Sanwa Bank of Cal.*, 35 F.3d
466, 469 (9th Cir. 1994); *Ershick v. United Mo. Bank of Kan. City, N.A.*, 948 F.2d
660 (10th Cir. 1991)).

[124]     *Ershick*, 948 F.2d at 663 (quoting the ESOP).

will not create a prohibited transaction and conflict of interest where Congress and precedent have not indicated one.'"[125]  Earlier in the opinion the court noted the district court's findings that

> federal agencies regulating banks had recommended that banks with commercial loan departments and trust departments separate the two; the federal agencies had developed and promoted the concept of erecting a "Chinese Wall" to obstruct the flow of information between bank lending and trust departments; and UMB's commercial loan personnel had acted in conformity with the Comptroller of the Currency and Federal Reserve directives by not communicating Greb X-Ray's commercial loan performance to UMB's trust department personnel.[126]

Similarly, in *Friend v. Sanwa Bank of California*, the beneficiary of certain ERISA pension plans – which were invested in unsecured promissory notes issued by Supreme Finance, Inc. ("Supreme") – had argued that Sanwa Bank's acceptance of a trusteeship of the plans, while simultaneously extending a three million dollar secured line of credit to Supreme (to which all of Supreme's other debts were subordinated), constituted a breach of the duty of loyalty.  Supreme began to experience financial problems and, when Sanwa Bank refused to extend Supreme's line of credit, Supreme filed for bankruptcy, leaving only enough assets to cover Sanwa Bank's loan.

---

[125]   *Id.* at 671 (quoting the district court opinion).

[126]   *Id.* at 665.  However, the court did not explicitly rely on these findings in upholding the district court's determination that there was no conflict of interest.

43

*First*, the court rejected Friend's argument that it was a per se violation of ERISA for Sanwa to agree to become the trustee of the plans while serving as a secured creditor of Supreme because "[a] bank does not commit a per se violation of section 1104(a)(1) by the mere act of becoming a trustee with conflicting interests."[127]   *Second* – and most relevant to the case before this Court – the Ninth Circuit rejected Friend's argument that the decision not to renew Supreme's line of credit violated ERISA's provision against a trustee "deal[ing] with the assets of the plan in his own interest or for his own account."[128] Anticipating the reasoning of the Supreme Court in *Pegram*, the Ninth Circuit reasoned that

> [w]hether a trustee is also an employer or a creditor, it only violates section 1106(b) when it uses the assets of a plan for its own benefit. *Sanwa did not use the assets of the Plans. Instead, acting as a creditor it conducted a transaction with a third party, which affected the Plans.*   Sanwa did not violate section

---

[127]     *Friend*, 35 F.3d at 469 (citing *Ershick*, 948 F.2d at 671 ("The court will not create a prohibited transaction and conflict of interest where Congress and precedent have not indicated one."); *Brock v. Citizen Bank of Clovis*, 841 F.2d 344, 347 (10th Cir. 1988) (courts have been unwilling to create "a per se violation [of section 1106(b)] when Congress has not done so") (considering "whether [section 1106]  was violated when [] trustees approved loans from plan funds which permitted the borrowers to pay off interim financing they had received from the Bank")).

[128]     29 U.S.C. § 1106(b)(1).

1106(b).[129]

Ershick and Friend lend strong support to JPMC's argument that a bank does not violate ERISA merely because it acts simultaneously as an investment manager and secured lender, because any action taken by a bank's commercial loan department is not taken in the bank's fiduciary capacity as a trustee.  And while Ershick suggests there is some relevance to a bank's compliance with regulatory agencies' directives to erect information barriers, Friend supports the notion that, even with an information barrier in place, the commercial and trust departments' direct communication about the fact of a bank's extension of secured financing and the fact of the bank's status as trustee does not somehow convert actions taken by the commercial department into actions taken in a fiduciary capacity.[130]

Although the facts of Friend, in particular, closely resemble those presented here, there are a few distinctions worth noting.  First, the court in Friend

---

[129]    Friend, 35 F.3d at 470 (emphasis added) (rejecting the argument that "ERISA makes a conflict of interest exception for employers serving as trustees but does not make such an exception for creditors of the plan's assets also serving as trustees") (citation omitted).

[130]    See id. at 467 (noting that Friend, the plans' beneficiary, "told the trust representative that the [p]lans were invested in Supreme" and that "Sanwa officials discussed internally the potential for a conflict of interest but did not mention their concerns to Friend").

found that Sanwa Bank was not acting in a fiduciary capacity in refusing to renew

Supreme's line of credit (as opposed to extending a line of credit or seizing

collateral in the event of a default).  *Second*, there was no evidence of Supreme's

impending insolvency when Sanwa Bank *made* the loan.  *Third*, there was no

evidence that Sanwa made the loan to Supreme with some expectation of its

defaulting.

Plaintiffs contend that these distinctions render *Sanwa* and

*Ershick* inapposite,[131] directing the Court to two Second Circuit cases from 1945

and 1952, both authored by Learned Hand, that they argue attach significance to

these distinctions.[132]  The "principle" of both *Dudley v. Mealey* and *Dabney v.*

---

[131]     *See* Opp. Mem. at 21 (calling *Sanwa* and *Ershick* "inapplicable" because JPMC "*intentionally created* the conflict to 'directly profit' from various repo transactions with Sigma knowing that its conduct would cause harm to the Class").

