UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X

BOARD OF TRUSTEES OF THE AFTRA
RETIREMENT FUND, in its capacity as a
fiduciary of the AFTRA Retirement Fund,
individually and on behalf of all others
similarly situated,

                     Plaintiff,

       - against -

JPMORGAN CHASE BANK, N.A.,

                     Defendant.

------------------------------------------------------- X

BOARD OF TRUSTEES OF THE
IMPERIAL COUNTY EMPLOYEES'
RETIREMENT SYSTEM, in its capacity
as a fiduciary of the Imperial County
Employees' Retirement System,
individually and on behalf of all others
similarly situated,

                     Plaintiff,

       - against -

JPMORGAN CHASE BANK, N.A.,

                     Defendant.

------------------------------------------------------- X



**OPINION AND ORDER**

09 Civ. 686 (SAS)

THE INVESTMENT COMMITTEE OF
THE MANHATTAN AND BRONX
SURFACE TRANSIT OPERATING
AUTHORITY PENSION PLAN, in its
capacity as a fiduciary of the MaBSTOA
Pension Plan, individually and on behalf of
all others similarly situated,

       Plaintiff,

   - against -

JPMORGAN CHASE BANK, N.A.,

       Defendant.

----------------------------------------------------------- X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.  INTRODUCTION[1]

   Plaintiffs and defendant bring cross-motions *in limine* seeking rulings on evidence and the burden of proof in advance of trial.  For the following reasons, both motions are granted in part and denied in part.

---

   [1]  This Opinion assumes familiarity with the background and applicable law of this case, as stated in prior opinions.  *See Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase Bank, N.A.*, 269 F.R.D. 340, 355 (S.D.N.Y. 2010) (class certification); *Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase Bank, N.A.*, — F. Supp. 2d —, No. 09 Civ. 686, 2011 WL 3477219 (S.D.N.Y. Aug. 5, 2011) (summary judgment); *Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase Bank, N.A.*, No. 09 Civ. 686, 2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011) (*Daubert* rulings).

## II.    LEGAL STANDARD

The purpose of a motion *in limine* is to allow a court to rule on the admissibility of potential evidence in advance of trial.[2]  A court will exclude evidence on a motion *in limine* only if the evidence is "clearly inadmissible on all potential grounds."[3]  However, a court "considering a motion *in limine* may reserve judgment until trial, so that the motion is placed in the appropriate factual context."[4]

## III.    APPLICABLE LAW

Rule 401 of the Federal Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Rule 402 states that "[i]rrelevant evidence is not admissible."  Rule 403 states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

---

[2]    *See Luce v. United States*, 469 U.S. 38, 40 n.2 (1984).

[3]    *United States v. Ozsusamlar*, 428 F. Supp. 2d 337, 340 (S.D.N.Y. 2002).

[4]    *In re Methyl Tertiary Butyl Ether("MTBE") Prods. Liab. Lit.*, 643 F. Supp. 2d 471, 476 (S.D.N.Y. 2009) (citation and quotation marks omitted).

## IV.   DISCUSSION

### A.   JPMC Bank's Motion *in Limine*

Initially, I note that JPMorgan Chase Bank's ("JPMC Bank") opening memorandum raised two issues that are now moot.  *First*, JPMC Bank sought to exclude "hearsay marketing documents" produced by Interactive Data Pricing and Reference Data, Inc., a securities pricing service.  The parties have reached a consensual resolution of this issue.[5]  *Second*, JPMC Bank also sought to exclude "patently prejudicial and irrelevant evidence and assertions by counsel and experts."[6]  This issue is moot as plaintiffs have represented that they have no intention to "invite the jury to return a verdict 'based on generalized views about Wall Street, banks or the financial crisis.'"[7]  Two issues remain to be resolved on JPMC Bank's motion.

### 1.   Lawsuits Against Other Securities Lending Agents

Plaintiffs contend that they will not introduce evidence about similar

---

[5]   *See* Plaintiffs' Memorandum of Law in Opposition to JPMorgan's Motion *In Limine* ("Pl. Opp. Mem.") at 3 ("The parties have agreed to stipulate to the authenticity and admissibility of certain IDC pricing documents and plaintiffs have agreed to withdraw the remainder.").

[6]   JPMC Bank's Memorandum of Law in Support of Its Motion *in Limine* to Exclude Irrelevant, Prejudicial, and Hearsay Matters from Trial ("Def. Mem.") at 15.