[132]     *See id.* at 18-19 (citing *Dabney*, 196 F.2d at 671-73; *Dudley v. Mealey*, 147 F.2d 268, 272-73 (2d Cir. 1945)).  Plaintiffs also argue that this case is somehow unique because the JPMC/Sigma repo agreements included haircuts, *see* Pl. Response to SIFMA Mem. at 4 n.2.  But, as noted above, there is no meaningful distinction between repo and ordinary secured lending.  That a repo lender takes title to collateral has no significance, because the repo borrower can recover the full amount of the collateral at any time by repaying the loan.  And secured lenders, like repo lenders, commonly take a security interest in assets worth more than the loan.  *See Resolution Trust Corp.*, 25 F.3d at 578 ("[T]he economic substance of each repurchase transaction was collateralized lending: Because the market value of the underlying securities exceeded their 'sale' value in the repurchase agreement, the buyer/lender . . . was essentially over-collateralized during the term of the transaction."); *In re Pitts*, 2 B.R. 476, 478 (Bankr. C.D. Cal.

46

*Chase National Bank of New York* was "precisely the same": "whether the circumstances under which a trustee exercises a power are such that his decision may be influenced by his own interest to the possible detriment of his beneficiaries."[133]  For example, in *Dudley v. Mealey*, the bank served simultaneously as (1) trustee of certain bonds issued by debtor, a trusteeship which carried with it "the only power to foreclose the mortgage" on the bonds;[134] (2) creditor of the debtor (it held a different issue of bonds issued by the debtor as well as a ten thousand dollar note of the debtor); and (3) the debtor's depository institution.  The court held that the bank's right to set a debtor's deposit off against the debtor's individual debts to the bank

> inevitably introduced a selfish motive into any decision [the bank] might make as to the exercise of its own power [as a trustee] . . . [f]or . . . *it was to [the bank's] interest so to time any foreclosure that the mortgagor's deposit should be as large as it was likely to become*; and some part of every cent, added to the deposit while it delayed, or when it did not delay, was taken from the bondholders, who, as general creditors, were entitled to share in

---

1979) ("The cushion was part of the [secured creditor's] bargain!  No secured creditor structures a transaction in such fashion that the value of the property equals the amount of his claim.  The existence of an equity cushion, in terms of collateral value in excess of the secured creditor's claim, is an elementary and fundamental part of the transaction.").

[133]    *Dabney*, 196 F.2d at 670.

[134]    *Dudley*, 147 F.2d at 272.

the general assets.[135]

But in the instant case, Plaintiffs' duty of loyalty claims are not premised on the theory that JPMC's status as a secured lender to Sigma introduced a "discordant motive into its decisions"[136] as a fiduciary, or vice versa;[137] JPMC issued notices of default based on Sigma's failure to meet margin calls, not based on fluctuating values in the size of some independently-held lien that it could apply as a set-off at its own discretion.  Thus, *Dudley* does not advance Plaintiffs' claims.

The "controlling issue" in *Dabney v. Chase National Bank of New York*, by contrast, was

> how far the corporate trustee of two series of unsecured bonds is bound to abstain from transactions with the debtor which may give it an advantage over the bondholders, its beneficiaries[, or, m]ore particularly . . . what doubts of the continued solvency of

---

[135]   *Id.* (emphasis added).

[136]   *Id.*

[137]   *See* Def. Mem. at 3 ("There is no evidence that the investment decisions made by Securities Lending were influenced by the fact that JPMC rather than some other lender was providing repo financing to Sigma.  Nor is there evidence that JPMC benefitted in its capacity as a repo lender from its status as plaintiffs' securities lending agent.").  *Cf. In re Polaroid*, 362 F. Supp. 2d at 479 (dismissing ERISA conflict of interest claim where complaint "fail[ed] to allege that the conflict of interest impeded [defendants'] prudent decision-making with respect to the Plan and Plan participants"); *EBC*, 5 N.Y.3d at 18 (Goldman Sachs' arrangement with its customers gave it an incentive to advise its fiduciary client to sell its shares at an unfairly low price, constituting a conflict of interest that Goldman Sachs therefore had a duty to disclose to its fiduciary client).

the debtor should bar such a trustee from collecting a personal claim against the debtor.[138]

In *Dabney*, defendant Chase National Bank (the "bank") served as the indenture trustee for two issues of debentures issued by debtor and, on October 16, 1931, the bank made a six-month, four million dollar unsecured loan to debtor.[139]  In the Spring of 1932, before the loan was fully paid off, the bank had became "most uncertain whether [debtor] would be able to refund its long term debts and loans which were very soon to become due" or whether it would "survive the crisis which in 1932 was so ominous."[140]  Nevertheless, it accepted payment of part of the loan before it was due, and insisted upon security for the balance when it was due.[141]

When the debtor filed for bankruptcy eight years later, its trustee in bankruptcy brought an action against the bank to obtain the four million dollars loaned to debtor and recovered by the bank.  The court concluded that "with such knowledge and such a forecast of [debtor]'s immediate future [as the bank held]

___

[138]    *Dabney*, 196 F.2d at 669.

[139]    *See Dabney v. Chase Nat. Bank of City of N.Y.*, 98 F. Supp. 807, 810 (D.C.N.Y. 1951).

[140]    *Dabney*, 196 F.2d at 671.

[141]    *See id.* at 672.

the bank was [not] justified in collecting the loan"[142] because "the power to collect should have yielded to the duty of loyalty:"[143]

> A creditor who accepts payment of part of a loan before it is due, from a debtor known to be "fighting for its life," *and who insists upon security for the balance when it is due*, has not merely sat by, receptive to the debtor's voluntary advances; he has compelled payment; and to compel payment when the debtor's survival was as doubtful, as the bank's own declarations show that it knew [debtor]'s survival to be, was to secure itself by the depletion of assets which, in the event of [debtor]'s insolvency it would be obliged to share ratably with all of [debtor]'s creditors, including the plaintiff's bond-holders. Collection would manifestly result in the bank's preference and would indubitably be a breach of its duty as trustee. *It was equally a breach of that duty presently to assure itself of such a preference against the chance that the insolvency might occur.* This was a breach, regardless of [debtor]'s actual insolvency; *it was a breach because the trustee put itself in a position of advantage vis-a-vis its beneficiary*. True, it might turn out to be a breach which neither harmed the beneficiary, nor profited the trustee; but that only means that the beneficiaries would need no remedy; it was none the less an act in violation of the bank's duty.[144]

---

[142]   *Id.* at 672.