[7]   Pl. Opp. Mem. at 2 (quoting Def. Mem. at 15).

lawsuits *if* JPMC Bank is precluded from introducing evidence about third-parties'

decisions to purchase or hold Sigma notes.[8]  However, plaintiffs argue that if

JPMC Bank introduces evidence about how third-parties acted, plaintiffs should be

able to introduce evidence that such third-parties are also facing lawsuits.

　　　　　Plaintiffs' opposition brief does not cite a single case for the

proposition that mere *allegations* of misconduct are probative.  Indeed, courts

generally exclude evidence of other related lawsuits.[9]  As I stated at the January 10,

2012 conference, "I see little probative value in allegations only."[10]  Accordingly,

evidence of the existence of similar lawsuits is excluded from this trial.

### 2.　　　Evidence About JPMC Bank's Repo Financing of Sigma

　　　　　Plaintiffs seek to introduce evidence on the contractual terms and

protections that JPMC Bank negotiated while providing repo financing to Sigma.

Plaintiffs note that a fiduciary owes "a duty to the beneficiary in administering the

---

[8]　　　*See infra* Part IV.B.3.

[9]　　　*See Figueroa v. Boston Scientific Corp.*, No. 00 Civ. 7922, 2003 WL
21488012, at *4 (S.D.N.Y. June 27, 2003) ("The probative value of the fact that
approximately 720 plaintiffs have brought suit is substantially outweighed by the
danger of unfair prejudice, confusion of the issues, and considerations of undue
delay and waste of time."); *Foster v. Berwind Corp.*, No. 90 Civ. 0857, 1991 WL
83090, at *1 (E.D. Pa. May 14, 1991) (excluding evidence of other lawsuits
because "the complaints in these other actions are just that: allegations" and "are
dispositive of nothing and would confuse the complex issues already present").

[10]　　　1/10/12 Tr. at 18:1-2.

5

trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with *his own property*."[11]  Accordingly, plaintiffs contend that how JPMC Bank dealt with Sigma when its own money was on the line is highly relevant.

Plaintiffs do not seek to introduce evidence of non-public information JPMC Bank received in connection with the repo financing.  Specifically, plaintiffs do not intend to introduce evidence concerning (1) the reasons JPMC Bank extended repo financing to Sigma; (2) JPMC Bank's non-public analysis of specific Sigma assets; and (3) the reasons for JPMC Bank's decision to declare Sigma in default.  Rather, they seek to introduce evidence focusing on measures JPMC Bank took to protect its own funds in light of public risks and compare that with the steps JPMC Bank took (or failed to take) as fiduciaries charged with protecting the class's assets.  In particular, JPMC Bank demanded and received stringent contractual and financial protections in extending repo financing to Sigma.  Plaintiffs also seek to introduce evidence that JPMC Bank declared Sigma in default.

I agree that there is some probative value in comparing JPMC Bank's conduct when its own money was at risk with JPMC Bank's conduct when

---

[11]      Restatement (Second) of Trusts § 174 (1959) (emphasis added).

investing funds held in a fiduciary capacity.  However, the analogy between how

JPMC Bank acted as an investment advisor and as a repo financier is so tenuous

that the probative value of the terms of JPMC Bank's repo financing agreement

with Sigma is outweighed by risks of prejudice and confusion.  The prudent man

standard involves weighing JPMC Bank's conduct against the "care and

management . . . prudent [people] . . . employ in their *own like affairs*."[12]  JPMC

Bank's conduct in providing repo financing to Sigma is so different from its

investment in a debt security that the confusion to the jury would outweigh any

minimal probative value in admitting the evidence.

A repo financier and an investor in a debt security have a

fundamentally different relationship with Sigma.  A repo financier negotiates the

terms of the financing individually with a counterparty.  The relationship is

maintained with continuous discussions about margin and posting of securities.