[143]   *Id.* at 671.

[144]   *Id.* at 672-73 (emphasis added). A dissenting Judge disagreed "with that portion of the opinion which holds the defendant liable for accepting payment of its loan" because "[t]he trial judge found that . . . the [b]ank [did not have] reasonable cause to believe that [debtor] was insolvent or in imminent danger of insolvency in March or May 1932." *Id.* at 676. He agreed, however, that "a trustee, even though the trust instrument permits him to lend money to the settlor of the trust, is under a fiduciary duty not to collect the loan *if he has reason to believe that collecting the debt will impair the likelihood of his cestuis receiving payment of debts owed by the settlor to them*." *Id.* (emphasis added).

Plaintiffs argue that,

> [l]ike the situation in *Dabney*, [JPMC] knew of Sigma's precarious financial condition – indeed, it expected Sigma to fail – but nonetheless entered into repo transactions to benefit itself knowing that its conduct would materially impair the financial interests of its fiduciary clients. . . .  As such, [JPMC], like its corporate predecessor in *Dabney*, breached the duty of loyalty by furthering its own pecuniary interests at the expense of those parties it was duty-bound to protect.[145]

To the extent *Dabney* is still good law, there are at least three reasons why it is inapplicable to the facts of this case.  *First*, as the *Dabney* court stated, the "principle" of the case was "precisely the same" as that of *Dudley*: "whether the circumstances under which a trustee exercises a power are such that his decision may be influenced by his own interest to the possible detriment of his beneficiaries."[146]  As I noted earlier, that is not the theory of Plaintiffs' duty of loyalty claims (i.e., it was entering into the repo agreements that breached the duty of loyalty – not issuing the notice of default together with all the other repo lenders).  *Second*, JPMC was not "assur[ing] itself . . . a preference" when it exercised its rights under the repo agreements to issue notices of default to Sigma; it already held that preference by virtue of the repo agreements, which were executed at arm's length.  JPMC was not an unsecured lender who, mid-loan,

---

[145]  Opp. Mem. at 19-20.

[146]  *Dabney*, 196 F.2d at 670.

determined that Sigma was insolvent and then sought additional security for its financing, or "compelled" early "collection" to the detriment of the Class.  *Third*, as JPMC observes, it appears that "[t]here were no information barriers in that case; rather, the same personnel were involved in making the relevant fiduciary and non-fiduciary decisions."[147]  Perhaps the *Dabney* court did not address the topic of information barriers because they were not as common in 1952.[148]  Put differently, the *Dabney* court could not have predicted the scale of modern-day multi-service financial institutions, the scope of services they would be permitted to offer simultaneously, and the information barriers they would be required by law to erect in order to avoid liability for insider trading and related conflicts-of-interest.

Given the great legal significance JPMC accords its information barrier, it is important to note that the alleged conflict of interest in this case did

---

[147]    Def. Mem. at 20.

[148]    *See* Herzel & Colling at 78 ("Th[e] traditional view of a fiduciary's responsibility to isolate and use inside information was upset by a series of rule 10b-5 cases commencing [in 1961 when] the [SEC] adopted and enforced the principle that the recipient of material inside information about a publicly traded security must either disclose such information to the public or abstain from trading . . . . [T]he commission has repeatedly encouraged financial institutions possessing material inside information to adopt internal procedures to preserve the confidentiality of such information . . . .  In response . . . many banks have undertaken to construct Chinese Walls.").

not arise from any leakage of nonpublic information across that information barrier

– the straw man repeatedly set up and knocked down in JPMC's motion.[149]  It is

true that *some* conflicts of interest may be "reduced 'perhaps to the vanishing

point' by an information barrier"[150] – such as information barriers walling off

ERISA plans' claims administrators from the payer of such plans' benefits.[151]  But

the primary purpose of the information barrier between JPMC's Securities Lending

---

[149]     *See* Def. Mem. at 17 ("Summary judgment is . . . appropriate because the personnel involved in the repo transactions were separated from the securities lending business by effective information barriers, and there is no evidence that the relevant personnel coordinated their actions or shared non[]public information across these barriers."); *id.* at 18 ("JPMC's information barriers prevented any potential conflict of interest.  The undisputed evidence shows that Securities Lending on the one side, and the [Investment Bank] and [Chief Investment Office], on the other, made independent decisions and shared no non[]public information about Sigma or the repo transactions."); *id.* at 19 ("[Plaintiffs] and their compliance expert have conceded that JPMC was prohibited from disclosing [nonpublic] information to plaintiffs (or from using it for plaintiffs' benefit).").

[150]     *Id.* at 17 (quoting *Metropolitan Life Ins. Co.*, 554 U.S. at 117-18).

[151]     *See Metropolitan Life Ins. Co.*, 554 U.S. at 117-18 (explaining that such a conflict of interest "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration" but holding that "[i]t should prove less important (perhaps to the vanishing point) *where the administrator has taken active steps to reduce potential bias and to promote accuracy*, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits") (citing Herzel & Colling at 114).

division and its Investment Bank was to prevent the leakage of material, nonpublic

information from JPMC's private-side personnel, to JPMC's public-side

personnel.[152]  Moreover, there is no dispute that JPMC's information barrier

effectively prevented the leakage of any such information, and Plaintiffs' conflict-

of-interest claim is not based on a theory that JPMC had a duty to share such

information; indeed, insider trading laws would clearly prohibit any transfer of

material nonpublic information from one side of the bank to the other.