Most importantly, repo agreements are negotiated and maintained by personnel

with access to confidential information.  Despite the claims of plaintiffs, allowing

the terms of the repo financing to be admitted into evidence would inevitably bring

into question the confidential information to which JPMC Securities Lending

lacked access.  The terms and protections that the private side of JPMC Bank

---

[12]     *LNC Invs., Inc. v. First Fidelity Bank*, No. 92 Civ. 7584, 1997 WL
528283, at *17 (S.D.N.Y. Aug. 27, 1997).

negotiated in connection with its repo financing were based on that confidential information.  On the other hand, Sigma issued large quantities of debt securities on a regular basis with fixed terms.  Plaintiffs have presented no evidence that Securities Lending could have negotiated protections when purchasing debt securities.  Although plaintiffs are welcome to make the argument that JPMC Bank should have tried to negotiate more protections from Sigma when purchasing the medium-term notes ("MTNs"), it would be misleading to draw a comparison with how JPMC Bank acted as a repo financier, where extensive conditions and protections are customarily negotiated with access to confidential information.

While it is true that Securities Lending could have obtained *some* confidential information concerning Sigma's individual assets if it negotiated a ratio trade, plaintiffs need not introduce evidence of the terms of the repo agreement to make the argument that Securities Lending should have pursued ratio trades more aggressively.  In a ratio trade, the note holder would redeem the note in exchange for buying some specific assets of Sigma.  Plaintiffs have argued extensively that this alternative was preferable to holding the Sigma MTNs.  JPMC Bank disagrees.  Regardless, the issue of the prudence of ratio trades can be fully argued without a misleading comparison to the terms of JPMC Bank's repo financing.

Finally, JPMC Bank's identity as the repo financier of Sigma, as well as the fact that it issued a notice of default, are irrelevant to the claims at issue here. JPMC Bank declared Sigma in default in its capacity as a repo financier because Sigma failed to meet a margin call. Securities Lending, in contrast, had no right to make margin calls or declare a default before Sigma entered receivership. To admit this evidence would invite the jury to return a verdict based on the conduct of JPMC Bank's private side, a claim which I dismissed in the summary judgment opinion.[13]

Likewise, JPMC Bank's identity as Sigma's primary repo financier is irrelevant. At the time of the investments in Sigma, this information was confidential. Securities Lending was only aware of rumors in the marketplace. While plaintiffs may state that JPMC Bank was involved in repo financing – like every other large bank – the fact that JPMC Bank was Sigma's largest repo financier is irrelevant – claims concerning JPMC Bank's conduct as a repo financier have been dismissed from this case. Plaintiffs may also prove that Sigma obtained repo financing. Indeed, plaintiffs' arguments on the claims at issue hinge on the fact that plaintiffs believe Sigma had too much repo financing. The source of such financing is not material. Accordingly, the terms of JPMC Bank's repo

---

[13]     *AFTRA Ret. Fund*, 2011 WL 3477219.

financing agreement with Sigma, JPMC Bank's identity as Sigma's primary repo financier, and the fact that JPMC Bank declared Sigma in default are not admissible at trial.  Of course, the fact of the default is admissible.

### B.    Plaintiff's Motion *in Limine*

#### 1.    Judith Polzer

At the January 10, 2012 conference I denied plaintiffs' motion *in limine* to the extent it sought to exclude Judith Polzer from testifying.[14]

#### 2.    Evidence Concerning Individual Account Holders

JPMC Bank seeks to introduce evidence that certain individual account holders did not object to holding the Sigma notes.  Plaintiffs point to language from the class certification opinion to argue that this evidence is not relevant.  Specifically, the class certification opinion stated that "[f]or purposes of determining liability, it is JPMC's conduct – rather than that of individual class members – that is the key issue" and "[t]he direct account holders' ability to direct JPMC to sell the Sigma MTNs does not detract from the overarching question of whether JPMAM's recommendation to hold the notes was prudent."[15]  Moreover,

---

[14]    *See* 1/10/12 Tr. at 3:13-15 ("Depose her [Polzer].  I am not going to preclude her.  That is what the pilot project says.").

[15]    *AFTRA Ret. Fund*, 269 F.R.D. at 352-53.

according to plaintiffs, individual account holders were not privy to Lisa Shin's increasing level of concern with Sigma. In sum, plaintiffs believe this evidence seeks to draw the jury away from the real issue – JPMC Bank's conduct.

While plaintiffs are correct that JPMC Bank may not use evidence concerning the individual account holders' investment decisions to abrogate its role as a fiduciary, the evidence of communications between JPMC Bank and individual account holders is admissible here.  Plaintiffs' concerns are best addressed in the jury charge explaining JPMC Bank's obligations as a fiduciary, regardless of the views of the investors.