What, then, is the significance of the JPMC's information barrier to its

defense?  It is that information barriers are prophylactic measures geared toward

preventing not only the leakage of nonpublic information, but also (1) banks'

commercial relationships from "influencing the advice and decisions made by the

fiduciary in its fiduciary capacity"[153] and (2) the "theoretical possibility" that a

bank might "extend[] credit in order to improve the performance of its trust

accounts."[154]  Banks' asset management divisions do not share detailed information

---

[152]     *See, e.g.*, JPMorgan Chase & Co. Code of Conduct, Ex. S to Hurwitz
Decl., at JPMC00382014-15; *Ershick*, 948 F.2d at 665 (noting that "federal
agencies had developed and promoted the concept of erecting a 'Chinese Wall' to
obstruct the flow of information between bank lending and trust departments" such
as commercial clients' "loan performance").

[153]     Def. Reply at 7 ("[T]hat is one basic reason such walls exist.").

[154]     Herzel & Colling at 105.  Ironically, this was the very action Friend
argued Sanwa had a *duty* to take.  *See Friend*, 35 F.3d at 470.

about their holdings with their repo departments, and repo departments do not share detailed information about their commercial loans with their asset management divisions, for the express purpose of preventing such conflicts, and the appearance of such conflicts.  The fact that such information may periodically be publicly reported (as in the case of JPMC Asset Management's holdings) or leaked through market rumors (as in the case of JPMC's repo agreement with Sigma) does not change the fact that multi-service financial institutions are essentially mandated *not* to share such information with each other directly; nor does the fact that wall straddlers like Jamie Dimon are aware of transactions on both sides of the wall change that fact.[155]  The duty of banks to minimize bias in the carrying out of their public- and private-side functions essentially requires the private side of a bank *not* to consider the interests of its fiduciary clients – in the same sense that it requires fiduciaries not to consider the interests of their

---

[155]    *See* Def. Reply at 5 ("At every financial institution, senior executives above the wall necessarily know what the public and private sides are doing . . . ."); *see also* Méndez-Peñate, Carlos E., *The Bank "Chinese Wall": Resolving and Contending with Conflicts of Duties*, 93 Banking L.J. 674, 699 (1976) ("To extend the Wall in order to isolate the bank's directors and most senior management from trust department activities is a logical but legally impossible solution [to the problem that at the bank's highest levels, information barriers are nonexistent.]. . . . Case law supports the view that senior officers and directors must be at least available for guidance and consultation in trust matters.") (citations omitted).

commercial clients.[156]  Preventing banks from aligning their private- and public-side incentives, but then penalizing them when it turns out – or their private side discovers – that their fiduciary clients' money is invested in the same assets in which their public side holds a priority interest, would effectively penalize them for complying with the law.

It would also render the risks inherent in repo financing so great that banks would either cease providing such financing, or would drastically curtail the provision of asset management services:  Why would banks ever make loans to issuers whose securities are held in trust, if the collateral securing those loans – but only those loans – could not be seized in an event of default?  How could banks be sure that none of their commercial clients were issuers of securities held in trust, if their private side is essentially prohibited from being notified of their public side's investment decisions?  How could banks protect against the risk, after extending repo financing to an issuer, of their asset management divisions' subsequent decision to invest in that issuer's securities – rendering the loan's collateral valueless to the bank in the event of default, because (under Plaintiffs' theory) their

---

[156]    *Accord* 9/18/07 Email from Hogan to Cox, Winters, Sankey and Best, Ex. 14 to LeVan Decl., at JPMC0015770 ("[W]e need to protect our position irrespective of the broader 'break the buck' issue or worry about what JPM Asset Mgmt has invested in.").

"superior encumbrance"[157] must be transferred to their fiduciary clients?[158]

The logical results of such a rule would be (1) a substantial increase in the cost of virtually all financial services transactions, (2) severe restrictions on the availability of products and services that Congress has determined provide essential liquidity and market efficiency and, ultimately, (3) the disaggregation of commercial and investment banking functions from asset management, thereby "negating the legislative will and public policy expressed in decades of legislation and regulation."[159]  In short, if it were a conflict for a bank to act as a secured lender to an issuer whose securities were held in a fiduciary or custodial account – and to seize the assets collateralizing its loans in the event of default – that

---

[157]    Opp. Mem. at 18.

[158]    *See* Def. Mem. at 21 ("Under plaintiffs' theory, . . . a modern multi-service bank would put itself at grave risk whenever it entered into a private-side transaction with any issuer whose securities it happens to hold in a fiduciary account."); Def. Reply at 1 ("If the plaintiffs' theory is accepted, when a borrower defaults, an account holder will always be able to argue that confidential information should have been disclosed, or that the bank breached a duty by foreclosing on collateral.").

[159]    Memorandum of Law of *Amicus Curiae* the Securities Industry and Financial Markets Association in Support of JPMC's Motion for Partial Summary Judgment ("SIFMA Mem.") at 7.  *See Pegram*, 530 U.S. at 232-33 ("Our doubt that Congress intended the category of fiduciary administrative functions to encompass the mixed determinations at issue here hardens into conviction when we consider the consequences that would follow from Herdrich's contrary view," the "elimination of the for-profit HMO.").

conclusion surely would be reflected in the extensive regulations that govern the banking industry.