With regards to prudence, JPMC Bank, in deciding whether to hold the Sigma notes, considered the conduct of other sophisticated investors, such as the account holders.  When fact witnesses are asked the factors they considered in assessing Sigma, they must be able to give a full and complete answer.  Such an answer will likely include statements that they considered the analysis and recommendations from individual account holders, which were largely sophisticated investors.  Moreover, to the extent that plaintiffs contend JPMC Bank failed to disclose Sigma's risks, JPMC Bank's communications with account holders are admissible to rebut such contentions.  Plaintiffs' concern that the communications from the account holders were based on inadequate information

about Sigma goes to the weight of the evidence and is best addressed through vigorous cross examination.   The internal communications of account holders, which JPMC Bank never saw, are irrelevant because these communications were not part of JPMC Bank's analysis of Sigma.  However, such communications may be admissible with respect to causation and damages and will have to be assessed individually for that purpose.

To the extent that plaintiffs' losses resulted from account holders' independent decision to hold the notes based on their own analysis and despite JPMC Bank's advice, plaintiffs' claims fail.  The issue of whether plaintiffs would have purchased and continued to hold the Sigma MTNs – even if JPMC Bank had scrupulously complied with its fiduciary duties – is one for the finder of fact. While plaintiffs may present evidence showing that JPMC Bank's breach of fiduciary duty caused the class's loss as a whole, they cannot prevent JPMC Bank from presenting evidence with respect to individual accounts to rebut plaintiffs' showing of causation and damages.

### 3.   Evidence Concerning Third-Party Investments in Different Sigma Notes

Plaintiffs also seek to exclude evidence relating to other investors who

purchased securities issued by Sigma during the same time period.[16]  Plaintiffs

have three primary arguments.  *First*, third-party investors were acting for different

clients with different investing goals.  Accordingly, their investment decisions

have no bearing on whether JPMC Bank breached its duty under this specific set of

facts.  *Second*, the third-party investors invested in different securities – JPMC

Bank purchased the entire issue of the June 2009 Sigma medium-term notes

("MTNs").  *Third*, there is no evidence that the third-parties acted prudently in

purchasing Sigma securities – there is no evidence about their due diligence

efforts, what information was available to them, and their respective risk tolerance.

JPMC Bank argues in response that evidence showing other sophisticated,

conservative institutional investors invested in Sigma securities is relevant to

prudence because conformity with an accepted practice can establish due care.

I find plaintiffs' first two arguments unconvincing.  Plaintiffs' first

argument, that these funds were operating with different goals, is undermined by

---

[16]    The class certified in this action consists of "[a]ll plans and entities for which [JPMC Bank], pursuant to a securities lending agreement, invested cash collateral, either directly or through a collective investment vehicle, in one or more debt securities of Sigma Finance, Inc. and continued to hold those debt securities as of the close of business on September 30, 2008."  *AFTRA Ret. Fund*, 269 F.R.D. at 341.  Specifically, the class is limited to "only those investors who held Sigma Medium-Term Notes that were purchased in June 2007 and had a maturity date of June 2009."  *Id.*  The discussion in this section applies to investments in Sigma by non-class members.

the fact that these third-party funds had investment guidelines substantially similar to the investment guidelines here.  Plaintiffs' second argument, that the third-party funds invested in Sigma securities with different maturity dates, is off-point because none of plaintiffs' evidence concerning JPMC Bank's lack of prudence distinguish the June 2009 MTNs as being meaningfully different from the other Sigma MTNs.  Plaintiffs argue that JPMC Bank should not have invested in Sigma because it was (1) an SIV, (2) not transparent, (3) formed under foreign law, and (4) financed excessively through repo financing.  All of these arguments apply equally to all Sigma securities, not just the June 2009 MTNs.  Any difference among the Sigma notes goes to the weight of this evidence, not its admissibility.

However, I am persuaded by plaintiffs' argument that there is no evidence concerning the third-parties' due diligence efforts, respective risk tolerances, and the information available to them.  The confusion and wasted time resulting from requiring a mini-trial on the prudence of every non-party investor in Sigma would substantially outweigh any probative value this evidence has.[17] Therefore, plaintiffs' motion *in limine* is granted to the extent that JPMC Bank may not admit evidence of investments in Sigma by other, unrelated investors.