Plaintiffs claim that they "are not seeking a bright-line rule prohibiting a bank from ever extending any type of financing to an issuer where the bank is also holding securities of that issuer for a fiduciary client; instead a fiduciary bank is prohibited from knowingly profiting for itself at the direct expense of its beneficiaries."[160] But to the extent Plaintiffs' proposed rule hinges on a bank's "knowledge" that an issuer is on the verge of collapse, it is simply unworkable. How sure must a bank be that an issuer is "fighting for its life" before it is barred from extending repo financing, and thereby securing a priority interest in that issuer "at the expense" of its fiduciary clients in the event of default? How are courts to discern the difference between a loan designed to be well-collateralized or risk neutral, and one designed to "cherry pick"[161] and poach a client's best assets at fire-sale prices? When does repo lending – a financing arrangement entered into at

---

[160] Opp. Mem. at 25. *Accord* Pl. Response to SIFMA Mem. at 3 ("[P]laintiffs ask the Court to recognize, under the *specific facts of this case*, that [JPMC] breached its duty of loyalty to the Class where – with full knowledge of the Class' investments in Sigma [MTNs] and with the expectation that Sigma would fail – it engaged in predatory repo financing with substantial haircuts, took title to more than $9.3 billion of Sigma's best assets for itself, and had actual knowledge that its conduct would materially impair the value of the Class' notes when Sigma ultimately failed.").

[161] Pl. Response to SIFMA Mem. at 3.

arm's length between two extremely sophisticated financial entities – become

"predatory"?  According to its own internal emails, JPMC structured this "trade" to

ensure "best possible return on capital if Sigma survives" *and* "best possible

protection if Sigma defaults (enforcement of collateral at discounted prices)," *i.e.*,

"[t]he chance to buy high quality assets in large blocks at deep discounts if Sigma

defaults."[162]  Its profits did not depend on Sigma's failing, notwithstanding

Plaintiffs' repeated assertions that JPMC "predicted" Sigma's failure.[163]  To the

---

[162]    6/5/08 Update on Sigma financing opportunities, Ex. 10 to LeVan Decl., at JPMC00158636-37.

[163]    *See, e.g.*, Pl. Response to SIFMA Mem. at 3 ("The evidence of record . . . establishes that [JPMC] predicted Sigma's collapse."); *id.* (claiming that Kodweis "predict[ed] the demise of the SIV sector, including Sigma").  As JPMC notes, "had [it] presciently predicted market movements, believed that Sigma would fail before the repo transactions expired and wanted to obtain Sigma's assets, it would simply have waited until the collapse and then bought the assets." Def. Mem. at 8.  As it turned out, "the risk that the assets [could not] be sold at above valuation level less haircut" materialized for, when Sigma defaulted, JPMC's position was approximately $383 million underwater (even after fees earned on the repo transactions).  2/4/08 Email from Jones to Best, Winters, Cox, Lewis and Crawley, Ex. 7 to LeVan Decl., at JPMC00158042-43; *see* Def. Reply at 5 n.4.  It was only several months *after* Sigma's default that JPMC saw any appreciation in the assets it seized – what Plaintiffs call JPMC's "profits" from the "trade."  *See* 1/13/11 Pre-Motion Letter from JPMC to the Court at 3 ("Any profits [JPMC] eventually recovered came not at [P]laintiffs' expense, but from holding a huge portfolio in a risky and volatile market, a portfolio that no one else wanted until the financial crisis eventually eased.").  In any event, JPMC did not "engineer the financial collapse" of Sigma, Opp. Mem. at 22.  Perhaps the strongest incentive banks face to refrain from doing so derives not from the law of fiduciary duty, but from good business sense not to destroy your *commercial* clients' businesses for your own profit.

contrary, at the time Sigma failed, JPMC's loan could not be covered.[164]  In short, a

bank's liability to its fiduciary clients cannot turn on its state of mind when

extending financing to its non-fiduciary clients.

It is primarily for these reasons that I hold, as a matter of law, that

JPMC was not acting in a fiduciary capacity when it extended repo financing to

Sigma, selected Sigma's "best" assets as collateral, and seized that collateral when

Sigma defaulted.  JPMC's Investment Bank did not "use the assets" of Plaintiffs'

plans; instead, "acting as a creditor it conducted a transaction with a third party,

which affected the Plans."[165]  Accordingly, it did not breach any duty of loyalty to

its fiduciary clients.  Any other finding would supplant Congressional and

regulatory determinations as to the appropriate tradeoff between (1) the facilitation

of credit and capital formation (as a byproduct of the promotion of multi-service

financial institutions) and (2) the alignment of incentives such that financial

services firms' bottom lines are driven *exclusively* by the success of their fiduciary

clients' investments.[166]

---

[164]     *See* Def. Mem. at 8.

[165]     *Friend*, 35 F.3d at 470.

[166]     *See, e.g.*, *Pegram*, 530 U.S. at 234 ("[T]he Federal Judiciary would be
acting contrary to the congressional policy of allowing HMO organizations if it
were to entertain an ERISA fiduciary claim portending wholesale attacks on
existing HMOs solely because of their structure, untethered to claims of concrete

### 2. Plaintiffs' Duty of Loyalty Claims Fail for the Independent Reason that JPMC's Conduct Was Neither a But For Cause of, Nor a Substantial Factor in Causing, Plaintiffs' Losses

JPMC is also entitled to summary judgment on Plaintiffs' duty of

loyalty claims for the independent reason that "Plaintiffs' notes were not paid

because the market tumbled, not because JPMC loaned over $8 billion to Sigma at

its request:"[167]