---

[17]     *See* 1/10/12 Tr. at 21:20-24 ("I am not keen on allowing any proof of what BNY Mellon did because I think it's a trial within a trial, we have a mini trial, we have . . . to try the BNY Mellon case, which thankfully is in Oklahoma and not in my court.  So, let that judge live with that case.").

This ruling does not mean, however, that fact witnesses may not state that one factor they considered in investing in Sigma was that other large, sophisticated, conservative investors were investing in Sigma.  Likewise, JPMC Bank's expert witnesses may testify that a prudent investment manager would look at the behavior of other such investors in the marketplace, and the fact that they were investing in Sigma is relevant to JPMC Bank's prudence.[18]  However, witnesses may not name specific institutions that invested in Sigma.[19]  I note that this ruling applies equally to evidence plaintiffs plan to present on ratio trades – plaintiffs may present evidence concerning the existence and amount of such ratio trades, but they may not name the specific institutions engaged in the ratio trades with Sigma.

Any remaining concerns that plaintiffs have may be addressed on

---

[18]   *See id.* at 27:3-9 ("I certainly can have the expert say one of the things I look at, looking in hindsight as to whether things were done correctly, is to see what the larger community was doing.  There were many other banks investing in SIVs, or lending in SIVs, or whatever they want[] to say, or putting their investors into SIVs.  I mean that's certainly OK.") *id.* at 28:5-9 ("So, if they just want to give the generalities, I researched this and I found that, you know, banks were doing it, ten banks, major banks were doing the same thing, that's sort of a generality, but it makes the point that they looked at that as a factor.").

[19]   *See id.* at 27:17-23 ("They don't need to name them.  It could be banks A, B, C and D.  But if you start putting the names of the four biggest banks, it lends it a certain gravitas that may not be fair given that there are lawsuits pending, given that there is discovery that may have shown that they did or didn't do certain things, or they knew or didn't know certain things.").

cross-examination, where they can ask JPMC Bank's witnesses their knowledge of the due diligence employed by these other investors.  Indeed, plaintiffs' counsel indicated at the January 10, 2012 conference that they have no objection to JPMC Bank introducing testimony that other large, sophisticated conservative investors were investing in Sigma securities and JPMC considered that factor in deciding whether to purchase and hold the Sigma MTNs.[20]

### 4.    Burden of Proof on Causation

Plaintiffs seek an *in limine* ruling on the causation element of their claim.  Courts may entertain *in limine* motions to make pre-trial rulings allocating burdens of proof in order to avoid uncertainty at trial.[21]  Plaintiffs contend that after they have established a breach of fiduciary duty and *prima facie* case of loss, the burden shifts to JPMC Bank on the element of causation.  Plaintiffs' position is based on the principle that "once a breach of trust is established, uncertainties in

---

[20]    *See id.* at 29:13-23 ("[THE COURT]: But the expert can say that one of the factors that he or she looks back at is w[hat] is going on in the market, were other, as you put it, prudent investors going into the same security, and just leave it at that generality.  I don't think we can go further. . . . MR. LEVAN:  The only issue, your Honor, would be that you said the other prudent investors.  I think we have an objection to the adjective 'prudent,' but otherwise there would not be an issue on behalf of plaintiffs.").

[21]    *See, e.g.*, *Reale Int'l, Inc. v. Federal Republic of Nigeria*, No. 78 Civ. 23, 1984 WL 837, at *2-4 (S.D.N.Y. Sept. 11, 1984) (considering and denying "Plaintiff's motion for a ruling in limine reducing or modifying its burden of proof").

fixing damages will be resolved against the wrongdoer."[22]  Plaintiffs contend that the Second Circuit has extended this principle to shift the burden of proof on causation to defendants after plaintiffs establish a breach of fiduciary duty and a *prima facie* case of loss.  Plaintiffs rely primarily on two Second Circuit decisions – *Donovan v. Bierwirth*[23] and *New York State Council Health & Hospital Fund v. Estate of DePerno*.[24]

In *Donovan*, the fiduciaries of the Grumman Corporate Pension Plan, who were also high-ranking officials at Grumman Corporation, used Plan funds to purchase Grumman stock to fight off a tender offer.  The Grumman stock was purchased at $38 a share, an inflated price due to the pending tender offer.  After the takeover failed, the price of Grumman stock dropped to $23 per share.  Seventeen months later, the fiduciaries sold the stock for $47 per share.  The district court dismissed the complaint, holding that the Plan had suffered no loss because the stock had increased in value to $47.  The Second Circuit framed the issue on appeal as follows – "The chief issue presented for our review concerns the *applicable measure of damages*. Specifically, if securities are purchased in breach

---

[22]    *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985).