> JPMC extended credit to Sigma in a series of arm's-length transactions. The undisputed evidence shows that Sigma failed . . . because the Lehman bankruptcy, coming on the heels of the worst financial crisis since the Depression, caused the market value of Sigma's assets to plummet. When this occurred, Sigma could not meet margin calls of its repo lenders. Had the market prices of Sigma's assets not collapsed, it would not have been obligated to make additional collateral calls to JPMC and its other repo lenders and the repo transactions would not have gone into default. Similarly, had the market value of the assets held up, the collateral would have been sufficient to pay off the loans with no effect on Sigma when the repo facilities expired by their terms. Sigma would then have had sufficient assets to repay at maturity the MTNs held by [P]laintiffs. . . . Nor is there any evidence that

---

harm" given that "for over 27 years the Congress of the United States has promoted the formation of HMO practices."); *Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 131 (2d Cir. 2000) ("Despite . . . considerations favoring a finding of materiality . . ., we believe such a finding would supplant the SEC's determination of what is material with our own."); *Geiger v. Solomon-Page Group, Ltd.*, 933 F. Supp. 1180, 1187 (S.D.N.Y. 1996) ("The absence of a regulation requiring disclosure, in the face of the detailed requirements of what information about selling shareholders must be disclosed, is some evidence that the information the plaintiff seeks to require is not in fact material.").

[167]   Def. Reply at 9.

> JPMC's decision to serve notices of default caused Sigma's other repo lenders – who had loaned Sigma close to $10 billion – to foreclose on their loans when they otherwise would not have done so.  In the teeth of the financial crises, no rational lender would have continued to extend credit to Sigma while the market value of the collateral plummeted.[168]

Once again, *Friend* provides strong support for JPMC's position.  In that case, the court held that

> [e]ven if Sanwa had breached [ERISA] by not considering solely the interests of the Plans' participants when it accepted the trusteeship without Friend's fully informed consent, Friend has not presented a genuine issue of material fact that this act caused the Plans' losses. . . .  Whether or not Sanwa had become the trustee or had accepted the trusteeship with Friend's consent, *there is no reason to believe that Sanwa would not have refused to renew Supreme's loan and that Supreme would not have become bankrupt, resulting in the Plans' losses*.  Friend has not alleged that Sanwa would have renewed the loan or have prevented Supreme's bankruptcy if Sanwa had not been trustee or if Friend had given his fully informed consent.  *Thus, there is no dispute about the lack of a causal connection between Sanwa's alleged breach and the losses incurred by the Plans*.[169]

Similarly, whether or not JPMC served as Plaintiffs' fiduciary, or retained that status after obtaining Plaintiffs' consent to its extension of repo financing, there is no reason to believe it would not have issued notices of default to Sigma or that

---

[168]  Def. Mem. at 24-25 (citations omitted).

[169]  *Friend*, 35 F.3d at 469 (emphasis added) (noting that "ERISA holds a trustee liable for a breach of fiduciary duty only to the extent that losses to the plan result from the breach").  *Accord Silverman*, 138 F.3d at 104; *Taylor*, 2007 WL 2302284, at *5; *Salovaara*, 1998 WL 276186, at *4.

Sigma would not have gone into receivership, resulting in Plaintiffs' losses under their plans. Plaintiffs have not alleged that JPMC would not have extended repo financing or would have prevented Sigma's bankruptcy if JPMC's Securities Lending department had not served as Plaintiffs' fiduciary, or if Plaintiffs had given their fully informed consent. "Thus, there is no dispute about the lack of a causal connection between [JPMC's] alleged breach and the losses incurred by [Plaintiffs]."[170] More to the point, all the other repo lenders would have noticed Sigma's default, producing the same result. For this additional reason, Plaintiffs' duty of loyalty claims must fail. Accordingly, JPMC's motion for summary judgment is granted, and Plaintiffs' motion is denied.

### B.     Duty to Disclose Claim

Plaintiffs move for summary judgment that JPMC breached its duty to disclose "'material facts'" that Plaintiffs should have known "'for [their] own protection.'"[171] According to Plaintiffs, "when acting as a discretionary investment

---

[170]     *Friend*, 35 F.3d at 469. *Accord Mintener v. Michigan Nat. Bank*, 117 Mich. App. 633, 641 (Mich. App. 1982) ("The actions by defendant of which plaintiff complains are no different than the actions which would have been taken had plaintiff's creditor been someone who was not their trustee. There was no claim that defendant's actions as creditor were affected by its status as trustee. We see no advantage to a rule which gives debtors a windfall because of the fortuitous circumstance that their creditor is also their trustee. On the contrary, serious disadvantages resulting from such a rule can be foreseen.").

[171]     Opp. Mem. at 11-12 (quoting *Glaziers*, 93 F.3d at 1180).

manager for its fiduciary clients, [JPMC] retained knowledge of its conduct as repo

financier and was obligated to take all necessary steps to protect the Class,

including disclosure of [(1)] its conflicted position and [(2)] its conclusion that

Sigma would fail."[172]  JPMC's "Chinese Wall" argument provides no defense to its

failure to disclose such information, Plaintiffs further argue, because (1) the

information "was *not* material non-public information";[173] (2) "the wall is

inapplicable because the party with the fiduciary disclosure obligation was [*JPMC*]

– not simply one of its business lines or a limited number of employees";[174] and/or

(3) "even if [JPMC] could properly raise a 'Chinese Wall' defense, the evidence

establishes that personnel on both sides – and on top – of the wall were aware of

the conflict and, thus, knew of the need for disclosure to the Class."[175]  I address in

turn the two categories of information Plaintiffs claim JPMC had a duty to

---

[172]    *Id.* at 14.

[173]    *Id.* at 15.