[23]    754 F.2d 1049 (2d Cir. 1985).

[24]    18 F.3d 179 (2d Cir. 1994).

of trust but are later sold at a price exceeding the purchase price, is there a 'loss' within the meaning of ERISA section 409?"[25]  The Second Circuit found that the district court's ruling that "'loss' to the Plan would be established only if the stock had been sold for less than its purchase price" was erroneous.[26]  Rather, the Second Circuit held that the proper measure of loss "applicable under ERISA section 409 requires a comparison of what the Plan actually earned on the Grumman investment with what the Plan would have earned had the funds been available for other Plan purposes."[27]  In applying this test the Second Circuit held that "[w]here several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these.  *The burden of proving that the funds would have earned less* than that amount is on the fiduciaries found to be in breach of their duty."[28]  Finally the court noted that "[t]his is nothing more than application of the principle that, once a breach of trust is established, uncertainties in fixing damages will be resolved against the wrongdoer."[29]

---

[25]   754 F.2d at 1052 (emphasis added).

[26]   *Id.* at 1053.

[27]   *Id.* at 1056.

[28]   *Id.* (emphasis added).

[29]   *Id.*

In *DePerno*, the district court found that defendants "had violated several provisions of ERISA, but that plaintiffs had failed to prove any losses due to the violations, and that they were therefore entitled to neither damages nor their attorney's fees."[30]  The Second Circuit affirmed the finding of an ERISA violation and remanded "for consideration of damages" after concluding "that after the plaintiffs sustained their burden of showing the defendants' violation of their fiduciary duty to the Fund and the payment of money as a result of that violation, the burden should have shifted to the defendants to demonstrate factors mitigating the costs incurred by the plaintiffs."[31]  The Magistrate Judge erred in "[a]sserting that the plaintiffs had the burden of proof as to *damages*,"[32] and was instructed to determine "the *damages* question with the burden of proof properly placed on the defendants."[33]

Plaintiffs overstate the significance of *Donovan* and *DePerno*.  In both cases, the Second Circuit framed the issue as one of damages.  This line of cases simply establishes that where there is uncertainty in damages, there is a

---

[30]     18 F.3d at 180.

[31]     *Id.* at 180-81.

[32]     *Id.* at 181 (emphasis added).

[33]     *Id.* at 183 (emphasis added).

19

presumption that the fund plans would have been invested in the most profitable of equally plausible investment strategies.  Defendants have the burden to prove that the damages would have, in fact, been less.

The Second Circuit directly addressed the issue of causation in a more recent case – *Silverman v. Mutual Benefit Life Insurance Company*.[34]  In *Silverman* the plaintiff alleged that a defendant's "failure to investigate . . . embezzlement and to take reasonable steps to recover missing plan funds" breached its fiduciary duty under ERISA.  The court began its analysis with the language of ERISA, emphasizing that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan *resulting from* each such breach."[35]  Accordingly, "[c]ausation of damages is . . . an element of the claim, and the plaintiff bears the burden of proving it."[36]  In fact, in *Silverman*, both Silverman and the Secretary of Labor, as *amicus curiae*, made the exact same argument plaintiffs make here, requesting "a shift of the burden of proof on the issue of causation, so that once a plaintiff has

---

[34]     138 F.3d 98 (2d Cir. 1998).

[35]     *Id.* at 104 (quoting 29 U.S.C. § 1109(a)) (emphasis in original).