[174]    *Id.*

[175]    *Id.*  Plaintiffs argue that JPMC's failure to disclose these two pieces of information prevented Class members from taking "steps to protect their interests, such as [(1)] demanding that [JPMC] (i) make them whole by taking the Sigma MTNs onto its books or (ii) sell the MTNs" or (2) "critically examin[ing] [JPMC's] statements about Sigma in light of its conflicted position and make an informed decision as to how to proceed."  *Id.* at 12 (citing affidavits submitted by the representative plaintiffs claiming that they would have taken such steps had they been aware of such information).

disclose.

      *First*, JPMC had no duty to disclose its "conflicted status"[176] or "conflicted position"[177] to the Class, *because there was no conflict of interest*.[178]  If JPMC was required to disclose to Class members the fact of its repo department's loan to Sigma, then *every* bank would be required to disclose to *every* fiduciary client the existence of *any* secured loan made at *any* time to an issuer whose securities are held in trust for that fiduciary.  As JPMC rightly notes, "[c]rediting plaintiffs' new disclosure theory would turn banking law and regulation on its head, eviscerating information walls . . . making it practically impossible for banks to offer secured financing to issuers of securities held in fiduciary or custodial accounts."[179]  This is not to mention the practical difficulties – and resulting inefficiencies – of a bank's having to obtain every fiduciary client's consent in order for its private side to make a loan to an issuer whose securities are or might be held in trust for that client.[180]  Once these regulatory and administrative realities

---

176    *Id.* at 12.

177    *Id.* at 14.

178    *See supra* Part V.A.1.

179    Def. Reply at 1.

180    *See* SIFMA Mem. at 5-6 (under Plaintiffs' theory, "nearly every transaction would require a conflict analysis against the approximately *$43 trillion in assets* managed by affiliated investment advisors") (citing Speech by SEC

are acknowledged, it is obvious that there is also no significance to individual JPMC private-side employees' views on Sigma's viability, or the reasons for the bank's extension of repo financing to Sigma – because it was not acting in a fiduciary capacity when it expressed those views or extended that financing.

Moreover, the fact that Asset Management personnel eventually learned, through market rumors, that JPMC had extended billions of dollars in repo financing to Sigma does not transform an otherwise proper lending relationship into one rife with conflict, thereby necessitating its disclosure. To the extent Sigma's heavy dependence on repo financing "affect[ed] [Plaintiffs'] material interests"[181] – because it effectively buried their priority claim on Sigma's underlying assets in the event of a default – the identity of JPMC as one of the repo

---

Commissioner Luis Aguilar, *SEC's Oversight of the Adviser Industry Bolsters Investor Protection* (May 7, 2009), available at http://www.sec.gov/news/speech/2009/spch050709laa.htm); *id.* at 6 n.8 ("Almost all transactions could create potential conflicts given that the securities of nearly every Fortune 500 company are held by the asset management accounts of the largest financial services institutions. Further, every fiduciary client would effectively be granted a controlling interest in the issuer whose securities it holds, no matter how small the position, with the ability to block any transaction with the investment manager's affiliated businesses, even crucial lending arrangements.").

[181]    *Pegram*, 530 U.S. at 228 n.8 ("[I]t could be argued that [the HMO] . . . is obligated to disclose characteristics of the plan and of those who provide services to the plan, if that information affects beneficiaries' material interests.").

lenders was irrelevant.[182]  What is more, Plaintiffs' own evidence suggests that

JPMC's Securities Lending personnel (1) investigated Sigma's heavy dependence

on repo financing[183] and (2) discussed that heavy dependence (and its concomitant

risks) in an email analysis deemed "OK FOR CLIENTS."[184]  In any event,

---

[182]    It is for this same reason that "top" private-side employees' "acut[e] aware[ness] of the [alleged] conflict with the Class" is irrelevant to the question of whether JPMC's information barrier broke down and, according to Plaintiffs, somehow transformed its private-side personnel into fiduciaries.  Opp. Mem. at 24. Given the public availability of information about Asset Management's securities holdings, and the immateriality of the fact of an individual bank's status as a repo lender, no bank can assure itself that its Securities Lending and commercial departments will be "blind to the activities of the other," as Plaintiffs claim JPMC's departments should have been.  *Id.*  In any event, it would be unworkable in practice to base a bank's liability on the happenstance of its learning, through publicly available information, that its trust department holds the assets of an issuer to which it had decided to extend, or was contemplating extending, repo financing.

[183]    *See* 6/4/08 Email from Shin to Saisselin, Ex. 15 to LeVan Decl., at JPMC00001588 (inquiring whether "there is any information you can give on [Sigma's] repo agreements?  Number/name of counterparties, maturity dates, etc, etc?"); 6/4/08 Email from Saisselin to Shin, Ex. Ex. 15 to LeVan Decl., at JPMC00001588 ("[W]e have , I believe, 8 repo counterparties.").

[184]    8/12/08 Email from Shin to Wilson and ten other JPMC personnel, Ex. 16 to LeVan Decl., at JPMC00402202 (noting that"[r]epo is a whopping 60% of total senior debt"); *id.* at JPMC00402205 (noting the fact that repo counterparties held a superior interest in the assets securing the MTNs); *id.* at JPMC00402204 (noting the fact that Sigma's "unencumbered assets are heavily weighted towards the CLO/CDO bucket" (whereas the "repo is secured by mostly financials")); *id.* at JPMC00402205 ("In the worst case scenario of an event of default or insolvency event, it is expected the repo counterparties would seize the collateral pledged under repo, *and those assets would not be available for the benefit of senior noteholders*.") (emphasis added).

Plaintiffs do not allege that they were unaware of *this* (public) information, or that JPMC's public-side personnel had a duty to disclose it.