[36]     *Id.* at 105 (Jacobs, C.J., joined by Meskill, J., concurring).

shown a breach of section 1105(a)(3) and a related loss, the defendant must prove that the loss was *not* caused by its breach of fiduciary duty."[37]  The Second Circuit noted that such an argument is derived "from the common law of trusts, under which a defaulting fiduciary bears the burden of disproving causation."[38]  However, "Congress has placed the burden of proving causation on the *plaintiff* by requiring him to prove that the losses 'result[ed] from' the defendant's inaction."[39]

Plaintiffs attempted distinction of *Silverman* is unavailing.  Plaintiffs contend that "the *Silverman* panel found that the plaintiff failed to make a *prima facie* showing of damages against Principal in the first instance."[40]  However, the loss of $130,000 in *Silverman* was undisputed, the question was whether defendant's breach caused this loss.  Plaintiffs rely on *Slovaara v. Eckert* to support their contention.[41]  Despite the language in *Slovaara*, the holding in

---

[37]    *Id.* at 105-06 (Jacobs, C.J., joined by Meskill, J., concurring) (quotation omitted) (emphasis in original).

[38]    *Id.* at 106 (Jacobs, C.J., joined by Meskill, J., concurring).

[39]    *Id.* (Jacobs, C.J., joined by Meskill, J., concurring) (quoting 29 U.S.C. § 1109(a)) (emphasis in original).

[40]    Plaintiffs' Memorandum of Law in Support of Their Omnibus Motion *in Limine* ("Pl. Mem.") at 15.

[41]    No. 94 Civ. 3430, 1998 WL 276186 (S.D.N.Y. May 28, 1998) ("[T]he Court finds that plaintiff must demonstrate both breach of fiduciary duty and a *prima facie* case of loss to the fund before the burden shifts to the defendant on the issue of causation of loss, and further that plaintiff's demonstration of a breach of

*Silverman* is unambiguous.  ERISA states that a fiduciary is liable for "any losses to the plan resulting from each such breach."  The Second Circuit interpreted the language "resulting from" to make causation an element of the claim, for which plaintiffs have the burden of proof.  Indeed, the Third Circuit has recognized that *Silverman* places the burden of proof for causation on plaintiffs.[42]

Because I am bound by the Second Circuit's decision in *Silverman*, which states that plaintiffs have the burden of proof on causation in ERISA actions, I must deny plaintiffs' motion *in limine* to the extent it requests a ruling that the burden of proof on causation shifts to defendants after plaintiffs have established a breach of fiduciary duty and *prima facie* case of loss for the ERISA claim.

I note that plaintiffs only cited law with respect to their ERISA claim, and they did not make any arguments with respect to the New York common law claim for breach of fiduciary duty.  Accordingly, I decline to make any decision with respect to New York state law at this time.  JPMC Bank cites cases for the

---

fiduciary duty alone is not sufficient to shift the burden to defendant to disprove loss.").

[42]     *See In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 160 n.23 (3d Cir. 1999) (recognizing that the circuits are split on whether the plaintiff or defendant bears the burden of proof on causation and noting that the Second Circuit, under *Silverman*, places the "burden of proof on plaintiff").

proposition that New York law is the same as under ERISA.[43] However, because plaintiffs did not discuss New York law, I reserve ruling on the burden of proof on that claim.

## V.    CONCLUSION

For the aforementioned reasons, JPMC Bank's motion is granted in part and denied in part, and plaintiffs' motion is granted in part and denied in part. The Clerk of the Court is directed to close these motions [Docket Nos. 124 and 127].

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      January 19, 2012
            New York, New York

---

[43]      *See In re Parmalat Secs. Litig.*, 684 F. Supp. 2d 453 (S.D.N.Y. 2010); *Northbay Constr. Co. v. Bauco Constr. Corp.*, 832 N.Y.S.2d 280 (2d Dep't 2007) (citing cases).

23

**- Appearances -**

**For Plaintiffs:**

Joseph H. Meltzer, Esq.
Peter H. LeVan, Jr., Esq.
Barroway Topaz Kessler Meltzer &
    Check, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

Milo Silberstein, Esq.
Dealy & Silberstein, LLP
225 Broadway, Suite 1405
New York, New York 10007
(212) 385-0066

Gregory M. Nespole, Esq.
Wolf Haldenstein Adler Freeman
    Herz LLP
270 Madison Avenue
New York, New York 10016
(212) 545-4761

Bradley E. Beckworth, Esq.
Brad Seidel, Esq.
Nix Patterson & Roach, LLP
205 Linda Drive
Daingerfield, Texas 75638
(903) 645-7333

David L. Wales, Esq.
Bernstein, Litowitz, Berger &
    Grossman, LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 554-1400

**For JPMC:**

Lewis Richard Clayton, Esq.
Jonathan H. Hurwitz, Esq.
Samuel E. Bonderoff, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3215