   *Second*, leaving aside for the moment that there is an issue of fact as to whether JPMC's private-side personnel had "conclu[ded] that Sigma would fail,"[185] Plaintiffs' argument that JPMC had a duty to disclose that "conclusion" is simply a regurgitation of their argument that JPMC breached its fiduciary duties of prudence and care in continuing to hold the MTNs.  Indeed, among the "Challenges and Opportunities" identified by Kodweis in his August 23, 2007 email – expressing his view that it was "probable . . . that the entire [SIV] sector unwinds" – was "advising . . . capital note holders directly [] on unwinding the portfolios" and "assisting senior debt investors with advice and guidance."[186]  Yet – Plaintiffs will presumably argue – no prudent advice or guidance was given, notwithstanding the fact that Asset Management was part of the "team" JPMC had put in place to analyze "a potential unwind of SIVs scenario," based entirely on "public side" information.[187]  Plaintiffs are absolutely right that JPMC cannot

---

[185]  Opp. Mem. at 14.  *See supra* note 164.

[186]  8/23/07 Email from Kodweis to Rosen and Fion, Ex. 2 to LeVan Decl., at JPMC00157661-62.

[187]  8/31/07 Email from Robert Rupp to Dimon Markets Meeting, Ex. 4 to LeVan Decl., at JPMC002942353.

"'circumvent[] [its fiduciary obligations] by building a 'Chinese wall' around those employees on whom plan participants reasonably rely for important information and guidance'"[188] – especially when the evidence strongly suggests that those employees were actually *kept in the loop about and aware of* the risks materializing in one of their fiduciary clients' largest investments.[189]  That JPMC's repo personnel took careful account of those risks when extending financing to Sigma while its Asset Management personnel simply compiled reports summarizing them (but appeared to do nothing about them) serves as evidence that JPMC's *Asset Management* personnel – and therefore JPMC – may have breached its duties of prudence and care to the Class.[190]  Although those claims are not at

---

[188]    Opp. Mem. at 16 (quoting *Fischer v. Philadelphia Elec. Co.*, 994 F.2d 130, 135 (3d Cir. 1993)).

[189]    *See* Abney & Nadeau at 258-59 (1990) (noting that "the trustee named in the trust instrument is the bank as a whole, not merely in the trust department" and opining that "[t]he most successful defense strategy for a bank properly accused of turning its back on useful public information that one department knew and another overlooked . . . is settlement") (quotation marks and citations omitted).

[190]    *Accord* 1/19/11 Pre-Motion Letter from Plaintiffs to the Court at 2 ("Plaintiffs' imprudent hold claim . . . is strongly supported by what [JPMC] was saying *at the very time* it continued to hold the Sigma MTNs on behalf of the class) (citing Kodweis's August 23, 2007 email); *id.* (noting that on September 7, 2007, JPMC issued a Short-Term Fixed Income Research Note entitled "SIVs: More Questions Than Answers" that warned: "We believe that the survival of the SIV business model is in serious jeopardy owing to the ongoing liquidity drought and the resulting difficulty SIVs face in issuing new debt"); *id.* (noting that in November 2007, Dimon was publicly quoted in Bloomberg as saying that SIVs

issue on this motion, they will eventually be decided at trial.

## VI.   CONCLUSION

For the aforementioned reasons, JPMC's motion for partial summary judgment on Plaintiffs' duty of loyalty claims is granted, and Plaintiffs' cross-motions are denied.  A conference is scheduled for August 15, 2011 at 5:00 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      August 5, 2011
            New York, New York

---

"don't have a business purpose" and will "go the way of the dinosaur"); *id.* (stating that Wilson testified that he had actual knowledge of the JPMC Research Note and Dimon's comments but made no effort to sell the Sigma MTNs, either to third-parties or to Sigma in response to its standing offer throughout 2007 to buy one hundred million dollars of MTNs for ninety-four cents on the dollar).

## Appendix A: *Dramatis personæ*

Jamie Dimon (CEO)

**Private Side:**
Jonathan Adams
Guy America (risk management for Sigma repo financing trade)
Tony Best
Andrew Cox (chief credit officer, Investment Bank)
Mark Crawley
Kevin Fion
Timothy Glasgow (brought over from the public side)
John Hogan (then-chief risk officer, Investment Bank)
Mark Jones
John Kodweis (head of Short-Term Fixed Income Origination, Investment Bank)
David Lewis
Eric Rosen
Brian Sankey
Ian Slatter
Bill Winters (then-head of the Investment Bank)

**Public Side:**
Seth Bernstein (Asset Management)
Sandra O'Connor (executive in charge of Securities Lending)
Robert Rupp
Lisa Shin (credit analyst covering Sigma MTNs, Asset Management)
John Tobin (Asset Management)
James Wilson (Securities Lending trader)

**Gordian Knot:**
Juliette Saisselin

**Plaintiffs' compliance expert:**
Charles Grice

**JPMC's expert:**
Christopher Laursen

71

**- Appearances -**

**For Plaintiffs:**

Joseph H. Meltzer, Esq.
Peter H. LeVan, Jr., Esq.
Barroway Topaz Kessler Meltzer &
    Check, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

Milo Silberstein, Esq.
Dealy & Silberstein, LLP
225 Broadway, Suite 1405
New York, New York 10007
(212) 385-0066

Gregory M. Nespole, Esq.
Wolf Haldenstein Adler Freeman
    Herz LLP
270 Madison Avenue
New York, New York 10016
(212) 545-4761

Bradley E. Beckworth, Esq.
Brad Seidel, Esq.
Nix Patterson & Roach, LLP
205 Linda Drive
Daingerfield, Texas 75638
(903) 645-7333

David L. Wales, Esq.
Bernstein, Litowitz, Berger &
    Grossman, LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 554-1400

**For JPMC:**

Lewis Richard Clayton, Esq.
Jonathan H. Hurwitz, Esq.
Samuel E. Bonderoff, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3215